UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-80039-CR-RLR

UNITED STATES OF AMERICA

v.

SUZANNE ELLEN KAYE,
   a/k/a "muckbangXX,"
   a/k/a "suzannekaye3,"
   a/k/a "Angry Hippie Patriot,"

                      Defendant.
_____/

### GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE DEFENDANT FROM ADMITTING INTO EVIDENCE AT TRIAL OTHER ONLINE VIDEO POSTS

COMES NOW the United States of America, by and through the undersigned Assistant United States Attorney, hereby moves this Court to preclude Suzanne Ellen Kaye (hereinafter "Defendant") from admitting into evidence at trial other videos posted to her social media accounts. Defendant has provided the government with 10 such videos. None of those videos contain any information that is relevant to the charged crime. As such, those videos should be excluded as evidence at trial.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On January 16, 2021, the FBI received an online tip that Defendant had an account on Facebook that posts "anti-Biden" and "anti-Democratic" statements. The tipster further reported that Defendant claimed she was at The United States Capitol in Washington, D.C., on January 6, 2021, and that she may have additional information. The FBI conducted open-source media checks of the Facebook account which did not reveal any posts related to her activity at The Capitol on January 6, 2021.

Based on public source information, agents learned that Defendant's last known address was in Lake Worth, Florida. On January 28, 2021, two FBI agents responded to that address to interview her about any illegal activity that occurred at The Capitol on January 6, 2021. While at the residence, agents observed numerous notes on the exterior of the apartment door, which led them to believe that the apartment had likely been unoccupied for an extended time.

Later that day, agents made telephonic contact with Defendant and informed her of their interest in interviewing her about her travel to Washington, D.C. on January 6, 2021. Defendant asked if they had proof that she traveled to Washington, D.C. The agents stated that the FBI would like to interview her about her travel. Defendant denied having traveled to Washington D.C., but claimed she was aware of individuals who did travel there. She agreed to speak with the FBI and provided her current address in Boca Raton, Florida. She further indicated that she was retired and had plenty of time to talk but needed to be interviewed at her residence because she was not able to drive. The agents stated that they would stop by later that day to speak to her. Unfortunately, they were not able to do so. The agents called her thereafter and apologized for not being able to come to her house as planned. They told her that they would call her again to let her know when they would be able to return.

On February 8, 2021, the FBI received another online tip from an individual who provided a link to a video posted to Defendant's known Facebook page. The tipster claimed in the online tip that the video was a threat to shoot the FBI.

On February 9, 2021, the FBI reviewed Defendant's Facebook page titled "ANGRY Patriot Hippie" which was uploaded on January 31, 2021. The video was captioned, "Fuck the FBI!!" In this 50 second video, Defendant is sitting at a table inside an unknown residence. After taking a drink from an almost empty bottle of Whiskey, she announced to her audience that the FBI

contacted her because they wanted to talk to her about her visit to The Capitol on January 6, 2021. She stated that she told them that they could not come talk to her unless she has counsel, and since she cannot afford counsel, they will have to arrest her so she can get counsel appointed to her. She then accused the FBI of spending four years "persecuting a three-star general based on no evidence, you think I am going to let you come fucking talk to me? You're out of your mother fucking mind, Bro." Defendant then told her audience that she will "exercise my second amendment right to shoot your fucking ass if you come here." The FBI reviewed Defendant's known Instagram and Tik Tok accounts and determined that she uploaded the same video to both social media platforms on January 31, 2021.

On March 23, 2021, a grand jury sitting in the southern District of Florida entered an indictment charging Defendant with making an interstate communication that contained a threat to injure the person of another, in violation of Title 18, United States Code, Section 875(c). Trial is scheduled for the two-week trial period beginning on February 28, 2022.

## **DEFENDANT'S OTHER ONLINE VIDEO POSTS**

Defendant has provided the government with 10 videos that she plans to admit as evidence at trial (*See* Attachments A-J).[1] She posted those videos to her social media accounts from December 9, 2020, to February 8, 2021. Each of the 10 videos are less than one minute long. These videos depict Defendant and others making both political and non-political statements. Some of the non-political content contained mundane material, like the defendant eating lunch. None of the videos contain any information that is relevant to the charged crime. As such, the videos should be precluded from admission at trial. The following is a summary of the videos:

---

[1] The videos will be submitted to the Clerk of the Court in a separate filing.

1. *Angry Patriot Voter Poll*, December 9, 2020[2] – In this 58-second video, Defendant appears to be sitting at home. In the beginning of the video, she states that she does not understand the problem with the election.[3] She claims that she has been trained as a poll worker whereupon she displays a document entitled, "Poll Worker Training & Procedure Manual." She states that she has been taught that if a person's signature does not match his/her identification, then he/she cannot vote. She asks, "How come all of these signatures on mail-in ballots were not verified?" She then recounts a story about her sister who lives in Seattle whose husband voted and subsequently received a phone call about his signature not matching his ballot. Defendant then asks, "Of all those people who voted, how many received a phone call? I don't think any." She ends the video by stating that "if procedures were followed, we wouldn't be having this problem." *See* Attachment A.

2. *"Wake & Bake,"* December 13, 2020 – In this 25-second video, Defendant appears to be sitting at an outdoor table holding a marijuana pipe shaped like a coffee mug. The pipe contains an emblem of a marijuana leaf. She said, "Oh, good morning, just having my breakfast. If you know what this is (Defendant points to the marijuana leaf emblem on mug), and this is (Defendant points to unidentified emblem on mug below the marijuana leaf), and this is (Defendant picks up a pen-like object from the table), we should be friends. Enjoy your coffee." *See* Attachment B.

---

[2] The information contained in italics for each of the summaries of these videos is the title of the video file attached hereto as an exhibit. The date corresponds to the date displayed under Defendant's social media account name in the comments section of the post.
[3] The defendant is referring presumably to the 2020 Presidential Election.

3. *"Still Alive at 55,"* December 13, 2020 – In this 20-second video, Defendant is wearing a solid black tee shirt standing inside a home. She says, "To all my Tik Tok friends over 55, we're still here, we're not dead. I want you to put your age and your state in the comments and let me know if you're still alive over 55." *See* Attachment C.

4. *"Wake the F-Up,* December 29, 2020 – In this one-minute video, a white male is walking outside. He talks about an explosion that occurred in Nashville that destroyed an AT&T tower and a 911 response communication system. He alleges that, at the same time, other explosions occurred in Canada and Rochester, New York. The man describes the targets of these explosions as "a ballot place … a calculating place … [and] a 911 response [facility]." He asserts that "as we speak, [there is] another bomb on Route 231 coming out of Lebanon, Tennessee. The FBI is on scene." He ends the vide by stating, "we've got to see how this plays out." In the comments section next to this video, Defendant posts to her social media account named Angry Patriot Hippie, "Wake the F- Up!!!!"[4] *See* Attachment D.

5. *Yes, He's Still Your* President, December 30, 2020 – In this 52-second video, a white male displays a montage music video of former President Donald J. Trump to the music of Bruno Mars' song, *Uptown Funk*." The lyrics to the song are changed to reflect support and admiration for former President Trump. In the comments section, Defendant posts, "Yes, He's still your President." *See* Attachment E.

6. *"Shit's About to Get Real. Never Give Up,"* January 7, 2021 – In this 38-second video, Defendant appears to be standing inside her home. She states, "Hey Tik Tok family, I want to run something by you. On the same day Joe Biden was certified as President,

---

[4] This comment contained the full expletive.

I got in my mailbox and I received a package from China, an unsolicited package from 'Jua-Jay' (phonetic), China. Can you see it, 'Jua-Jay (phonetic), China?" Defendant then holds up a large white mailing envelop and states, "What was in the package, my friends, my fellow patriots? This white flag of surrender." She is seen holding up a large white object. She concludes by stating, "Do you see this? They are telling me we've lost and I should surrender. What do you all think about that?" *See* Attachment F.

7. "F- the Elites," January 31, 2021 – In this 29-second video, a Caucasian male appears in the foreground of the screen with a copy of a letter from Arizona Congressman Paul Gosar to Acting Attorney General Monty Wilkinson in the background. The Caucasian male states, "ok, so if you are seeing this (man steps aside to show content of entire letter in background), take a screenshot right now. Save that to your phone. Whatever you've got to do. Pause the video. Watch this s-(expletive). It is epic! Citadel just got busted and cracked down by the U.S. department and they are investigating all what happened yesterday and the f-(expletive) stock market. I'm feeling so great right now. They deserve it. F-(expletive) the elites! F-(expletive) the elites!"[5] In the comments section, Defendant posts, "F- THE ELITES!!!!!"[6] *See* Attachment G.

8. Honor & Respect Need a Good Cry, January 31, 2021 – This 52-second video contains a split screen music montage to the song *Mr. Red, White, and Blue* by Coffee Anderson. On the left of the split screen, the video depicts a Caucasian male shaving. The left side video then switches to someone pouring two shots of alcohol. The left side video ends with a military man standing in uniform. The right-side video displays

---

[5] The video contained the actual expletives.
[6] The post in the comments contain the full expletive.

simultaneously with the left shows an adult female crying with words under her facial image. The words indicate that the girl's grandfather who served 23 years in the Air Force died last night. Additional text is displayed but is large illegible due to blurriness. *See* Attachment H.

9. *My Korean Lunch*, February 6, 2021 - In this 7-second video, a bowl of food containing two eggs cooked sunny side up is displayed. Next to the bowl are two jars of unknown food, lettuce, and a box of Yaki Nori Roasted Seaweed. In the comments section, the defendant posts the following message: "MY KOREAN LUNCH. Come join me!" *See* Attachment I.

10. *Three Cups of Ghost Pepper Noodles,* February 8, 2021 – In this 42-second video, the defendant appears sitting at home eating noodles with a wood spoon. During the entire video, she states the following: "Oh my [unintelligible]. Can you see me? (Defendant blows her nose in a blue hand towel). Ah. Wow! This f-(expletive) s-(expletive) is hot. Wow! (Defendant eats another spoonful) … One more bite. Oh s-(expletive)."[7] *See* Attachment J.

## ARGUMENT

The Government anticipates that Defendant will seek to admit all 10 videos at trial as evidence of her lack of criminal intent. These videos are not relevant to disprove her criminal intent at the time she threatened to kill FBI agents. Moreover, some of the videos contain strong political content that is also not relevant to this case. Their admission into evidence poses a substantial danger of confusing the issues or misleading the jury. As such, these videos should be excluded from trial.

---

[7] The video contains the full expletives.

Rule 401 of the Federal Rules of Evidence provide that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401; *United States v. Elliot*, 62 F.3d 1304 (11th Cir. 1995). The evidence must be probative of the proposition it is offered to prove, and the proposition must be one that is of consequence to the determination of the action. *United States v. Troya*, 733 F.3d 1125, 1131 (11th Cir. 2013). Even if relevant, the court may exclude the evidence if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Generally, evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait. Fed. R. Evid. 404(a). Evidence of any other crime, wrong, or act is not admissible to prove a person's character to show that on a particular occasion the person acted in accordance with the character. Fed. R. Evid. 404(b)(1). However, such evidence may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Fed. R. Evid. 404(b)(2).

**1. Evidence of Defendant's Other Online Videos Are Not Relevant to the Charged Crime.**

Defendant is charged with making an interstate threat to injure another person. "The Defendant can be found guilty of this crime only if the following facts are proved beyond a reasonable doubt: (1) the Defendant knowingly sent a message in interstate commerce containing a true threat to injure the person of another; and (2) the Defendant sent the message with the intent to communicate a true threat or with the knowledge that it would be viewed as a true threat." *Eleventh Circuit Pattern Jury Instructions Criminal*, Offense Instruction O30.3 (2016 Edition);

*See Elonis v. United States*, 575 U.S. 723 (2015) "[T]he mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat"); *United States v. Dierks*, 978 F.3d 585, 591-92 (8th Cir. 2020); *United States v. Howard*, 947 F.3d 936, 946 (6th Cir. 2020); *United States v. Khan*, 937 F.3d 1042, 1051 (7th Cir. 2019); *United States v. Stevens*, 881 F.3d 1249, 1253 (10th Cir. 2018).

A "true threat" is a serious threat – not idle talk, a careless remark, or something said jokingly – that is made under circumstances that would lead a reasonable person to believe that the Defendant intended to injure another person. *See Eleventh Circuit Pattern Jury Instruction*, Offense Instruction O30.3 (2016 Edition). A true threat has been defined as a statement "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 360 (2003). The government does not have to prove that the Defendant intended to carry out the threat. *Eleventh Circuit Pattern Jury Instruction*, Offense Instruction #30.3 (2016 Edition).

In determining whether a statement constitutes a threat, courts look to context. *United States v. Alaboud*, 347 F.3d 1293, 1296 (11th Cir. 2003) ("A communication is a threat when in its context [it] would have a reasonable tendency to create apprehension that its originator will act according to its tenor.") (citations committed); *United States v. Jordan,* 591 F. Supp. 2d 686, 706-07 (S.D.N.Y. 2008). The number of calls, the caller's tone, and the victim's reaction are factors that a jury could consider. *Alaboud*, 347 F.3d at 1297.

A "direct statement of personal intent is not necessary for" a court "to find that a communication conveys a threat of injury ...." *United States v. Dillard*, 795 F.3d 1191, 1200 (10th Cir. 2015). In assessing whether a reasonable person would consider a message to be a threat,

courts must take into consideration connotations that add an additional layer of meaning to a message. *United States v. Turner*, 720 F.3d 411, 422 (2d Cir. 2013); *United States v. Shoulberg*, 895 F.2d 882, 886 (2d Cir. 1990) (upholding a threat conviction against a First Amendment challenge due to an implied use of violence and overtones of an imminent threat).

Courts also consider the reaction of the recipient when assessing whether a communication entails a true threat. *See Watts v. United States*, 394 U.S. 705, 708 (1969) (noting that the Court considered the "reaction of the listeners" in its analysis). When the government is a recipient of the alleged threat, although not dispositive, a court may consider the rapidity with which the government responds to a threat. *United States v. Hoffman*, 806 F.2d 703, 712 (7th Cir. 1986) (noting that the immediate response of the government was "clear evidence" of the government's perception of the seriousness of the defendant's expressed intent to carry out his threat).

Thus, in *United States v. Baker*, 2021 WL 318311 (N.D. Fl., January 25, 2021), the District Court in the Northern District of Florida observed that the comingling of threats with political speech does not shield a defendant from culpability under the statute criminalizing interstate communications of a threat. *Id.* at 6.  Under the First Amendment, amalgamating true threats with political commentary does not immunize the former. *Id.*

In *Baker*, the defendant made numerous online statements relative to a political event he created on Facebook on January 12, 2021, entitled "Defend Tallahassee."  In the details section of the post, the defendant allegedly wrote that "we will circle the state Capitol and let them fight the cops and take the building.  Then we will encircle them and trap them inside. We will drive them out of Tallahassee with every caliber …" *Id.* at 2.

On January 14, 2021, in a comment to an article posted on the internet, the defendant posted a "CALL TO ARMS JANUARY 20TH!" At the top of the posting was an image of what appeared to be an AK-47 assault rifle. The rest of the defendant's message stated:

> Armed racists have planted the confederate flag in America's Capitol as they openly declared that they WILL CONTINUE to wage an ARMED COUP at every American Capitol, including Tallahassee, on Inauguration Day.
>
> We need ALL FLORIDA RESIDENTS to RISE UP! Here in Florida we must encircle terrorists who attack the Capitol! Let them take the capitol and fight with cops, SURROUND THEM AND TRAP THEM INSIDE!
>
> Tally residents have answered the call to arms, including combat veterans. Join us! Help protect your community from terrorists. We WILL protect capitol RESIDENTS and CIVILIANS from armed racist mobs WITH EVERY CALIBER AVAILABLE.
>
> This is an armed COUP and can only be stopped by an armed community!

*Id.* at 3.

Although the threats were made in the context of political discourse, the District Court recognized that a reasonable person would understand that the defendant's communications were true threats. The defendant spoke about the use of force to commit acts of violence, kidnapping, and attempted kidnapping ("[W]e will encircle them and trap them inside"). He spoke about the use of a firearm ("We will drive them out of Tallahassee with every caliber available"). He also threatened the use of an angry mob intent on "driving" "the enemy" from an area. The court held that a reasonable person could understand these statements, and many others like them used by the defendant in the context of his political rhetoric, to be serious expressions of an intent to commit acts of unlawful violence. *Id.* at 4-6.

The *Baker* Court also recognized that the FBI perceived the defendant's messages to constitute a real threat of violence. The FBI sought a warrant to arrest the Defendant the same day that he transmitted his January 14th communication and a mere two days after his January 12th

communication. Although the government's understanding of a message cannot be a court's sole basis for concluding that a message constitutes a threat—that would be an abdication of the court's duty to determine probable cause independent of the executive branch—it is one relevant factor in the probable cause analysis. *Id.* at 5.

Additionally, the *Baker* Court observed, "[t]o the extent that the Defendant argues that the political nature of his speech insulates his threats from prosecution, even when a threat accompanies pure political speech, this comingling of threats with political speech 'does not shield a defendant from culpability.'" *Id.* at 6, citing *United States v. Viefhaus*, 168 F.3d 392, 396 (10th Cir. 1999); *United States v. Callahan*, 702 F.2d 964, 966 (11th Cir. 1983). "Although there are political overtones to Defendant's messages, he explicitly included true threats within his diatribe. That is sufficient to bring the Defendant's messages within the zone of threatening that Congress lawfully may prohibit and punish." *Id.*

Finally, the *Baker* Court rejected the defendant's claim that he did not intend to commit violent acts and he did not have the means to do so. A statement can be a threat even if he lacked the means to make his threat a reality and even if the speaker did "not actually intend to carry out the threat," so long as he at least knew that others likely would perceive his communication as a threat. *Black*, 538 U.S. at 359-60; *United States v. Dutcher*, 851 F.3d 757, 761 (7th Cir. 2017) ("A true threat does not require that the speaker intend to carry it out, or even that she have the capacity to do so.").

Similar to *Baker*, the District Court in the Northern District of Iowa also held that a defendant's tweets threatening a US Senator were "true threats" and not political hyperbole. *Dierks*, 978 F.3d at 589. It explained that "political context alone does not excuse a threat." *Id.* (citations omitted). True threats, statements that a reasonable recipient would have interpreted as

12

serious expression of intent to harm or cause injury to another, are not political speech protected by the First Amendment. *Id.* at 590.

Like *Baker* and *Dierks*, the Defendant in the instant case made a real threat to shoot the FBI if they came to her home to interview her. Defendant announced to her social media audience that the FBI had contacted her moments earlier about wanting to talk to her. She stated in the video clearly and unequivocally that she did not want to talk to them. She accused the United States Government of persecuting a four-star general, presumably a reference to former President Trump's national security advisor, Michael Flynn. She then declared angrily that if the FBI came to her home, she would exercise her Second Amendment rights and shoot them. Her threat was clear, direct, and specific. It identified her intended victim and the time and place that she would carry out her threat. Under these circumstances, a reasonable person would likely perceive her commitment to shoot the FBI if they come to her home again as a real threat.

Moreover, the FBI perceived the video as a real threat. One week before the FBI first viewed the video, two FBI agents in Broward County, Florida were shot and killed in Sunrise, Florida when responding to a residence to execute a search warrant. With the memory of those slain agents fresh in the Bureau's mind, agents in the instant case acted swiftly to dispel the threat. They withdrew their plan to return to her residence to interview her. Instead, they obtained a criminal complaint and arrest warrant six days after first seeing the video.

Defendant may argue that her other online video posts are relevant to prove that she did not intend to threaten the FBI or make any statement that she knew would be viewed as a threat. She may argue that had the FBI conducted a cursory review of her other online posts, they would have known that her post about the FBI was not a true threat.

These arguments are meritless. First and foremost, Defendant does not mention the FBI in any of the other posts or having been contacted by any federal agency for any reason. Thus, none of the other videos offer any contexts to the threat video.

Moreover, while a defendant is permitted to use Rule 404(b) evidence, lack of intent is not an enumerated basis under the rule. *See*, *by contrast*, *United States v. Cohen*, 888 F.2d 770 (11th Cir. 1989) (defendant was permitted to introduce a prosecution witness's prior criminal acts and misconduct to show a motive for the witness to lie and to show that he had the capacity to commit a crime without the aid of the defendants, whom he testified were his confederates in the offense). A defendant's ability to conform with the law on one occasion is not relevant to prove whether he or she conformed with the law on another occasion. Such propensity evidence is clearly inappropriate. *See* Fed. R. Evid. R. 404(a). The fact that Defendant had not made any other online threat in no way proves that she did not make a real threat on the occasion in question. Stated differently, her other online posts and her online threat are not mutually exclusive. Both can exist at the same time. As soon as the Defendant was contacted by the FBI, she elevated her otherwise passionate political speech to making a real threat against the FBI. The former is legal. The latter is a crime. As the court in *Baker*, *supra*, recognized, the existence of political speech does not shield the defendant from criminal culpability for making a true threat.

Thus, Defendant's other online videos contains no probative information to the charged offense. In fact, some of the videos pre-date the charged offense by several weeks. For example, in *Angry Patriot Voter Poll* posted 53 days earlier, Defendant questioned the legitimacy of mail-in ballots. *See* Exhibit A. In "*S-(expletive) About to Get Real. Never Give Up* posted 24 days earlier, Defendant claimed that she received a white flag of surrender from China on the same day President Joe Biden was certified as President of the United States. *See* Exhibit F. Both videos

14

offer no evidence of her intent on the day of the charged crime. The fact that she questioned the legitimacy of mail-in ballots and believes China asked her to surrender upon the election of President Biden in no way makes her threat to the FBI less likely to have occurred.

Similarly, for those videos posted on the day of the offense, they too offer no evidence of Defendant's criminal intent. In *F-(expletive) the Elites*, Defendant re-posted a video produced by someone else who railed against "the Elites." See Exhibit G. In *Honor and Respect Need a Good Cry*, Defendant re-posted a music montage that purports to show honor and respect for service members in the military. See Exhibit H. These videos also do not provide any context to Defendant's real threat to the FBI. The fact that dislikes people who she perceived as elites and supports our military in no way makes her threat less true.

Her non-political posts made before and after her threat to the FBI are also not probative of her intent at the time of the charged offense. In *Wake & Bake*, Defendant appears in the video to be smoking marijuana 49 days before the alleged threat. See Exhibit B. She tells her audience that if they know what a marijuana leaf is, then they should be friends. Later that same day, in *Still Alive at 55*, Defendant asks her social media friends over the age of 55 to put their age and state of residence in the comments and let her know if they are still alive at 55. See Exhibit C. In *My Korean Lunch*, she posts a 7-second video of a bowl of food six days after the threat. See Exhibit I. In Three Cups Ghost Pepper Noodles, she posts a video of her eating noodles eight days after the threat. See Exhibit J. None of these videos offer any relevant information probative to her intent at the time of threat. As such, they should be precluded from admission at trial.

The government acknowledges that context matters. See, e.g., *United States v. Davis*, 854 F.3d 1276, 1291 (11th Cir. 2017), quoting *United States v. Taylor*, 972 F.2d 1247, 1252 (11th Cir. 1992) ("If a reasonable recipient, familiar with the context of the communication, would interpret

[defendant's statement] as a threat, the issue should go to the jury."). Here, the FBI contacted Defendant three days before her threatening video. Clearly, Defendant was angry during her post. In a profanity laced tirade, she stated that she believed that the United States Government had persecuted a four-star general. She stated that she would not speak with agents and threatened to kill them if they came to her home. At no time during the video did she ever indicate or suggest by words or gestures that her threat was not real. She never smiled, winked, or made a single hand gesture to suggest that she was kidding. Her threat was clear, unequivocal, and specific. Thus, the context of the threat demonstrates that it was a real threat.

Arguably, in some circumstances, other online posts could provide relevant context to show that Defendant's threat was not real. For example, had Defendant posted a video on her social media account at or around the time of the alleged threat stating that she loves to annoy the FBI by joking about shooting them, this video might certainly be relevant to show that she did not intend to communicate a true threat or make any statement with knowledge that it would be viewed as a true threat. Such statement would certainly provide relevant context to the alleged criminal threat.

However, in the case at bar, Defendant's other online statements do not provide any context to the charged offense. To accept Defendant's argument, the Court would have to accept the proposition that passionate participants of political speech, by definition, are not capable of making true threats. More specifically, that passionate supporters of former President Trump should be perceived by law enforcement as non-serious people incapable to making threats. Moreover, the Court would have to believe that just because the Defendant did not make a true threat on any prior occasion, then she did not make a true threat at the time of the charged offense. Clearly, these propositions are untrue.

2. **Even If Marginally Relevant, the Probative Value of Some of the Other Online Videos Are Substantially Outweighed by the Danger of Confusing the Issues or Misleading the Jury.**

Even if the Court finds some of the Defendant's other online posts marginally relevant, those videos should be excluded because their probative value is substantially outweighed by the danger that the evidence would confuse the issues or mislead the jury. Some of the Defendant's videos show strong support for former President Trump. In *Yes, He's Still Your President*, Defendant re-posted a video montage of President Trump to the music of *Uptown Funk* by Bruno Mars. The lyrics are altered to convey strong support for the former President and anti-Democrat sentiments. In other videos, Defendant expressed strong opposition to the legitimacy of the 2020 Presidential Election and suggested that accepting the results of the election amounts to a surrender to one of our nations' global adversaries.

These strong political views have no place in this trial. This case is neither about politics nor about the events of January 6, 2021. This case is about the limits of what you can say in public and about the accountability for threatening others. Defendant's political views are simply not relevant. If allowed to be injected in this case, Defendant's political views may curry sympathy or favor among some of the jurors who shares her views. Such favor or sympathy may interfere with that juror's ability to fulfill their oath to dispassionately apply the facts as found to the law as given.

Accordingly, the Government respectfully requests this Court to enter an order prior to trial excluding the aforementioned videos as not relevant to the charged crime. If the Court finds some of the videos relevant, the Government requests that the Court exclude them nonetheless on the

grounds that their probative value is substantially outweighed by the danger of confusing the jury or misleading the jury.

                                  Respectfully submitted,

                                  JUAN ANTONIO GONZALEZ
                                UNITED STATES ATTORNEY

By:    */s/ Mark Dispoto*
        Mark Dispoto
        Assistant United States Attorney
        Court Id. No A5501143
        500 South Australian Avenue
        West Palm Beach, Florida 33401
        Tel: (561) 209-1032
        Mark.dispoto@usdoj.gov

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 19, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Mark Dispoto*
Mark Dispoto