UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **21-80039-cr-RLR(s)**

UNITED STATES OF AMERICA

v.

SUZANNE ELLEN KAYE,
   a/k/a "muckbangXX,"
   a/k/a "suzannekaye3,"
   a/k/a "Angry Hippie Patriot,"

              **Defendant.**
_____/

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF A SENTENCE AT THE LOW END OF THE ADVISORY GUIDELINE RANGE

The United States of America, by and through the undersigned Assistant United States Attorney, respectfully submits its *Memorandum in Support of a Sentence at the Low End of the Advisory Guideline Range*. For the reasons herein, a sentence at the low end of the advisory guideline range is sufficient, but not greater than necessary, to achieve the goals of sentencing. In support thereof, the government states the following:

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On January 16, 2021, the FBI received an online tip that Defendant had an account on Facebook that posts "anti-Biden" and "anti-Democratic" statements. The tipster further reported that Defendant claimed she was at The United States Capitol in Washington, D.C., on January 6, 2021, and that she may have additional information. The FBI conducted open-source media checks of the Facebook account which did not reveal any posts related to her activity at The Capitol on January 6, 2021.

Based on public source information, agents learned that Defendant's last known address was in Lake Worth, Florida. On January 28, 2021, Special Agents Arthur Smith and Michael

Stewart responded to that address to interview her about any illegal activity that occurred at The Capitol on January 6, 2021.  While at the residence, the agents observed numerous notes on the exterior of the apartment door, which led them to believe that the apartment had likely been unoccupied for an extended time.

Later that day, Agent Smith made telephone contact with Defendant and informed her of his interest in interviewing her about her travel to Washington, D.C. on January 6, 2021. Defendant asked if he had proof that she traveled to Washington, D.C.  The agent stated that was why he wanted to speak to her.  Defendant denied having traveled to Washington D.C., but claimed she was aware of individuals who did travel there.  She agreed to speak with the FBI and provided her current address in Boca Raton, Florida.  She further indicated that she was retired and had plenty of time to talk but needed to be interviewed at her residence because she was not able to drive.  Agent Smith stated that he would stop by later that day to speak to her.  Unfortunately, the agent was not able to do so.  He called her thereafter to reschedule their meeting.  The agents then returned to her home on February 2, 2021, but nobody answered the door.

On February 8, 2021, NTOC received another online tip from an individual who provided a link to a video posted to Defendant's known Facebook page (hereinafter "Tip Video").  The tipster claimed in the online tip that the video was a threat to shoot the FBI. The Tip Video, titled "ANGRY Patriot Hippie" with the caption, "Fuck the FBI," was posted on Defendant's Facebook page on January 31, 2021.  In this 50-second video, Defendant is sitting at a table inside an unknown residence.  After taking a drink from an almost empty bottle of Whiskey, she announced to her audience that the FBI contacted her because they wanted to talk to her about her visit to The Capitol on January 6, 2021.  She stated that she told them that they could not come talk to her unless she has counsel, and since she cannot afford counsel, they will have to arrest her so she can

2

get counsel appointed to her. She then accused the FBI of spending four years "persecuting a three-star general based on no evidence, you think I am going to let you come fucking talk to me? You're out of your mother fucking mind, Bro." Defendant then told her audience that she will "exercise my second amendment right to shoot your fucking ass if you come here."

After reviewing the Tip Video, agents in the WPB field office then reviewed Defendant's known Instagram and Tik Tok accounts and saw that she uploaded a second threatening video (hereinafter "Second Video") to those social media platforms. The Second Video contained substantially the same threat as the Tip Video with more profanity. Defendant posted the Second Video to Instagram approximately five minutes after the Tip Video. She deleted the Tip Video from her Instagram account but left it up on her Facebook account. She also posted the Second Video to her Tik Tok account at an unknown time (hereinafter "Tik Tok Video"). This version of the video contained an overlap of the song, "Every Breath Your Take," originally performed by the 1980's music band, *The Police*.

On March 24, 2022, a grand jury sitting in the southern District of Florida entered a superseding indictment charging Defendant with two counts of making an interstate communication that contained a threat to injure the person of another, in violation of Title 18, United States Code, Section 875(c). Count One related to the Tip Video posted on Facebook and Instagram. Count Two related to the Second Video posted on Instagram.

At trial, Defendant testified that her videos were a "parody" designed to generate the maximum number of social media followers. She denied intending to threaten the FBI or shoot agents if they came to her house. The jury rejected her testimony and found her guilty of Count 2 of the Superseding Indictment and not guilty of Count 1. Sentencing has been scheduled for October 4, 2022.

The United States Probation Office conducted a thorough Presentence Investigation Report (PSR). Defendant's base offense level begins at 12. (ECF 139, U.S.S.G. § 2A6.1). She received a two-level increase for the offense involving more than two threats, and a six-level increase for threatening a government employee for a total offense level of 20. (*Id.*, U.S.S.G. §§ 2A6.1(b)(2)(A), and 3A1.2(b)).

Although Defendant has been arrested five times and convicted twice, she does not have any criminal history points. (*Id.*, ¶ 27). With a Criminal History Category I, her advisory guideline range is 33 to 41 months' imprisonment. (Id., ¶ 63). In light of the 18 U.S.C. § 3553(a) factors, the United States believes that a sentence at the low end of the advisory guidelines is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

## LEGAL ANALYSIS AND RECOMMENDATION

**I.    Generally Applicable Legal Principles**

When determining the appropriate sentence, the district court should consider all applicable factors set forth in 18 U.S.C. § 3553(a). *See United States v. Gall*, 128 S. Ct. 586, 596 (2007). The listed factors in 18 U.S.C. § 3553(a) include the following:

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)   the need for the sentence imposed –

    (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)   to afford adequate deterrence to criminal conduct;

    (C)   to protect the public from further crimes of the defendant; and

    (D)   to provide the defendant with needed educational or vocational training, medical care, or other

       correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –

  (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

    (i) issued by the Sentencing Commission ...; and;

    (ii) that, . . . are in effect on the date the defendant is sentenced; ...

(5) any pertinent policy statement –

  (A) issued by the Sentencing Commission ... and

  (B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

## II. Section 3553 Analysis

A review of the sentencing factors set forth in Section 3553 indicates that a sentence within the advisory guideline range is sufficient, but not greater than necessary, to achieve the goals of sentencing. Defendant threatened on social media to kill an FBI agent for doing his job. "[T]hreats of violence and death on law enforcement officers who serve and protect the community … clearly cannot be permitted. Not in the world in which we live today." *United States v. Killingsworth*, Case No. 20-cr-00158-JRA (N.D. OH, at Docket Entry 48:17). Thus, the nature and circumstances of the offense strongly support a guideline sentence. Moreover, a guideline sentence would

accurately reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

    A.       **The Nature and Circumstances of the Offense**

On July 31, 2021, the defendant posted three videos on social media threatening to kill Agent Smith if he came to her house. Although Defendant did not carry out her threat, the fear that resulted from her threats was real. In 2021, the news agency Rueters documented more than 850 threatening and hostile messages aimed at election officials and staff related to the 2020 election. *See* https://graphics.reuters.com/USA-ELECTION/THREATS/mopanwmlkva/. The messages came via emails, voicemails, texts, letters, and internet posts. *Id.* About 110 of the 850 messages appear to meet what law professors and attorneys say are true threats under federal law. *Id.* Approximately 200 of the 850 threats (23%) wish death upon the recipient. *Id.* Yet arrests for making such threats have been rare, even in case of true threats. *Id.*

For those cases that have resulted in federal charges, courts around the country have imposed jail sentences consistently. Like the instant matter, many of those cases involved only one or a few threats against current or former federal employees. In *United States v. Howard*, 947 F.3d 936 (6th Cir. 2020), the defendant left a single voicemail message in 2017 for former Attorney General Eric Holder at his law firm. In the message, the defendant claimed to have been convicted in court previously in violation of the Double Jeopardy Clause of the United States Constitution. He then threatened to kill Holder. The court sentenced defendant to 30 months in prison.

In *United States v. Killingsworth*, 2020 WL 4703090 at *1 (N.D. OH., August 12, 2020), the defendant posted two threats against his local police department. In a post on his own Facebook page, the defendant stated, "I think a cop needs killed around here again." *Id.* On the police department's Facebook page, the defendant repeated the threat. *Id.* He also wrote, "More cops

need shot dead. *Id.* They kill us, we kill them," as well as comments against specific individuals such as "Your kids need shot in front of you", "F you and your kids, you won that price", and "I'll see you in the woods." *Id.* The court sentenced Killingsworth to the high end of the advisory guidelines range of 30 months in prison.

In *United States v. Dierks*, 978 F.3d 585 (8th Cir. 2019), the defendant sent three threatening tweets to Senator Joni Ernst of Iowa. *Id.* at 588. In the tweets, the defendant threatened to "fu up seriously in my sleep," and "I'll beat ur ass in front of ur window, I promise that." *Id.* After being visited by law enforcement and requested to tone down the rhetoric, the defendant made several additional uncharged tweets wherein he continued to threaten the Senator. *Id.* at 589. The court rejected the defendant's claim that his texts were political statements and not true threats. *Id.* at 589-590. At sentencing, the trial judge described the nature and circumstances of the offense as follows:

> In this day and age, threats and rants by people like Mr. Dierks have to be taken seriously. As we know, some individuals who behave this way, threatening others, do end up inflicting injury and death on others, and the Court takes defendant at his word. If a person makes threats, they should know that the recipients take those threats seriously. Because of the seriousness of this crime, a just punishment, a serious time in prison, is necessary.

*United States v. Dierks*, Case No. 17-cr-2065 (N.D. IA, at Docket Entry 97:59). Due to the substantial number of threats and the victim being a high-ranking government official, the court imposed an upward variance from the advisory guideline range of 41 to 51 months and sentenced Dierks to 72 months imprisonment.

In *United States v. Fratus*, Case No. 20-00270-cr-GJP (E.D. Pa, at _____, 2022), the defendant sent two threatening emails from his i-Phone in Massachusetts against the Philadelphia Police Commissioner. In the emails, the defendant used racial expletives, called for hanging, and for "Jews into the ovens!!!" At sentencing, the court described the defendant's offense as

7

"disgusting, offensive, destructive and inexcusable on every level ... And there's no place or room for what Mr. Fratus has done in any society much less a civilized one." *Id.*, at Docket Entry 98:109. The court then imposed an upward variance from the advisory guideline range of 31-37 months and sentenced him to 48 months in prison.[1]

In *United States v. Hoff*, 767 Fed. Appx. 614 (6th Cir. 2019), the defendant left three voice messages at the office of United States Representative Steve Stivers that gave the Congressman concern for his safety and his family. *Id.* at 616. Congressman Stivers contacted the Capitol Police to investigate the calls. *Id.* During the investigation, an investigating agent warned Hoff not to contact Congressman Stivers's office again. *Id.* Nevertheless, Hoff left two additional voice messages four days after a shooting at a baseball practice in Washington D.C. where Republican congressmen and their staffs were fired upon. *Id.* In the messages, Hoff stated, "I think y'all better hit your knees and pray for the people that you're screwin' up their lives with your secret legislation....," and "We are taking our country back. We are on the march. The other day is the tip of the iceberg. I've tried to warn you.... Maybe the next one taken down will be your daughter, huh? Or even your wife. Or even you." *Id.* The court sentenced Hoff to 40 months imprisonment. *Id.* at 617.

In *United States v. Cooper*, Case No. 2019 WL 4259454 (M.D.TN., September 9, 2019), the defendant posted on the iFunny.co website a threat against federal law enforcement. *Id.* at 2. Specifically, he announced, "IF YOU ARE A MEMBER OF THE FBI, CIA, WHATEVER, AND ARE ON MY PROFILE I WILL TRACE YOUR IP ADDRESS AND KILL YOU IF THE OPPORTUNITY ARISES." *Id.* He claimed to be "dead serious" and described how he would do it. *Id.* He then stated, "If I am personally contacted by any federal agents, I will do this. I will kill

---

[1] Fratus's criminal history included prior assaultive behavior, including assault on law enforcement, threats to a Congresswoman, threats to an Islamic Center and Palestinian Businessman and an attack on homeless people.

you." *Id.* On October 21, 2020, the court sentenced Cooper to 12 months in prison (time served). *United States v. Cooper*, Case No. 19-cr-286-ABJ, at Docket Entry 21.

Finally, in *United States v. Pratersch*, 808 Fed.Appx. 768 (11th Cir. 2020) (unpublished), the defendant was convicted of making threatening phone calls to the office of Senator Bernard Sanders from Vermont. At sentencing, the court found that the defendant's threats were serious:

> I remember when I was a kid the civics teachers used to tell us, I disagree with you with every fiber of my being, but I will fight to the death to protect your right to say it. And I think that's being damaged by things like this. So I take it very seriously. And although I take you at face value you weren't going to fly up there and do anything. Maybe you didn't have the wherewithal to do it. But when you make that phone call, everything gets turned on its head. You have all of these federal law enforcement agencies that have to make take it seriously. They have to investigate it. They have to come down and talk to you. They have to begin a federal prosecution and do all of these things.

*United States v. Pratersch*, Case No. 19-cr-0026-CEM-T, at Docket Entry 87:13-14. With the defendant having a Criminal History Category I, the court sentenced him at the low end of the advisory guidelines and imposed a sentence of 15 months' imprisonment. *Id.* at 15. The court explained that it imposed a sentence within the advisory guidelines partly because the defendant did not accept responsibility for his crimes and that he testified at his trial untruthfully. *Id.* at 14.

Like many of the defendants in the aforementioned cases, Defendant has never accepted responsibility for her crimes. Instead, she went to trial and provided testimony that the jury did not believe. When interviewed by probation prior to sentencing, Defendant gave a self-serving statement bereft of any contrition or acknowledgement of wrongdoing. (ECF 139, ¶ 14). She maintained her innocence by claiming that she "did not intend to threaten the FBI." (*Id.*). Instead of apologizing for her conduct or poor judgment, she apologized "for the spectacle and resulting fallout." (*Id.*). She expressed no regret for her unlawful actions. Rather, she stated that she regretted "risking my own health and life with my granddaughter." (*Id.*). She once again referred

to her criminal threat video as "political videos" and vowed never to do it again. (*Id.*). She does not mention the victim who she threatened or the agency who had to marshal numerous human and tactical resources in response to her threat. Her words simply ring hollow. Defendant is clearly more concerned about how her actions has inconvenienced her than she is about how her actions have impacted the victim.

The seriousness of Defendant's crime is also not limited to the affect it had on the FBI. Her threat is part of the ubiquity of violent political rhetoric that causes serious harm to our communities. A thesis submitted in April 2002 to the Department of Criminal Justice at the University of Arkansas described the dangers of violent political rhetoric as follows:

> Nugent and Conway (2021) examined violent political rhetoric and other factors on the rate of mass shootings in the country. They found that violent political rhetoric was positively associated with mass shootings and hypothesized that this was because "VPR [violent political rhetoric] may stimulate racism, xenophobia, and anger towards those who have been the targets of the VPR and help erode social norms against violence. The VPR would legitimize the use of violence in the minds of those amenable to such rhetoric."

Ford, T. J. (2022). *Can Violent Political Rhetoric Influence Bias Homicide Rates? Analyzing the Trump Effect.* Sociology and Criminology Undergraduate Honors Theses Retrieved from https://scholarworks.uark.edu/sociuht/9.

Moreover, hateful rhetoric can also stir dangerous consequences. Bynam, Daniel L. (2021), *How Hateful Rhetoric Connects to Real World Violence*, Brookings Institute. A study of violence in Sweden found that hateful speech spurs negative emotions toward the target community amount listeners. *Id.* Another study of European audiences found that exposure to politicians' violent rhetoric increased support for political violence among those surveyed. Such rhetoric also makes political violence against the target community seem more legitimate. *Id.* In Germany, another study found that increases in anti-refugee sentiments on Facebook led to

10

increases in violence against refugees. *Id.* When Facebook had an outage, or when different events dominated the news, violence fell off. *Id.*

Defendant's threat to kill Agent Smith presented the same deleterious effect – it likely engendered negative emotions among her social media audience toward the FBI. By doing so, her words endangered countless FBI agents who interact with the community on a regular basis by undermining its credibility among the people it serves.

Further, Defendant did not make her threat in isolation. Rather, she broadcasted her threat to a community of like-minded people, as evidenced by her reference in her video to her "Tik Tok patriot friends." If any member of her social media followers had contemplated violent acts themselves, Defendant's words likely emboldened them to engage in similar violent rhetoric, or possibly act on their violent thoughts. "Violent language … normalizes violence and encourages people inclined toward it to be more violent," said Rachel Kleinfeld, a senior fellow in the democracy, conflict and governance program at the Carnegie Endowment for International Peace. https://www.nytimes.com/2022/08/09/nyregion/fbi-search-violent-rhetoric.html.

To justify her threat, Defendant dehumanized the FBI as an organization by accusing them of "spending four years persecuting a three-star general with no evidence." By doing so, she suggested to her audience that violence against the FBI is justified. The fact that she may not have ever intended to carry out her threat, or had the means to do so, is irrelevant. Her threat was real and serious. It was destructive to our society because it undermined the important work of the FBI – to serve and protect our nation and the people who live therein. As such, her threat cannot be treated lightly.

      **B.**    **The History and Characteristics of the Defendant**

It has been over 18 months since Defendant committed her crime. To date, she has never

11

accepted responsibility for her actions. Instead, she offered several implausible explanations and excuses to justify her conduct. At trial, she testified that her threat videos were theatrical performances designed to generate as many social media followers as possible. She described her threat videos as parody. Yet, the videos contained no imitation, comedy, or deliberate exaggeration. Despite her genuine anger in the videos as evidence by her rage and profanity, Defendant claimed that she did not mean what she said. On cross examination, she was evasive, argumentative, and combative. She displayed no indication, either through her testimony or demeanor on the witness stand, that she has any insight into the seriousness of her criminal acts. Even when given an opportunity by the Probation Office to express contrition, Defendant chose to merely apologize for "the spectacle and resulting fallout." She said nothing about the harm she caused to the victim. Thus, her personal characteristics support a guideline sentence.

Defendant's criminal history is also concerning. Although she has not been convicted of any violent crimes, her arrest record involves allegations of violence. In 2010, Defendant allegedly punched her husband in the lip in front of their minor children. (ECF 139, ¶ 28). She was charged with domestic battery, which was later *nolle prossed*. (*Id.*). Later that year, Defendant allegedly choked a woman who believed that the Defendant had stolen money from her. (ECF 139, ¶ 29). Defendant scratched the victim, hit her, ripped her underwear, and bit her on the right leg. (*Id.*). The victim was able to escape the Defendant, run into her house, and call 911. (*Id.*). Witnesses reported that Defendant was the aggressor. (*Id.*). Defendant was charged with simple battery, which was again *nolle prossed*. (*Id.*).

Ten years later, in 2020, Defendant allegedly assaulted her daughter during a domestic disturbance. (ECF 139, ¶ 30). During the fight, Defendant grabbed the victim's shirt collar causing it to rip. (*Id.*). Defendant then armed herself with a knife and proceeded toward the victim. (*Id.*).

The victim closed a door between them to ensure her own safety. (*Id.*). The victim's friend restrained the Defendant after she stabbed the door four to five times. (*Id.*). Defendant was charged with aggravated assault with a deadly weapon and battery. (*Id.*). The State Attorney's Office no filed the charges. (*Id.*).

These incidents all display a serious issue that Defendant has with her anger management. Consistent with her threat videos from the instant case, Defendant tends to lash out and threaten others when they do something she doesn't like. These incidents display a lack of good character, which also supports a guideline sentence.

      **C.**      **Need for the Sentence Imposed to Reflect Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

In sentencing the defendant, the court must consider the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. 18 U.S.C. § 3553(a)(2). As explained above, threatening to kill an FBI agent who is doing his job is a very serious offense. As such, a prison sentence is needed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

      **D.**      **Afford Adequate Deterrence to Criminal Conduct.**

In the past several years, we as a nation have become increasingly polarized along political and ideological lines. As a result, political speech on social media has become significantly more passionate. Passionate speech, even unpopular or provocative language, is healthy to a vibrant democracy where people's voices contribute to the marketplace of ideas. However, criminal threats serve no useful purpose. As such, the consequences for such criminal behavior should be severe to deter the speaker and others from engaging in such behavior. The need to deter is particularly strong when the target of the threat is a government agent who is tasked by law to uphold the constitution and protect the nation from all enemies, foreign and domestic. *See, e.g.*,

13

*United States v. Voneida*, 2008 WL 189667 at 3 (E.D.PA., January 18, 2008) (the court recognized that the effect of a "true threat" upon institutions required to take seriously even joking threats, however, is one of the evils that a statute like § 875(c) attempts to deter); *United States v. Feeney*, 2022 WL 580955 at *4 (E.D.N.Y., February 25, 2022) (court stated that a sentence at the high end of the guidelines for transmitting a threat in interstate commerce in violation of § 875(c) recognizes the seriousness of the Defendant's conduct and provides for both specific and general deterrence); *United States v. Pratersch*, 808 Fed.Appx. 768, 771 (court cited need to deter the defendant and others among basis for imposing 15-month jail sentence for threatening officials based on their political viewpoint).

Today, the need to deter violent online rhetoric, particularly against the FBI, is even stronger than usual because such speech seems far too common in our political discourse. In response to the FBI executing a court authorized search warrant in West Palm Beach at the home of former President Donald J. Trump on August 8, 2022, several people took to social media and made not-too-subtle threats. "Lock and load" was one of the top comments on an online forum dedicated to the former President, soon after the search took place. https://www.cnn.com/2022/08/09/politics/violent-rhetoric-pro-trump-internet-fbi-search/index.html. Someone else wrote, "I'm just going to say it. [Attorney General Merrick] Garland needs to be assassinated. Simple as that." *Id.* Another user posted, "kill all feds." *Id.* Some online users also encouraged others to post the address of the judge they believe signed off on the search warrant. Under a picture of the judge read, "I see a rope around his neck." *Id.* "They will cry out in authenticate pain soon," wrote another, appearing to refer to the former President's opponents. https://www.mediaite.com/online/nbcs-ben-collins-sounds-alarm-on-violent-rhetoric-flooding-pro-trump-message-boards-they-are-ready-to-go/.

Violent rhetoric must never be tolerated in a civilized democracy where the safety of members of our democratic institutions must be sacrosanct. To clearly delineate the line between acceptable and unacceptable speech, our courts should send a clear message that violent speech will not be tolerated. A prison sentence will send that clear message. Conversely, a light sentence would send the wrong message to this defendant and others. In effect, it would tell offenders like the defendant that such speech carries with it little to no consequences. That message would undermine the seriousness of the conduct and do little to prevent it from re-occurring.

### E.  Conclusion

Based on the sentencing factors of 18 U.S.C. 3553, the government respectfully requests this court impose a sentence within the advisory guideline range, followed by three years of supervised release. This sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing. The factors that support this recommendation include the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and to afford adequate deterrence to the criminal conduct.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

By:   */s/ Mark Dispoto*
      Mark Dispoto
      Assistant United States Attorney
      Court Id. No A5501143
      500 South Australian Avenue
      West Palm Beach, Florida 33401
      Tel: (561) 209-1032
      Mark.dispoto@usdoj.gov

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 1, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

>*/s/ Mark Dispoto*
>Mark Dispoto