UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  21-80039-CR-ROSENBERG

UNITED STATES OF AMERICA,
        Plaintiff,
vs.

SUZANNE ELLEN KAYE,
        Defendant.
_____/

**DEFENDANT'S OBJECTIONS TO
PRESENTENCE INVESTIGATION REPORT**

Mrs. Suzanne Kaye, through her counsel, and pursuant to Fed. R. Crim. P. 32(f)(1–2), respectfully objects to the following portions of the Pre-Sentence report ("PSI") filed on August 30, 2022 at DE 139.

1. At ¶ 4, Mrs. Kaye objects to the tipster's mischaracterization of her social media posts as "anti-democratic." Mrs. Kaye strongly believes in democracy and in the Constitutional principles of this county. It is likely that the tipster and/or FBI meant that her social media account contains posts critical of the Democratic Party.

2. At ¶ 7, Mrs. Kaye seeks to clarify the facts regarding her communication with the FBI. If the FBI called Mrs. Kaye to apologize to her for their failure to meet with her at her home as they agreed, Mrs. Kaye did not get their voicemail message. The testimony at trial was undisputed that the FBI did not personally speak to Mrs. Kaye (in person or by phone) about a future meeting. The agent testified that he believed he left a voicemail.

3.  At ¶ 8, Mrs. Kaye would clarify that records indicate that both the tip in this paragraph and in paragraph 4 were made by the same person, who is an individual in the opposite political party as Mrs. Kaye.

4.  At ¶ 10, Mrs. Kaye objects the mischaracterization of facts that "on the same day" the FBI found the "slightly altered" videos on Instagram and TikTok. As the Court will recall from the trial testimony, the FBI swore in at least three affidavits to the Court including Facebook and Instagram search warrants and the Complaint that, "On the same date, Agent Smith reviewed KAYE's known Instagram and TikTok accounts and determined that she uploaded *the same video* to both social media platforms on January 31, 2021." *See* DE 3 at ¶ 19 (emphasis added). The videos are substantially similar and Mrs. Kaye testified at trial that she intended to post only one video to all three social media platforms.

      Indeed, the government did not "discover" the Instagram video and provide it to the defense until approximately one year after Mrs. Kaye's arrest, and after considerable months of defense counsel's own attempts to litigate the disclosure of the video from Instagram. It was then, in early 2022, that the parties (and presumably the FBI) discovered the Instagram video was a slightly altered version of the Facebook video. The government filed the superseding Indictment based on the Instagram video on March 24, 2022. DE 86.

      However, the TikTok video was provided to the government early in discovery in 2021 and later to the Court in the defense motion to dismiss in

June of 2021. *See* DE 26 TikTok offers a feature where music may be uploaded with videos, but Instagram does not offer the same feature and thus did not contain any music when uploaded. Otherwise, the Instagram and TikTok videos are identical.

5. At ¶ 11, Mrs. Kaye understands that the testimony at trial was that the FBI viewed and investigated her statements as a "threat to life," but she maintains that she never intended her videos to be considered a true "threat to life."

6. At ¶ 14, a scrivener's error was made and the probation office left out the word "threaten" in the first sentence of Mrs. Kaye's written acceptance statement. The sentence should read, "I did not intend to threaten the FBI."

7. At ¶ 16, Mrs. Kaye objects to the § 2A6.1(b)(2)(A) enhancement for the offense involving "<u>more</u> than two threats." (emphasis added). Mrs. Kaye only intended to upload one version of her video and, at worst, she uploaded only two versions: 1) Facebook version and 2) the Instagram/TikTok versions. The fact that Instagram would not publish music (for copyright reasons) that TikTok will publish should not qualify the identical Instagram and TikTok videos as separate threats. Certainly, there is no evidence that Mrs. Kaye *intended* the Instagram and TikTok videos to be viewed as separate threats. Therefore, at worst, only two "threats" are present in this case and not "more than two," which is required for the two level enhancement.

At the same time, Mrs. Kaye also objects to the use of the Facebook video in this analysis because the jury acquitted her of threatening the FBI in the

Facebook video in Count 1 of the Indictment. Mrs. Kaye objects to the inclusion of acquitted conduct in her PSI and objects to this Court relying on acquitted conduct for any purpose other than mitigation. The Constitution prohibits a district court from sentencing a defendant based on conduct for which a jury has acquitted her.  Specifically, both the Sixth Amendment right to a jury trial, and the Fifth Amendment right to due process, prohibit that practice.  Several Supreme Court Justices, federal appellate judges, and state courts of last resort have explained why that is so.  *See, e.g.*, *Jones v. United States*, 574 U.S. 948 (2014) (Scalia, J., joined by Thomas and Ginsburg, JJ., dissenting from denial of certiorari); *United States v. Bell*, 808 F.3d 926, 927–28 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the denial of rehearing en banc); *id*. at 928–32 (Millett, J., concurring in the denial of rehearing en banc); *United States v. Canania*, 532 F.3d 764, 776–78 (8th Cir. 2008) (Bright, J., concurring) (citing additional separate opinions); *State v. Melvin*, 258 A.3d 1075 (N.J. 2021); *People v. Beck*, 939 N.W.2d 213 (Mich. 2019); *State v. Cote*, 530 A.2d 775, 784–86 (N.H. 1987).  Mrs. Kaye expressly adopts and incorporates those arguments here.

Nonetheless, the Eleventh Circuit has permitted the use of acquitted-conduct at sentencing, so long as the government proves the conduct by a preponderance of the evidence (rather than beyond a reasonable doubt).[1]  *See,*

---

[1] The United States House of Representatives has passed a bill which would prohibit the use of acquitted conduct at sentencing except for mitigation purposes. Prohibiting Punishment of Acquitted Conduct Act of 2021, H.R. 1621, 117th Cong., available at https://www.congress.gov/bill/117th-congress/house-bill/1621/text (last visited August 23, 2022). A related bill has been introduced in the United States Senate.

*e.g.*, *United States v. Green*, 981 F.3d 945, 953 (11th Cir. 2020); *United States v. Maddox*, 803 F.3d 1215, 1220–21 (11th Cir. 2015); *United States v. Cavallo*, 790 F.3d 1202, 1233 (11th Cir. 2015); *United States v. Campbell*, 491 F.3d 1306, 1314 (11th Cir. 2007); *United States v. Faust*, 456 F.3d 1342, 1347–48 (11th Cir. 2006); *United States v. Poyato*, 454 F.3d 1295, 1297–1300 (11th Cir. 2006); *United States v. Duncan*, 400 F.3d 1297, 1304–05 (11th Cir. 2005).

At this time, there has not been a preponderance finding from the Court that the Facebook video is a "true threat" and that that Mrs. Kaye separately *intended* to make this threat. Mrs. Kaye maintains that her Facebook video is political speech and parody, protected by the First Amendment. However, if the Court finds by a preponderance of the evidence that Mrs. Kaye did post the video with the intent to communicate a true threat or with the knowledge that it would be viewed as a true threat and that she subjectively intended to convey a threat because it is not enough that a reasonable person might have understood the words as a threat[2], then defendant acknowledges that binding

Prohibiting Punishment of Acquitted Conduct Act of 2021, S. 601, 117th Cong., available at https://www.congress.gov/bill/117th-congress/senate-bill/601/text (last visited August 23, 2022).

[2] Defendant maintains that the Court, like the jury, is required to find that the defendant had a subjective intent to threaten in order to find a true threat. *Virginia v. Black*, 538 U.S. 343 (2003), requiring subjective intent to make a true threat. *See also*, e.g., *Commonwealth v. Knox*, 190 A.3d 1146, 1156-57 (Pa. 2018); *United States v. Heineman*, 767 F.3d 970, 975-82 (10th Cir. 2014); *United States v. Bagdasarian*, 652 F.3d 1113, 1117-18 (9th Cir. 2011); *United States v. Cassel*, 408 F.3d 630-33 (9th Cir. 2005); *see also Perez v. Florida*, 137 S. Ct. 853, 855 (2017) (Sotomayor, concurring in the denial of certiorari) (opining that *Black* and *Watts* "strongly suggest that it is not enough that a reasonable person might have understood the words as a threat— a jury must find that the speaker actually intended to convey a threat").

circuit precedent currently forecloses her arguments that acquitted-conduct sentencing is unconstitutional. Accordingly, she preserves this issue for further review.

8. At ¶¶ 16-20 (offense computation), Mrs. Kaye objects to the exclusion of the § 2A6.1(b)(6) four level reduction for "the offense involved a single instance evidencing little or no deliberation." While Mrs. Kaye admits her videos included some deliberation, as she scripted her social media content, she would contend that conduct amounted to "little" deliberation. Unlike the defendants described below and in the government's sentencing memorandum, Mrs. Kaye's videos were posted in such a quick, half-hazard style such that she erroneously posted two versions of the same video. The two videos constitute a "single instance" and, indeed, the jury acquitted her of one count. She did not engage in extensive planning to make her videos, she did not go and buy anything (such as a firearm) to make her video, and she did not post over multiple days, weeks, or months. The four level reduction is appropriate in this case.

9. At ¶ 22, Mrs. Kaye objects to not receiving any reduction for acceptance of responsibility. To be clear, Mrs. Kaye has admitted the general facts of her case since at least her motion to dismiss in June of 2021. During the course of litigation in this case, Mrs. Kaye, her lawyers, and her conflict speech and Constitutional law expert, Dr. Fuller, have all submitted legal arguments and facts to the Court to support that her speech was protected, political speech under the First Amendment. The only way to resolve this issue was through a

trial. United States Sentence Guidelines Section 3E1.1 permit an acceptance reduction in just this circumstance:

> In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

Mrs. Kaye's decision to exercise her 6th Amendment Constitutional right to trial in order to preserve her First Amendment rights to speech and expression should not bar her from acceptance in this instance. Mrs. Kaye was required to proceed to trial to preserve her Constitutional law challenges, and she never disputed the essential facts of the case.

10. At ¶ 25, Mrs. Kaye clarifies that she does not believe that she was prosecuted for this theft. Mrs. Kaye recalls that her mother was prosecuted, went to trial, and was found guilty. Her mother was required to do probation, community service, and pay restitution. Mrs. Kaye denies ever having those court-ordered obligations and believes that her mother's record is erroneously being attributed to her, since she was originally arrested with her mother.

11. At ¶ 28, 29, and 30 Mrs. Kaye objects to the veracity of the allegations and the alleged criminal conduct outlined in the narratives of these dismissed cases. These hearsay statements are unreliable and have not been proven in Court. For example, in paragraph 28, Mrs. Kaye denies hitting Michael. In paragraph

29, Mrs. Kaye submits that her daughter was trying to rob her. Finally, in paragraph 30, Mrs. Kaye was trying to remove the door handle with a butter knife.

Pursuant to *Shepard v. United States*, 544 U.S. 13, 125 S.Ct. 1254 (2005), it is inappropriate to rely on the allegations in the arrest and booking sheet for the alleged circumstances of a prior offense.   Therefore, the paragraphs purporting to provide the circumstances of the offense should be removed from the PSI unless it was obtained from "the charging document, the terms of a plea agreement or transcript of colloquy between the judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." *Id.* at 26, 125 S.Ct. at 1263.

12. At ¶ 34, Mrs. Kaye clarifies the following facts: She was not born on August 2, 2022 but was born on January 16, 1962. Brenda Kaye and Tony Bruno were married when Marilyn Sherman conceived Mrs. Kaye. In other words, an extramarital affair took place. Brenda Kaye adopted Mrs. Kaye in 1962, three months after her birth. Louis Kaye Stepfather never adopted Mrs. Kaye. Mrs. Kaye is not an only child, and is actually one of nine siblings. She has never met eight of her siblings, and one brother was adopted by her mother's brother and grew up as her first cousin.

13. At ¶ 37, Mrs. Kaye clarifies that she is the primary lease holder of the rental agreement and not her son Samuel. As discussed at trial and verified by U.S.

probation, Mrs. Kaye lives in Century Village in Boca Raton, which is a 55 years and older independent living community.

14. At ¶ 40-41, Mrs. Kaye would submit the following summary of her medical records to be included in her PSI report. This summary is from hospital and doctor's files obtained by the Federal Public Defender's investigators. The records were reviewed and the summary written by Investigator Sarah Shannon on 09/07/2022 through 09/09/2022. More than 11,000 pages of medical records have been provided to the United States Probation Office for their verification of the following:

*Suzanne Kaye has had multiple hospitalizations since the beginning of 2012 for abdominal pain relating to complications from gastric bypass, reversal of the gastric bypass and a recurrent hernia. Below are some of the hospitalizations relating to those complications. She also has a history of having petit, grand mal and unexplained seizures. She was diagnosed with epilepsy in 2007. These hospitalizations are also summarized below. Finally, medical records state that she was previously prescribed five different antipsychotic meds and note her multiple admissions to JFK North's Psychiatric Unit. She previously took Lithium for bipolar, Seroquel for sleep, Clonopin for anxiety, and Dilantin and Kerra based on her history of seizures. However, Mrs. Kaye discontinued the seizure medications after her August 2019 hospitalization wherein she was put in a medically induced coma, put on a ventilator, and was*

*in critical care for some time. After that hospitalization, Mrs. Kaye transitioned to medical marijuana to control her seizures.*

- During a hospitalization on 4/23/2012, Suzanne suffered a seizure and had to be administered Ativan.  She was originally admitted for acute-on-chronic abdominal pain.  She ultimately underwent surgery for a hernia and was discharged on 05/11/2012.

- On 09/20/2012, Mrs. Kaye was admitted to the hospital for abdominal pain and discovered additional hernia issues. On 09/26/2012, doctors performed surgery for a recurrent incarcerated ventral hernia (this is one of many surgeries she has and will undergo in the future for the same problem). She developed a DVT (blood clot) in her right subclavian and right axillary vein (right chest area) due to the PICC (peripherally inserted central catheter) line, and was not discharged until 09/30/2012.

- From 02/10/2013 to 02/21/2013, she was hospitalized for abdominal pain due to obstructed Incisional Hernia and Fecal Impaction. She underwent surgery for that hernia while in the hospital.

- From 02/24/2013 through 02/28/2013 she was admitted again to JFK Medical Center for abdominal pain and diarrhea.  She had an E.coli infection in her urinary tract.  She was treated with antibiotics in the hospital and advised to follow up with her doctor.

10

- On 04/02/2013 she was taken to JFK Medical Center emergency department by fire rescue for abdominal pain.  She was seen and treated for abdominal pain and nausea with vomiting and released the same day.

- Ms. Kaye went to the emergency department on 04/28/2013 suffering from lower abdominal pain, vomiting and diarrhea.

- From 06/21/2013 until 06/25/2013, Ms. Kaye was at the JFK Medical Center for abdominal pain and nausea, and her stomach was distended. This time, doctors found a hiatal hernia. The hernia repair was not done during this admission.

- She returned to JFK Medical Center on 7/12/2013 for her Ventral Hernia and underwent an operation to repair it (the second documented surgery).  She was discharged on 7/19/2013.

- On 07/21/2013 Suzanne went to the emergency department at JFK Medical Center for Abdominal pain and distention. They found a large fluid collection in the anterior abdominal well and could not rule out a secondary infection. She was discharged on 7/23/13.

- On 09/05/2014 Mrs. Kaye was admitted to the Psychiatry Department of JFK Medical Center for depressive disorder.  Her psychiatrist sent her there because she was in a manic phase of her bipolar disorder. She further stated, "[S]he had stress at home. Her 14 year old daughter and 16 year old son were both having

pysch issues and that her husband has cancer.  Her body is constantly in pain." She was voluntarily admitted to the hospital with a mixed manic episode. She was discharged on 09/09/2014.

- Mrs. Kaye went to the JFK Medical Center emergency department on 07/14/2015 complaining of abdominal pain and back pain and she told doctors her hernia had gotten so big that she couldn't even urinate. Doctors believed her pain came from constipation, but nevertheless ordered an upper endoscopy exam (EGD or esophagogastoduodenoscopy) and colonoscopy. Both came back without abnormalities, and she was released on 07/28/2015.

- On 02/09/2016 Mrs. Kaye was admitted to JFK Medical Center for abdominal pain, epigastric pain with nausea, vomiting and could not take medicine orally. She had mild small bowel ileus and mild anasarca.  She was discharged on 02/17/2016.

- Mrs. Kaye went to the emergency department on 06/03/2016 for a recurrent ventral hernia. Surgery was performed on 06/03/2016 to repair the pooching and bulging in the lower mid abdomen where the hernia was, and she was discharged from JFK Medical Center on 06/06/2016.

- Mrs. Kaye went to the emergency department of JFK Medical Center on 06/29/2016 for an abdominal wound infection. She had a ventral hernia and was experiencing drainage from an

abdominal wound with surrounding cellulitis. She was discharged on 07/05/2016.

- On 07/21/2016 she was hospitalized for abdominal wall mass infection that caused her abdominal pain, nausea, vomiting and diarrhea. She was discharged from the hospital on 7/28/2016.

- On 11/08/2016 Suzanne was Baker Acted by police for suicidal ideations. She admitted that she was depressed and needed help. The Baker Act was upheld by the attending doctor. Per notes in her chart, she had previously been admitted to JFK North from 11/02/2016 to 11/05/16, but she did not follow up with anyone after she was discharged. Suzanne experienced a seizure during the inpatient admission process.

- On 11/10/2016 Mrs. Kaye was transferred from the psychiatric unit to JFK Medical Center emergency department for treatment of a urinary tract infection as well as continued mental health treatment. She was released from the hospital on 11/13/2016.

- On 08/04/2019 Mrs. Kaye went to the emergency department at JFK Medical center for adnominal pain, diarrhea, nausea and vomiting that had been persistent for the past three days. She was placed on observation by the emergency department at this point. While in observation, Mrs. Kaye began to have multiple seizures, and was formally admitted for treatment 08/05/2019. She had one

seizure so severe that day that, after being given Ativan twice with no response, they declared her "status epilepticus" (a seizure that occurs for much longer than usual, or seizures that occur in quick succession with no time between the seizures for the person to recover). The intense seizures caused her acute respiratory failure and eventually a "code blue" for cardiac failure. The problems were so severe providers intubated her that same day and placed her in a medically induced coma for nearly a week. During her coma, she received sustenance via a feeding tube from 08/11/2019 to 8/16/2019. Only on 08/18/2019 did providers feel confident enough to slowly taper off her sedation, but they also discovered she was positive for DVT (Deep Vein Thrombosis, a blood clot substantially blocking a vein) in the right axillary, brachial, basilica and cephalic veins. Testing determined that her initial complaint of stomach pain was because of an ulcer, GI outlet obstruction and severe gastro-jejunal stenosis. When she was finally discharged on 08/21/2019, she wasn't discharged to go home; she was discharged to a nursing facility.

- Less than two months later, she spent 21 days (10/16/2019-11/07/2019) in JFK Medical for complications related to the gastric bypass procedure she had done. The hospital found that she had an anastomotic stricture versus kink, and she was severely

malnourished. While in the hospital she had a gastrostomy tube placement and an intraoperative EGD performed.

- Less than a week after her release, she returned to JFK Medical Center for tachycardia and abdominal pain on 11/12/2019. The Rapid Response team was called to Mrs. Kaye's room on 11/15/2019 for a seizure she was having. She left the hospital on 11/16/2019.

- Days later on 11/20/2019 JFK Medical Center admitted Mrs. Kaye was admitted to JFK Medical Center for observation of complaints about chest pains, palpitations, nausea and vomiting. An EKG (electrocardiogram recording electrical signals from the heart) and echocardiogram (ultrasound of the heart looking for structural issues) were performed and came back without abnormalities. While there, she also requested to be put back on medication for her bipolar disorder, since she had just moved back to Florida 2 months prior and hadn't found a psychiatrist yet to prescribe her medication. She was discharged 11/21/2019.

- Mrs. Kaye arrived to JFK Medical Center via Fire and Rescue on 11/27/19 suffering from severe abdominal pain. She reported nausea and vomiting for three days and had not eaten in six days. Providers placed another gastrostomy tube and placed a central line (similar to an IV, but placed with almost direct access to the

heart for prolonged administration of medication, fluids, sustenance, etc.) to the right chest. On 11/30/2019 she experienced her first of three episodes of seizures during this hospitalization. On 12/02/2019, Rapid Response treated Mrs. Kaye for pseudoseizures (a seizure caused by psychological issues rather than epilepsy), and on 12/03/19 they responded again for a seizure episode that lasted 5 minutes but was treatable and treated with Propofol (normally used only as a general anasthetic). She was discharged on 12/03/2019.

- On 02/06/2020 Ms. Kaye was brought to JFK Medical Center for clearance post arrest. She was short of breath from having to walk to many flights of stairs. She was cleared by the emergency department and released into police custody.

- Days later, (02/09/2020) Mrs. Kaye was admitted to JFK Medical Center for complications caused from her gastric bypass surgery. She was suffering from vomiting, ulceration and delayed emptying of her stomach. Providers ordered multiple upper GI endoscopies for therapy of post-bariatric anastomotic stenosis and persistent vomiting. She remained at the hospital until 02/14/2020 when she was discharged.

- On 3/11/2020 Suzanne had gastric bypass reversal surgery due to bariatric gastric bypass complications, a decision brought about by

her many different complications and constant GI/abdominal pain. Records indicate she had often been seen for these issues at JFK Bariatric Wellness and Surgery Center. The reversal was an open abdominal surgery, and she remained at the hospital recovering until 03/20/2020.

- Three days after her release from her gastric bypass reversal procedure (03/23/2020), Mrs. Kaye was admitted again to JFK Hospital for seizures. She arrived at the hospital unresponsive with eyes open, with her upper extremities flexed and verbally unresponsive and was again diagnosed status epilepticus with vomiting. Like before, she was diagnosed with acute hypoxemic respiratory failure and aspiration into the airway Providers immediately intubated her for airway protection, and after a dose of Ativan and 1 mg dialudid, she became verbally responsive and tearful. She was not extubated until 03/24/2020.  That day she had another series of seizure like movements and was given Ativan, which stabilized her. Mrs. Kaye was eventually discharged 03/28/2020.

- Less than two weeks later (04/10/2020), Mrs. Kaye had surgery to remove a Hickman catheter (a central line) from her upper right chest. The catheter had caused complications and was causing her malnutrition.

- On 05/28/2020 Suzanne was seen at the JFK Bariatric Wellness and Surgery Center for the follow-up on her gastric bypass reversal procedure. She had been post-operative for two and a half months.

- On 02/17/2021, following her arrest in this instant case (see PSI pg 2) Suzanne Kaye was brought to Good Samaritan Hospital by law enforcement officers for medical treatment of seizure, and doctors ordered a CT Head or Brain W/O Contrast due to a head injury. The CT of the brain showed that there was nothing abnormal. She was transported to the ER by medics for witnessed seizure. She had 3 additional seizure events in the ER witnessed by bedside RN and ED doctor.

- On 04/15/2021, (during her pretrial release and when Mrs. Kaye suspended her medical marijuana use), Mrs. Kaye went to the Emergency Department at West Boca Medical Center for tangential thought, multiple moderate complaints, abnormal blood pressure and seizure at home. She then had another seizure at the hospital where Ativan was administered. She presented on 04/15/2021 with seizure activity and afterwards she had left hemiparesis, most likely Todd's paralysis. A CT of the head and follow-up MRI of the brain and MRA were unremarkable. The CT

Brain scan was performed because Mrs. Kaye was presenting with stroke symptoms and it was necessary to rule out a stroke.

- Mrs. Kaye was admitted to JFK Hospital again on 04/25/2022 for the initial surgery for a recurrent ventral hernia. Unfortunately, the procedure was cancelled 04/27/2022 because staff could not start an IV on the patient, and Mrs. Kaye was sent home.

- On 06/01/2022 Suzanne Kaye she returned to JFK Hospital for her recurrent ventral hernia repair procedure, and was discharged on 06/02/2022.

- Finally, on 06/29/2022 while in court for the current offense, Mrs. Kaye began to have seizures. She had approximately 4 to 5 seizures with vomiting. She also stopped breathing 4 different times and started to turn blue. She was unresponsive to verbal and physical contact. Fire rescue was called to the scene and arrived after 20 minutes. They administered Ativan and oxygen and then took her to the hospital (Good Samaritan). She had another seizure that was witnessed by fire rescue on the way to the hospital. When she arrived at the hospital, she was hypertensive and tachycardic. Her skin was pale, dusky, gray and blue, and she had difficulty speaking and swallowing. A CT scan of her brain showed no abnormalities, and she was ultimately released 07/01/2022.

15. At ¶ 46, Mrs. Kaye clarifies that she uses her medical marijuana vape pen nearly every hour in order to prevent potentially deadly seizures. She uses a new cartridge weekly and about five cartridges a month.

16. At ¶ 51, Mrs. Kaye states that she has been receiving Social Security since 2005.

17. At ¶ 72, Mrs. Kaye objects to the finding that no factors warrant a departure or variance.[3] The Court should depart or vary simply because the guidelines overstate Mrs. Kaye's culpability and do not adequately account for the minor conduct at issue in this case compared to that of most true threats cases. Undersigned counsel maintains her position that after reviewing hundreds of these cases, she has found no case where so little conduct resulted in a criminal conviction. Most threats cases involve speech plus an action: acquiring firearms related to the threat, making additional confirmatory threats, recruiting others to join in the threat, traveling to make the threat, an interview with law enforcement where the defendant confirms their intent to threaten, or at a minimum -- mailing, calling, or otherwise directing and actually delivering the threat to the victim. No such actions accompany the speech in this case. The Court must consider the lack of corroborating conduct and action, which failed to accompany Mrs. Kaye's videos, when determining where her speech fall on the spectrum of threats.

---

[3] Mrs. Kaye will separately submit a motion for downward variance based on the remaining § 3553 factors and primarily because of her health conditions.

To that end, the PSI also fails to include two important provisions of the § 2A6.1 commentary, including the built-in departure provision of Note 4(A), which states:

> **In General.—**The Commission recognizes that *offenses covered by this guideline may include a particularly wide range of conduct* and that it is not possible to include all of the potentially relevant circumstances in the offense level. Factors not incorporated in the guideline may be considered by the court in determining whether a departure from the guidelines is warranted. *See* Chapter Five, Part K (Departures).

§ 2A6.1 N.4(A) (emphasis added). Nor does the PSI include the following "background" definition regarding when the Court should grant departures:

> **Background:** These statutes cover a wide range of conduct, the seriousness of which depends upon the *defendant's intent and the likelihood that the defendant would carry out the threat.* The specific offense characteristics are intended to distinguish such cases.

§ 2A6.1 N.4 Background.

Therefore, the Court must consider Mrs. Kaye's intent when posting the video and the likelihood that she would carry out the threat when imposing a sentence. Mrs. Kaye continues to maintain that she never intended to threaten the FBI and that she posted the videos for social media "content," The evidence at trial supported her lack of intent because she addressed the videos to her audience and addressed them as her "TikTok family," she posted the videos on her personal social media pages and not the FBI's social media, she did not send the videos to the FBI by email, mail, or any other fashion, she did not tag the FBI in the videos to alert them of the posts, and she took no action to carry out her statements. While the parties dispute the intent requirement for conviction,

in terms of the Court's sentencing review, Mrs. Kaye's intent is simply less than other defendants. She also did not receive the benefit of a warning, like many defendants described below.

As to the § 2A6.1 N.4 "background" guideline provision, zero evidence has been presented to this Court that Mrs. Kaye intended to carry out her threat. Indeed, agents did not even bother to apply for a search warrant to search her home to look for a firearm. Mrs. Kaye did not possess a firearm and made no efforts to acquire one in the several weeks after her videos were posted. She never intended to carry out any threat against the FBI.

The *de minimis* conduct Mrs. Kaye displayed compared to other convicted threats defendants is evident when comparing her case with those cited by the Government in their sentencing memorandum. *See* DE 140 at pg 6-9.[i] She was not on supervision like *Howard*, *Killingsworth*, and *Dierks*, she had no other criminal history like defendants Dierks, Killingswoth and Hoff, and she had no means to carry out her "threat" as seen in *Cooper* and *Dierks*. She did not deliver her threat directly to any person or organization (*Howard, Dierks*, *Killingsworth*, *Fratus, Hoff*, and *Pratersch*). Nor did she make prior or subsequent statements of a similar nature to the victim or others like *Howard*, *Killingsworth*, *Dierks*, *Fratus*, *Cooper*, and *Hoff*. Indeed, until her indictment, she had no idea anyone might believe them serious as she had not been previously warned to stop as in *Dierks*, *Fratus* and *Hoff*. Perhaps the closest case, that of defendant Pratersch, resulted in a 15-month sentence only after

the judge found he had both testified untruthfully and acted only "to sow chaos." And, unlike all the government's cited cases, Mrs. Kaye never explicitly (*Howard*, *Killingsworth*, *Dierks*, *Fratus*, *Cooper*) or implicitly (*Hoff*, *Pratersch*) claimed she desired the death of any specific or named agent.

The defense submits that Mrs. Kaye's conduct is more akin to the following cases, all of whom received supervision-only sentences:

- *United States v. David George Hammond*, 22-cr-00134-KKM (M.D. FL)(July 6, 2022). In this case the defendant directly emailed Congresswoman Ilhan Omar with the subject line "Your Dead You Radical Muslim," and the email stated:

  > "We Are Ready To Carryout Mass Assassinations Against Alquida Radicals That Have Somehow Got Into Our American Political Parties! Your Already On The HIT LIST BY OUR AMERICAN PATRIOT ARMY AND THE MOUSAD! YOU BETTER GET MORE SECURITY, OR WITHIN A WEEK YOU AND THE OTHER THREE RADICAL RATS WILL BE SIX FEET UNDER! THIS IS NOT A THREAT BUT FACT! ARE YOU READY TO DIE FOR ISLAM? ARE YOU READY TO DIE FOR ALLAH? ARE YOU READY TO GET OUT OF OUR COUNTRY! YOU WONT HEAR THE BULLET GOING THROUGH YOUR OR THEIR HEADS! ALL FOUR OF YOU CONGRESS WOMEN WILL DIE AND THE AMERICAN PEOPLE WILL CHEER! PATRIOTS AGAINST ISLAM! GOD BLESS AMERICA!"

DE 33 at pg 1-2. For this single email, which was sent directly to the subject of the threat, the Court sentenced the defendant to probation. DE 35.

- *United States v. Randall Tarr*, 20-cr-30001 (C.D. Ill.)(Nov. 20, 2020), Tarr called congressman Rodney Davis's Decatur's Illinois office and left the following voicemail:

> Man, I just saw you [unintelligible] on the TV. You backing the Russians, boy? What's wrong with you? Are you [unintelligible] so fucking stupid? I was in the military for eight years, and you son of a bitch, are backing the Russians over our own intelligence? What is wrong with you Rodney? Oh my God. I'm not voting for you next time. 2 3:20-cr-30001-SEM-TSH # 1 Page 3 of 5 You fucker. I'm not voting for, boy, you are a stupid son of a bitch. I don't care if you back Trump. But stupid son of a bitch, you're gonna go against our military and back the Russians? You fucking cocksucker. [Unintelligible], If I [unintelligible], I'm a sharpshooter. I could. I'd like to shoot your fucking head off you stupid motherfucker.

DE 1 at pg 3-4. Tarr received a sentence of two years probation from the Court. DE 37.

- *United States v. Theodore Mack*, 14-cr-00012-MW (N.D. FL) (May 2, 2014): the defendant sent an email message directly to Congressman Jim Jordan's which stated:

> ... Your Tea Party shit is hurting me, so now I am going to hurt your family. Get ready, [J.J], I am coming after you and all members of your family. You can't hide from an Army Ranger who is well armed and doesn't care if he dies.

DE 1. Mack entered a diversion agreement[4] with the United States and his federal case was dismissed. DE 22, 23.

18. At ¶ 74, Mrs. Kaye objects to the recommended special condition of supervision of mental health treatment, as she has already completed an evaluation and treatment as part of this case. As noted at ¶ 45, Mrs. Kaye underwent a mental health evaluation as part of her pretrial release and was evaluated on March

---

[4] Notably, the United States rejected a defense offer to enter into a diversion agreement in this case.

16, 2021 by Compass Health Services. Mrs. Kaye then engaged in counseling sessions until her discharge from treatment on December 10, 2021. *Id.* Essentially, the defense contends that this recommended supervision condition has already been satisfied, and therefore should not be ordered as a condition of supervision.

Respectfully submitted,

MICHAEL CARUSO
Federal Public Defender

*s/ Kristy Militello*
Kristy Militello
Assistant Federal Public Defender
Attorney for the Defendant
Florida Bar No. 0056366
450 South Australian Avenue, Suite 500
West Palm Beach, Florida 33401
(561) 833-6288 - Telephone
Kristy_Militello@fd.org

CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

_s/ Kristy Militello_
Kristy Militello

---

i For the court's convenience, each case's facts and ultimate sentence, with some additional, important factual details gleaned from their docket entries, are as follows:

_United States v. Killingsworth_, No. 4:20CR158, 2020 WL 4703090, at *1 (N.D. Ohio Aug. 12, 2020), _aff'd_, No. 21-3028, 2022 WL 294083 (6th Cir. Feb. 1, 2022) Killingsworth posted multiple threats on social media. _Id._ First, he posted general threats on a social media news page such as, "I think a cop needs killed around here again" and "More cops need shot dead. They kill us, we kill them." Secondly, he posted "_comments directed toward specific individuals_" such as: "Your kids need shot in front of you"; "F you and your kids, you won that prize"; "I'm going to F your wife first. Trust me I'll take one with me"; and "I'll see you in the woods." When arrested, Killingsworth reiterated his intent and the seriousness of his threats by stating to the police officers, "that more cops need shot because the police were killing people." 20-cr-00158-JRA (N.D. Ohio) at DE 18 at pg 3. At the time of the threats, Killingsworth was on parole for Attempted Burglary and Trespass. 20-cr-00158-JRA (N.D. Ohio) at DE 18 at pg 2. At sentencing, Killingsworth at only 28 years-old, was in criminal history category XI, the highest category under the federal guidelines. _See_ 20-cr-00158-JRA (N.D. Ohio) at DE 38.

The Court sentenced Killingsworth to 30 months in prison. _See_ 20-cr-00158-JRA (N.D. Ohio) at DE 40.

*United States v. Howard*, 947 F.3d 936, 940 (6th Cir. 2020) The defendant called former Attorney General Eric Holder at his current place of employment (a law firm) and directly left him a voicemail stating, "Former U.S. Attorney General Eric Holder, I'm going to kill you." In the voicemail, the defendant explained why he was making the threat and bolstered the seriousness of the threat by stating that double jeopardy prohibited him from being punished because he had already been "sentenced to 50 months in federal prison for…intentional assault of a federal agent or employee." *Id.* Indeed, Howard was on supervised release at the time of his threat, and he received a concurrent two-year sentence for his supervision violation. *Id.* at 941.

Howard received a 30-month sentence for his threat against former Attorney General Holder. *Id.*

*United States v. Dierks*, 978 F.3d 585, 588 (8th Cir. 2020) Mr. Dierks sent a series of tweets to Senator Ernst including "u r sn army bitch and I'll @USMC u tf up :)(: ; I'll f u up seriously in my sleep; I'll beat ur ass in front of ur widow I promise that." State law enforcement asked Dierks to "tone it down" warned him to stop sending threatening tweets. *Id. See also* 17-cr-2065 (N.D. IA) at DE 69-1 at pg 4. Instead of heeding the warning of law enforcement, Dierks sent several more tweets over the next few days including the following small sample of tweets,"@joniernst I'll flatline ur ass like @tendoublezero lol," "@senjoniernst [sic] i want u to die sorry not sorry," "@SenJoniErnst I'll end u cuz u think u r a man," and "@SenJoniErnst @TENdoubleZERO Ur a bitch deserving death I ask for life." 978 F.3d 585, 588. *See also* 17-cr-2065 (N.D. IA) at DE 69-1 at pg 4-7 (for a complete list of the tweets). A search of Dierks' home revealed a BB-gun, a karambit (a small Southeast Asian hand-held, curved knife resembling a claw), 2 other knives, and drug paraphernalia. 17-cr-2065 (N.D. IA) at DE 69-1 at pg 7. Officers also found in Dierks' home a video of the defendant appearing to covertly make threats against an unknowing neighbor and offering to kill that neighbor to viewers for "Bitcoin." *Id.* at 8. While awaiting trial, Dierks, "referred to Special Agent Scott Irwin as 'the fucking devil'; stated 'they better pray to God that I don't win'; and said 'if they want to put me away for five fucking years that's fine because I'll fucking get out and when I do I'm going to sue the fucking FBI. I'm going to be a millionaire after this is all done with.'" 17-cr-2065 (N.D. IA) at DE 69-1 at pg 17.

Dierks was convicted by a jury in three separate counts. 17-cr-2065 (N.D. IA) at DE 59. Dierks was a criminal history category of III. 17-cr-2065 (N.D. IA) at DE 69-1 at pg 14. The government moved for an upward variance, pursuant to the guidelines, because Dierks engaged in "substantially" more than two threats and because the senator was a high ranking official. 17-cr-2065 (N.D. IA) at DE 69-1. But the government found "most troubling" that "in the midst of making threats to Senator Ernst [defendant] also made a video of

himself making covert threats against an unwitting neighbor." 17-cr-2065 (N.D. IA) at DE 69-1 at pg 17. Dierks was also on supervision when he committed his threats. 17-cr-2065 (N.D. IA) at DE 69-1 at pg 18.

The Court sentenced Dierks to 72 months in prison. 17-cr-2065 (N.D. IA) at DE 84.

*United States v. Fratus*, 20-00270-cr-GJP (E.D. Pa) Mr. Fratus sent two emails directly to the Philadelphia Police Commissioner's email address. The first email contained subject "Answer the phone" with body "Calling the police now for an emergency. No answer. Dirty n*****! Find a n***** hang a n*****. Jews into the ovens!!!" The second email contained subject "Find a n***** kill a n*****" with body "Where does police chief live?"[i] 20-00270-cr-GJP (E.D. Pa) at DE 55 at pg 1. Fratus also threatened a Massachusetts law enforcement official by leaving voicemails on her phone during which he allegedly threatened to slit her throat. 20-00270-cr-GJP (E.D. Pa) at DE 55 at pg 2. When interviewed, Fratus admitted to threatening both the Philadelphia Police Commissioner and the Massachusetts law enforcement official. *Id.*

The same week, Fratus called a Jewish children's charity and left three voicemails and engaged in one recorded conversation during which he threatened, "Find a Jew, Kill a Jew. I'll find out where that f***ing day camp is and I'll find out where they are and I'll kill all those f***ing kids, how about that?" *Id.* at 2-3. Fratus also stated that he wanted to find the rabbi who operated this children's charity so he could slit his throat. *Id.* at 3. In the third voicemail, Fratus stated "I'm trying to find out where Jews live so I can kill them," and  "I hate Jews, I want them in the fucking oven." *Id.*

The calls were not the first time Fratus had come to the attention of the FBI. Two years prior, Fratus engaged in a series of threats against an African American Congresswoman. *Id.* Fratus made multiple statements, including a warning that the senator should be careful where she goes to eat because "maybe she will be assaulted," *id*;  "you are all a bunch of dumb n*****s who were brought here on slave ships, you should be grateful for it, stop being unacceptable and ungrateful, before you guys get whipped again, or maybe we will just have to f***king put you in the f***ing ropes where you belong," *id.* at 3-4; and that the Congresswoman should shut her mouth and get in her place or "we will start lynching n*****s again." *Id.* He also made several other statements regarding lynching the congresswoman and her children. *Id.* at pg 4. At that time, like *Dierks*, Fratus received merely a warning to stop and was not prosecuted. *Id.*

Fratus received a sentence of 48 months in prison. 20-00270-cr-GJP (E.D. Pa) at DE 87.

*United States v. Hoff*, 767 F. App'x 614, 616 (6th Cir. 2019) Mr. Hoff left five voicemails at U.S. Representative Steve Stiver's office that

concerned his safety and that of his family. Stiver contacted the Capitol Police, who warned Hoff to stop engaging in threatening behavior, but he continued. *Id.* Just four days after a shooting at a baseball practice in Washington D.C. where Republican congressmen and their staffs were fired upon, Hoff left Stiver a voicemail referencing the baseball practice shooting and stating: "I've seen the [ ] prayer y'all were saying at the baseball diamond last night. I think y'all better hit your knees and pray for the people that you're screwin up their lives with your secret legislation...." *Id.* Hoff continued: "We are taking our country back. We are on the march. The other day is the tip of the iceberg. I've tried to warn you.... Maybe the next one taken down will be your daughter, huh? Or even your wife. Or even you." *Id.*

At sentencing, Hoff had four and a half pages of criminal history ranging from "assault and battery, and criminal damaging, and vandalism, and criminal mischief, and petty theft, and disorderly conduct, and falsification, domestic violence, and stalking, aggravated menacing." *Id.* at 625. The judge found that he had "violated protective orders in the past and yet you have no criminal—no countable criminal history for purposes of this case simply because of the age." *Id.* at 625-626.

Hoff was sentenced to 40 months in prison. *Id.* at 625.

*United States v. Cooper,* 2019 WL 4259454, 3:19-mj-04254 (M.D. TN)
Mr. Cooper made two separate online threats on the same day including one post which stated, "make sure you tell them about how I plan to shoot up a planned parenthood facility in Washington dc on August 19th at 3pm." DE 12 at 3. In another post he stated, "IF YOU ARE A MEMBER OF THE FBI, CIA, WHATEVER, AND ARE ON MY PROFILE I WILL TRACE YOUR IP ADDRESS AND KILL YOU IF THE OPPORTUNITY ARISES. And I am dead serious about this. I'll do it with ricin, a bomb, or .308. Whatever it takes, the end result will be the same. I am serious about this. If I am personally contacted by any federal agents, I will do this. I will kill you. Again, I am serious. Sic semper tyrannis." *Id.* Cooper previously posted online pictures of firearms, images of Ted Kaczynski surrounding the text "DO IT FOR HIM" and a post stating "women dont fucking deserve to be the carriers of human life. they unanimously support abortion and the degradation of the family at least in the united States. if only i could impregnate one of my bros. i know theyd be a better mother than any 'modern woman.'" *Id.* at 4. A search of Cooper's telephone revealed a screenshot of the locations of ten power plants which supply "the majority of power" in the United States, several screen shots of firearms, a saved conversation regarding how to build a thermite bomb, diagrams of how to build a "Cupric Thermite Firebomb," a "Gasoline Bomb," directions for "DIY Thermite," and directions for making "Homemade Molotov Cocktails Using Homemade Napalm." 19-CR-286-ABJ (D.D.C) at DE 18 pg 3. He also discussed getting, "a bunch of retards behind me then im gonna commit domestic terrorism." *Id.* Cooper also saved "the entire sixteen-minute video of

the March 15, 2019, mass shootings at two mosques in Christchurch, New Zealand that left 51 people dead and dozens injured." *Id.* at 4. His own family made statements regarding Cooper's use of violence, punching holes in the wall, and his desire to purchase a firearm after the 2019 El Paso mass shooting. *Id.*

Despite all of these indications of violence, the government requested only a six month jail sentence. *Id.* at 8. Ultimately, the defendant received a sentence           of           "time           served."           DE           21.

*United States v. Pratersch*, Case No. 19-cr-0026-CEM-T (M.D. FL) Defendant Pratersch called Senator Sanders's main telephone line three times in about a half-hour timeframe, leaving anti-Semitic, misogynistic messages threatening to assault and kill the senator. Brief of the United States, 2019 WL 7424935 (C.A.11), at pg 1. Specifically, he left the following messages:

> *First Message (4:43 p.m.)* "Bernie, you Jew bastard. You had your chance. Now we're going to behead you ISIS style video taped for the world to see. [Inaudible] fucking hoes you got working for you. What do you got them sucking your cock too? You freak bastard."
>
> *Second Message (5:12 p.m.)* "Bernie you fucking Jew bastard. How's the knife going to feel cutting your head off boy? You Jew fucking cocksucker."
>
> *Third Message (5:13 p.m.)* "You pussy ass fucking Bernie Sanders cocksucker. Leave your name and address we'll get back to you. You motherfucker. Listen you Jew fucking cocksucker. You're dead. You're fucking dead."

*Id.* at pg 2. At his trial, Pratersch testified "untruthfully in front of the jury." DE 87 at pg 11. The Court also found that crimes like Pratersch's three voicemails are made for the defendant's own "perverse satisfaction for no apparent reason, but they are designed to sow chaos." DE 98 at pg 9.

Pratersch received a 15-month sentence. *United States v. Pratersch*, 808 Fed. App'x 768 (11th Cir. 2020).