**The New York Times** | https://www.nytimes.com/2022/10/13/us/politics/florida-prison-cancer-release.html

## Judge Holds Prison Officials in Contempt for Treatment of Terminally Ill Inmate

In an extraordinary rebuke, a federal judge in Florida said officials misled a court to block the compassionate release of prisoner who was dying of cancer.

 **By Glenn Thrush**

Oct. 13, 2022

WASHINGTON — A federal judge in Florida issued an extraordinary rebuke of prison officials and prosecutors, accusing them of misrepresenting the cancer diagnosis of a terminally ill inmate who was deprived access to compassionate release programs and subjected to a grueling journey home that ended in his death.

Judge Roy B. Dalton Jr. of the U.S. District Court for the Middle District of Florida held the Federal Bureau of Prisons and Kristi Zook, the warden of the low-security prison in Seagoville, Texas, in civil contempt of previous court orders intended to ensure the humane treatment of Frederick Mervin Bardell.

Judge Dalton's order, issued on Oct. 4, came after a court-appointed arbiter described a long pattern of federal neglect and indifference that began with a diagnosis of treatable colon cancer in 2020. The ordeal ended with Mr. Bardell's death last year, at age 54, when he arrived in Jacksonville, Fla., from Dallas in a weakened, skeletal state.

"Frederick Marvin Bardell was a convicted child pornographer," Judge Dalton wrote. "He was also a human being."

In the 14-page order, in unusually agonized and aggrieved language, the judge accused the Bureau of Prisons of being "indifferent to the human dignity of an inmate in its care."

The Bardell case is the latest in a recent series of scandals, inmate deaths and leadership failures in the federal prison system, which is overseen by the Justice Department.

On Thursday, the department's inspector general released a memorandum condemning the Prisons Bureau's handling of abuse accusations against its employees, particularly those involving sexual assault. The report found that inconsistent policies for handling complaints violated federal regulations and bureau policy by undervaluing the testimony of victims.

That created an environment that heightened threats to prisoners, especially women, leading to "unreasonably lenient penalties on staff that engage in serious misconduct," the report said. The bureau's "reluctance to rely on inmate testimony" also "likely emboldens miscreant staff members in their interactions with inmates."

Attorney General Merrick B. Garland recently appointed Colette S. Peters, the former director of the Oregon Department of Corrections, to run the Prisons Bureau. But the Justice Department has yet to announce comprehensive overhauls that advocates say are long overdue.

In a statement, Ms. Peters offered her "deepest condolences" to the Bardell family but declined to comment on the specifics of the case because it was the subject of continuing litigation. But she promised to cooperate with any investigations into the matter.

"In instances where we have failed at upholding our mission, we are taking steps to find out what happened, how it happened and how we can prevent it from happening in the future," she said.

At the forefront of their requests is increased use of compassionate release. Congress passed a law in 1984 authorizing the practice for "extraordinary and compelling" reasons, such as terminal illnesses. But top prisons officials, leery of releasing repeat offenders, have been cautious despite negligible risk and provisions in the First Step Act of 2018 that were intended to spur greater use of the practice.

"The Justice Department seems hellbent on wasting millions to incarcerate people who pose no risk to public safety, and it makes no sense," said Kevin Ring, the president of Families Against Mandatory Minimums, a prisoners' rights group based in Washington. "It is as dumb as it is cruel."

Judge Dalton recommended that Mr. Garland or the inspector general, Michael E. Horowitz, investigate "the circumstances of Mr. Bardell's confinement and treatment, the failure of the B.O.P. to respond to his medical needs, and the B.O.P.'s misrepresentations in connection with the compassionate release briefing regarding the seriousness of his condition."

Senator Richard J. Durbin, Democrat of Illinois and the chairman of the Judiciary Committee, wrote on Twitter that "the details unveiled in this case are appalling, and may not be isolated." He called on the Justice Department's inspector general "to investigate B.O.P.'s treatment of medically vulnerable individuals both while incarcerated and upon their release."

Mr. Bardell was sentenced to 151 months in federal prison in June 2012, after pleading guilty to distributing pornography of adolescent children on a file-sharing network.

Doctors discovered several years ago that he had an intestinal mass. It was determined to be colon cancer that, if treated in a timely manner, would have given him a 71 percent chance of long-term survival, according to a physician interviewed by the arbiter, known as a special master. Instead, it progressed to metastatic liver cancer.

In November 2020, Mr. Bardell, who had experienced bouts of bleeding, applied for compassionate release on the grounds that his condition was terminal. But an assistant U.S. attorney in the Middle District of Florida, Emily C. L. Chang, argued against his release, citing the bureau's Covid-19 protocols. She also said that Mr. Bardell was not suffering from a terminal illness and could be treated in prison.

Judge Dalton took the government at its word and rejected Mr. Bardell's release — a decision he said he now believes was based on false information.

"As we now know, it was not true that Mr. Bardell could receive adequate care in custody," the judge wrote. "And, regrettably, his condition was indeed terminal."

On Feb. 2, 2021, Mr. Bardell filed a second request, supported by an affidavit from a board-certified oncologist. The U.S. attorney's office responded that he had an examination that revealed "no evidence of malignancy" and questioned whether he had cancer at all, Judge Dalton wrote.

This time, the judge quickly granted Mr. Bardell's request and ordered the Bureau of Prisons to create a court-approved release plan, which was to include details on his transportation to Florida, where his parents lived.

But the bureau disregarded the order, Judge Dalton wrote. It released Mr. Bardell immediately without a plan, charged his parents for his airfare and had him "deposited on the curb of the Dallas/Fort Worth ('D.F.W.') airport to fend for himself" — bleeding, incontinent and with the tumor protruding from his abdomen.

Mr. Bardell managed to find a wheelchair and make it onto his flight, aided by fellow passengers, who helped him navigate a transfer in Atlanta, the judge wrote.

His parents were shocked when they met him at the airport in Jacksonville, Judge Dalton wrote. They later described him as "a whittled old man with gray hair."

Mr. Bardell's father removed his own shirt and laid it under his son in the car to absorb the blood and excrement as Mr. Bardell's lawyer rushed him to the hospital.

He died there nine days later. In his order, Judge Dalton included three deathbed photographs of Mr. Bardell, describing his condition as "skin and bones."

The judge said he regretted that he could take few steps to punish those involved in Mr. Bardell's treatment besides charging them with contempt, an action he acknowledged was largely symbolic.

The possible consequences were "grossly inadequate to address the callous disregard" shown to Mr. Bardell, the judge wrote, adding that "the B.O.P. as an institution and Warden Zook as an individual should be deeply ashamed" of what happened.

Judge Dalton then charged the Prisons Bureau $200,000 to pay for the special master's fees. He also ordered the bureau to reimburse Mr. Bardell's parents for the $494.20 they spent to fly their son home.

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                                             Case No. 6:11-cr-401-RBD-DAB

FREDERICK MERVIN BARDELL
_____

### <u>ORDER</u>

Judges carry the heavy burden of depriving individuals of their liberty. But the Bureau of Prisons shoulders the constitutional burden of protecting the remaining rights of the incarcerated while in custody. The possibility that the Bureau of Prisons would be so indifferent to the human dignity of an inmate in its care as the facts here demonstrate, increases the burden on the sentencing judge exponentially. This, of course, pales in comparison to the suffering of the inmate and his family.

Frederick Marvin Bardell was a convicted child pornographer. He was also a human being. Sentenced in June 2012 to 151 months in federal prison, Mr. Bardell ultimately found himself housed at the Seagoville Federal Correctional Institute in Seagoville, Texas, under the supervision of Warden Kristi Zook. (Doc. 59; Doc. 77, p. 6.) While in federal custody Mr. Bardell developed an intestinal mass that developed into metastatic colon cancer. (Doc. 106-4, p. 306.)

On November 6, 2020, Mr. Bardell filed a counseled Emergency Motion for

Compassionate Release, contending that he suffered from "unspecified bleeding," "metastatic liver lesions (suspected cancer)," and "malignancy in his colon." (Doc. 77, p. 4.) These facts were attested to by Celio O. Burrowes, M.D., who averred that Mr. Bardell "ha[d] a high likelihood of having cancer of the colon with likely metastasis to the liver." (Doc. 77-1. p. 2.) Troubled by the apparent severity of Mr. Bardell's condition, the Court ordered the Government to supply the medical and administrative record for Mr. Bardell and to respond to the motion in an expedited fashion. (Doc. 78.) In response, AUSA Emily C. L. Chang, focused, in the main, on the Bureau of Prisons' ("BOP") COVID-19 protocols and argued that while Mr. Bardell has "liver lesions highly suspicious for metastatic disease . . . to date, no one has determined that [his] condition is terminal." (Doc. 80, p. 16.) The Government also argued that there was no indication that Mr. Bardell could not receive adequate care in custody. (*Id.* at 1.) Based, largely, on the Government's assurance that Mr. Bardell's condition had not been determined to be critical and that he was receiving adequate care, the Court denied his motion for compassionate release. (Doc. 85.) Concerned about the claim of delayed diagnosis and treatment, the Court ordered that a copy of the Order be provided to Warden Zook. (*Id.* at 6.) As we now know, it was not true that Mr. Bardell could receive adequate care in custody, and, regrettably, his condition was indeed terminal.

On February 2, 2021, Mr. Bardell filed a second counseled Emergency

Motion for Compassionate Release, this time supported by an affidavit from a board-certified oncologist who averred that Mr. Bardell required immediate specialized treatment from a medical oncologist specializing in metastatic cancer of the colon and that his medical condition was emergent and likely terminal. (Doc. 86-1, ¶¶ 41, 22, 24–25). That same day, the Court again directed the Government to respond to the motion, this time within forty-eight hours. (Doc. 87.) In its response, the Government asserted that Mr. Bardell had been examined on December 18, 2020, and that examination revealed "no evidence of malignancy." (Doc. 88, p. 3.) A colonoscopy was later performed on January 29, 2021, with results pending. (*Id.*) Based on those exams, despite Mr. Bardell's evidence, the Government again asserted that the BOP was adequately managing Mr. Bardell's medical condition and that his motion should be denied. (*Id.* at 3–4.) The Government maintained that it was not even definitive that Mr. Bardell had cancer—let alone terminal cancer. (*Id.*)

This time, the Court granted Mr. Bardell's motion, directed his attorney Kimberly Copeland, Esq. to work with the U.S. Probation Office to create a release plan, and ordered the BOP to release him from custody **AFTER** having an approved release plan. (Doc. 92, p. 6 ("Release Order").) But the BOP ignored the Release Order.

The day the Court issued the Release Order, Copeland began working with

Probation to form a plan for Mr. Bardell's release.[1] (Doc. 129, pp. 23–24.) But the BOP released Mr. Bardell without waiting for a release plan. (*Id.* at 37.) In disregard of the clear language of the Court's Order, the BOP unilaterally implemented its own release plan without Probation's input by contacting Mr. Bardell's parents and having them pay almost $500 for a commercial flight to bring their dying son home. (*Id.* at 29.)

Rather than a medical transport, the BOP chose a "trustee-inmate"—another prisoner—to get Mr. Bardell to the airport. (*Id.* at 6.) The trustee-inmate was apparently not authorized to get out of the vehicle to assist Mr. Bardell—though the BOP has no written policy to this effect. (*Id.* at 6, 37.) Mr. Bardell had to be pushed out of the prison in a wheelchair but the BOP did not allow him to keep the wheelchair for his travel. (*Id.* at 9, 37.) So Mr. Bardell was deposited on the curb of the Dallas/Fort Worth ("DFW") airport to fend for himself. (*Id.*)

Somehow, Mr. Bardell managed to get a wheelchair. (*Id.* at 38.) Now skin and bones, wheelchair dependent, and bladder and bowel incontinent, Mr. Bardell flew commercial from DFW to Jacksonville, Florida. He was forced to navigate the busy DFW and Atlanta airports and he endured a layover and change of planes, alone. (*Id.* at 9, 37.) A good Samaritan fellow passenger helped Mr. Bardell off the

---

[1] Probation's plan in process included Bardell taking a commercial flight to Jacksonville, Florida, though Copeland had been making her own arrangements for Bardell to be medically transported by air. (Doc. 129, pp. 23, 26–27.)

flight. (*Id.* at 38.) Mr. Bardell, who had a tumor protruding from his stomach and was visibly weak and bleeding, unsurprisingly soiled himself during this not so bon voyage. (*Id.*) He was nearly unrecognizable to his parents, who waited at the end of his long odyssey to take him to the hospital. (*Id.*) They described Mr. Bardell as a "whittled old man with gray hair." (*Id.*) Once Mr. Bardell's parents were reunited with their son and attempted to get him in the car, his father had to take off his own shirt and put it on the seat of Copeland's car to absorb the blood and feces. (*Id.*) Copeland immediately drove Mr. Bardell to the hospital. (*Id.*) This is how Mr. Bardell, then 54 years old, arrived:







(Docs. 94-1, 94-2, 107-6.)

Mr. Bardell never made it out of the hospital. He died nine days after his release. (Doc. 97.) With timely diagnosis and treatment, Mr. Bardell's attesting physician assessed his chances of survival at 71%. (Doc. 77-1, ¶ 9; Doc. 86-1, ¶ 14.)

For its wholesale disregard of the Court's Release Order, the BOP is found to be in civil contempt and sanctions are imposed.

## BACKGROUND

Once notified of Mr. Bardell's death and the disturbing circumstances of his release, the Court issued a show cause order to the BOP and Warden Zook why they should not be held in contempt for violating the Release Order, to which they responded. (*See* Doc. 99 ("OSC"); Docs. 106–07.) The Court appointed former U.S. Attorney A. Lee Bentley, Esq. as Special Master to develop a record for further investigation and recommendation. (Docs. 109, 111.) The Court ordered the BOP to pay for the Special Master's attorney's fees. (*See* Doc. 111, ¶ 7.) On completion of his investigation, the Special Master recommended the Court find the BOP and Warden Zook (in her official capacity) in civil contempt and impose sanctions.[2] (Doc. 129 ("R&R").) The Special Master found:

- The BOP and Warden Zook had the ability to comply with the Release Order.

---

[2] Neither party objected to the Special Master's appointment or the R&R. (Docs. 110, 130–32.)

- There were *no* procedures in place to ensure court orders were followed.

- Most BOP employees did not even read the Release Order.

- No BOP employee attempted to speak to Probation to comply with the approved release plan condition.

- No BOP employee considered whether Bardell should have been provided assistance given his medical condition.

(Doc. 129, pp. 4–6, 45, 65.) Further, though it is the BOP's responsibility to pay for an inmate's transportation once released, it refused to pay for Mr. Bardell's flight. (*Id.* at 5, 46–47; Doc. 129-24, p. 6.) Instead, his parents paid. (Doc. 129-26.)

At the hearing, the Court adopted the Special Master's recommendation, held the BOP and Warden Zook in civil contempt, and sanctioned the BOP. (*See* Doc. 135.) This Order memorializes the oral pronouncements made in the hearing.

## STANDARDS

A finding of civil contempt must be based on clear and convincing evidence that: "(1) the allegedly violated order was valid and lawful; (2) the order was clear, definite and unambiguous; and (3) the alleged violator had the ability to comply with the order." *McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000). Civil contempt sanctions may either coerce the party into compliance or compensate the injured party for losses sustained. *See In re McLean*, 794 F.3d 1313, 1323 (11th Cir. 2015). Once the "contumacious conduct" ceases, the need for a coercive sanction ends, but the court retains the power to impose compensatory sanctions. *FTC v.*

*Garden of Life, Inc.*, 516 F. App'x 852, 860 (11th Cir. 2013).[3] Damages only need to be shown by a preponderance of the evidence. *See McGregor*, 206 F.3d at 1387. A compensatory sanction "reimburses the injured party for the losses and expenses incurred because of his adversary's noncompliance. This [reimbursement] includes losses flowing from noncompliance . . . ." *Rickard v. Auto Publisher, Inc.*, 735 F.2d 450, 458 (11th Cir. 1984).

## ANALYSIS

### I.     Civil Contempt and Sanctions

The Special Master recommended finding that the Release Order was lawful and unambiguous and that the BOP and Warden Zook had the ability to comply. (Doc. 129, p. 4); *see McGregor*, 206 F.3d at 1383. Neither the BOP nor Warden Zook dispute this finding, implicitly acknowledging that they disregarded the Court's directives. (Docs. 131, 132.) So the BOP and Warden Zook[4] are held in civil contempt for their violation of the Release Order.

As for sanctions, the Special Master recommends imposing compensatory sanctions against the BOP in the form of reimbursing[5] Mr. Bardell's parents for the

---

[3] *See* 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[4] The Court holds Warden Zook in civil contempt only in her official capacity given that all actions she undertook were in the course of her duties as a warden. (*See* Doc. 129, pp. 58–60); 28 U.S.C. § 2679(d)(1).

[5] The Special Master did not recommend a sanction regarding the possibility of Mr. Bardell being medically transported by air because he may have traveled through commercial flight even if the BOP and Warden Zook had complied with the Release Order—

commercial flight and requiring the BOP to pay for the Special Master's attorney's fees as the Court previously ordered, which currently total over $200,000. (*See* Doc. 111, ¶ 7; Doc. 129, pp. 73–80; Doc. 132, p. 2 n.2); *Garden of Life*, 516 F. App'x at 860. Again, the BOP does not contest this sanction. The Court adopts the Special Master's recommendation and finds that reimbursing Mr. Bardell's parents for the flight they purchased, along with paying the Special Master's fees, are appropriate sanctions against the BOP. These consequences are, unfortunately, grossly inadequate to address the callous disregard for Mr. Bardell exhibited by his custodians but the Court's sanction toolbox is limited when dealing with civil contempt.

While the sanctions imposed are remedial in nature and restricted by law, the Court admonishes the BOP and Warden Zook for their blatant violation of a Court Order and sheer disregard for human dignity. The BOP as an institution and Warden Zook as an individual should be deeply ashamed of the circumstances surrounding the last stages of Mr. Bardell's incarceration and indeed his life. No individual who is incarcerated by order of the Court should be stripped of his right to simple human dignity as a consequence. The purposes of incarceration, which include rehabilitation, deterrence, and punishment, do not include depriving a

---

though nothing is certain because the BOP did not wait for an approved plan before releasing Mr. Bardell. (Doc. 129, pp. 6, 7.)

human being of the fundamental right to a life with some semblance of dignity. The treatment Mr. Bardell received in the last days of his life is inconsistent with the moral values of a civilized society and unworthy of the Department of Justice of the United States of America.

The BOP does not just bear a constitutional responsibility to care for incarcerated human beings. The BOP, like every other government entity in this country, must follow the Orders entered by United States District Courts by the power vested in them by Article III of the U.S. Constitution. They are not above the law or beyond its reach however insular may be their operation.

The Court is hopeful that in some small way, these proceedings will illuminate the BOP's arrogant—and wholly mistaken—notion that it is beyond reproach and the reach of the Court. It is not. If any institution should embody respect for the Rule of Law, it is an agency that operates under the aegis of the Department of Justice. This Court will do everything in its power to ensure that the BOP is held to account for its demonstrated contempt for the safety and dignity of the human lives in its care.

## II.     The Court's Recommendations

Though this contempt proceeding focused primarily on the circumstances surrounding Mr. Bardell's release, the Court is also troubled by his care and treatment while confined, especially during the latter stages of his incarceration.

(*See, e.g.*, Doc. 86-1.) The Court has serious reservations about the adequacy of his treatment and diagnosis. In light of these concerns, the Court recommends that the Attorney General (or Inspector General for the Department of Justice) undertake an investigation into the circumstances of Mr. Bardell's confinement and treatment, the failure of the BOP to respond to his medical needs, and the BOP's misrepresentations in connection with the compassionate release briefing regarding the seriousness of his condition.

On a parallel track, the Court retains jurisdiction to continue investigating the circumstances surrounding the truthfulness of the assertions in the Government's filings as well as Mr. Bardell's incarceration and release. To this effect, the Court does not discharge the Special Master from his duties, as further directives and Orders may follow.

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED**:

1.   The R&R (Doc. 129) is **ADOPTED**, **CONFIRMED**, and made a part of this Order in its entirety.

2.   The OSC (Doc. 98) is **DISCHARGED**.

3.   The BOP and Warden Kristi Zook in her official capacity are **HELD IN CIVIL CONTEMPT** for violating the Release Order (Doc. 92).

4.   By **Monday, October 17, 2022**, the BOP is **ORDERED** to reimburse

Mr. Bardell's parents for the commercial flight totaling $494.20.

5.      The Court **RECOMMENDS** that the Attorney General, Office of the Inspector General, or other appropriate investigative offices undertake an examination into the conditions of Mr. Bardell's confinement, treatment, and misrepresentations to the Court.

6.      By **Monday, October 17, 2022**, attorneys for the BOP and Warden Zook, Julie Posteraro, Esq., and Glenn S. Greene, Esq., are **DIRECTED** to certify that they have served this Order on the following parties:

      a.      The Director of the BOP;

      b.      The Attorney General of the United States;

      c.      The Deputy Attorney General of the United States; and

      d.      The Office of the Inspector General for the Department of Justice.

7.      By **Tuesday, October 18, 2022**, the Special Master is **DIRECTED** to file a motion to recover fees and costs incurred through the date of this Order or to otherwise file a notice with the Court certifying that the billing is current under (Doc. 111, ¶ 7).

8.      The Court **RETAINS JURISDICTION** to continue its own investigation into the Government's misrepresentations to the Court

and Mr. Bardell's confinement and release.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on October 4, 2022.



ROY B. DALTON JR.
United States District Judge

Copies:
A. Lee Bentley, Esq.
Kimberly L. Copeland., Esq.
Glenn S. Greene, Esq.
Julie Posteraro, Esq.