FORBES  >  MONEY  >  PERSONAL FINANCE

# Federal Bureau Of Prisons' Medical Care Falls Short Of Its Own Policy

**Walter Pavlo** Contributor ⓘ

*I write and consult on federal criminal law and criminal justice.*

Follow

💬 0                                        Apr 19, 2022, 11:41am EDT

Listen to article   8 minutes



**1 of 4** free articles                                   ✕

Subscribe to journalism that illuminates, informs and inspires.              **Subscribe Now**

The Federal Bureau of Prisons (BOP) has numerous policies and program statements, all meant to set a standard for operations in an agency responsible for the care of 160,000 prisoners. Among them is a program statement for medical care of prisoners entitled Patient Care. The overall goal of the program is stated as being, "*Health care will be delivered to inmates in accordance with proven standards of care without compromising public safety concerns inherent to the agency's overall mission.*" However, those standards are being compromised as a result of staffing shortages that the agency has faced for years now.

The BOP's prisoner population peaked at over 215,000 around the same time that the BOP updated its Patient Care Program in June 2014. Today, there are 155,000 prisoners, 60,000 fewer than in 2014, yet the BOP's budget has increased over the same period of time. One cost driver is healthcare of prisoners.

When the BOP updated its Patient Care program statement, it had one lofty goal of creating something called Primary Care Provider Team (PCPT). According to the statement, a PCPT is a core group of health care providers and support staff whose function is to provide direct patient care. It was designed to improve health care services by "*enhancing continuity of care and promoting preventive health care measures.*" The BOP believed that it would function in the same manner as a medical office in a community setting, only it would be inside a prison. On paper, every inmate would be assigned to a medical team of health care providers and support staff who are responsible for managing the inmate's health care needs. The statement went on with a lofty prediction that

**1 of 4** free articles

Subscribe to journalism that illuminates, informs and inspires.    **Subscribe Now**

forward to the reality of today, nearly 8 years after PCPT, the BOP is struggling to care for prisoners in its care.

Be assured, "sick call" is still very much part of medical care inside of federal prisons where prisoners stand in line asking for medical attention for anything from fever, to chest pain, to aching limbs from an injury. Not much has changed. One of the conditions cited in the program statement to make the program a success is that "*Appropriate levels of support staff must be achieved when implementing PCPT.*" That is a problem in today's BOP.

MORE FROM FORBES ADVISOR

### Best Travel Insurance Companies

By **Amy Danise** Editor

### Best Covid-19 Travel Insurance Plans

By **Amy Danise** Editor

PCPT guidelines were provided for each institution so that for a day shift PCPT staffing pattern for 1,000 general population inmates will have; 1 physician, 3 mid-level practitioners, 1 registered nurse, 1 or 2 licensed practical nurses and/or medical assistants, 2 health information technicians, and a medical clerical staff person. On paper, it is a team of professionals all assigned to take care of a contingent of prisoners.

In March 2022, the Department of Justice Office of the Inspector General (OIG) issued a report on audits of three BOP contracts awarded to the University of Massachusetts Medical School

**1 of 4** free articles

Subscribe to journalism that illuminates, informs and inspires.          Subscribe Now

OIG, the report also provided insight into challenges facing the BOP's medical care of prisoners. The report's conclusions were:

*"Although the BOP told us that it did not identify any significant problems with UMass's performance related to the timely delivery of inmate healthcare and quality of care, we found that BOP did not have a reliable, consistent process in place to evaluate either the timeliness of inmate healthcare or the quality of that care."*

*"Further, we found that the BOP faced challenges in transporting inmates to off-site appointments which resulted in a frequent need to reschedule appointments that could delay an inmate's healthcare. In addition, the BOP did not have systems in place to track and monitor the causes for rescheduling appointments, including whether the reason for a cancellation was a BOP issue or one that was out of its control, such as the physician cancelling the appointment.*

*"BOP also did not have a process in place to monitor how long an inmate waited to receive care after a cancelled appointment. Because the BOP did not have systems to measure or track any of these issues, we believe it is difficult for the BOP to determine whether inmates are receiving care within the required community standard."*

A report by OIG is one thing, but how is it playing out on the front lines of providing care in prisons?

A senior medical person at an institution (name and institution withheld) frustrated with the lack of action by the Warden, sent

**1 of 4** free articles

Subscribe to journalism that illuminates, informs and inspires.        **Subscribe Now**

according to the submission to OIG is that *"We now have several psychiatric patients decompensating daily. We also have many diabetics, hypertensives, cardiomyopathy and HIV inmates that have run out of medications and have no way of refilling them until they, as well as emergent issues, or are lucky enough to communicate the need to executive staff, or custody staff who communicate it to Medical. We repeatedly are responding to attorney, and family member inquiries about inmates who have not received medication. This, of course takes time away from patient care for the TWO BOP staff members who can resolve the issues, myself and the Nurse Practitioner. ... There are currently OVER 750 unfilled prescriptions."*

I spoke with Charles Jones, Union President of AGFE Local 4036, who works at FCI Marianna in Florida, *"The BOP till hasn't implemented PCPT teams as outlined in policy at Marianna or anywhere from my understanding. This was suppose to be used to give inmates an experience similar to outside world."*

Jones told me that the same issues faced in 2014 have been exacerbated today. *"Currently we are still down positions in medical and this doesn't include the additional positions of 1 nurse and 1 doctor position that we have still not gained back from the 2016 staffing cuts. We had several medical staff leave once hired due to the lack of staff in the department and the expectation for those staff to do all the work all while being questioned about overtime. Those shortages put a lot of normal heath procedures for inmates on backlog. This has caused significant issues of scheduling many outside medical trips each day which is carried*

**1 of 4** free articles

Subscribe to journalism that illuminates, informs and inspires.        **Subscribe Now**

Aaron Mcglothin, Union President at FCI Mendota (California) said in an interview about whether his facility could pass PCPT, "*I know our facility definitely does not meet that criteria. We have over 1,300 inmates and we would not pass that type of inspection but then again the only inspections that happen at our facilities are by agency representatives who cover for management.*"

The staff member at one institution who submitted the plea for help to OIG ended with this ominous note [all CAPS were part of the original submission], "*THIS IS UNACCEPTABLE, DANGEROUS. Literally a powder keg awaiting an explosion.*"

*Follow me on* [Twitter](#) *or* [LinkedIn](#). *Check out my* [website](#) *or some of my other work* [here](#).



**Walter Pavlo**                                    [ Follow ]

I founded Prisonology, an expert network firm of retired Bureau of Prisons professionals, to work with defendants and criminal defense lawyers on federal prison issues. In... **Read More**

Editorial Standards                                    Reprints & Permissions

ADVERTISEMENT

## Join Our Conversation

One Community. Many Voices. Create a free account to share your thoughts. Read our community guidelines [here](#)

Commenting as **Guest**    🔔  Log in   Sign up

Be the first to comment...

**1 of 4** free articles

Subscribe to journalism that illuminates, informs and inspires.                **Subscribe Now**



**No one seems to have shared their thoughts on this topic yet**

Leave a comment so your voice will be heard first.

Powered by ⚙ OpenWeb          Terms | Privacy | Feedback

**1 of 4** free articles

Subscribe to journalism that illuminates, informs and inspires.          **Subscribe Now**



Audit of the Federal Bureau of Prisons
Comprehensive Medical Services Contracts
Awarded to the University of Massachusetts
Medical School

★ ★ ★

22-052

MARCH 2022



# EXECUTIVE SUMMARY

## Audit of the Federal Bureau of Prisons Comprehensive Medical Services Contracts Awarded to the University of Massachusetts Medical School

## Objectives

The Department of Justice Office of the Inspector General conducted an audit of the Federal Bureau of Prisons' (BOP) contracts awarded to the University of Massachusetts Medical School (UMass) to provide comprehensive medical services at the Federal Correctional Complex located in Butner, North Carolina (FCC Butner); Federal Medical Center located in Devens, Massachusetts (FMC Devens); and Federal Correctional Institution located in Ray Brook, New York (FCI Ray Brook). The objectives of this audit were to assess the BOP's award and administration of the contracts, and UMass's compliance with the terms, conditions, laws, and regulations applicable to the contracts.

## Results in Brief

We found areas for improvement related to the BOP's acquisition process, contract administration, contract performance oversight, and payment of billings. The acquisition process weaknesses resulted in extended periods of time where the BOP acquired medical services without full and open competition. We also determined that BOP officials lacked sufficient data to effectively monitor the contracts, did not maintain adequate documentation for changes made to contracts, and did not appropriately review billing documentation prior to payment. In addition, BOP contract administration staff did not act within their delegated authority when approving invoices for payment.

Further, the BOP did not have a reliable, consistent process in place to evaluate timeliness or quality of inmate healthcare. We determined that the BOP could improve its contract monitoring to enable it to assess these performance requirements.

## Recommendations

Our report contains 15 recommendations to assist the BOP in improving its acquisition process for medical services, contract administration, management of contract performance, and billing process.

## Audit Results

Between 2012 and 2014, the BOP awarded three indefinite-delivery/requirements contracts to UMass, which has been providing comprehensive medical care to BOP since 1999. The three contracts, which had an estimated total value of over $304.4 million, were for UMASS to provide comprehensive medical services at FCC Butner, FMC Devens, and FCI Ray Brook. Each contract period of performance was 1-year base and four 1-year options. As of March 2020, all three contracts ended, and the facilities were using short-term contracting methods to acquire medical services from UMass.

### Acquisition Process

We found that the BOP did not always complete its acquisition planning and awarding of follow-on CMS contracts in a timely manner. We determined the delays in the CMS acquisition process were related to poor collaboration and communication among the facilities and the centralized contracting office, inefficient processes involving the preparation and approval of the Request for Contract Action and the completion of proposal technical evaluations, and a lack of preparing written acquisition plans and establishing milestones.

### Contracting without Full and Open Competition

As a result of the BOP's inefficient acquisition process, FCC Butner and FMC Devens purchased medical services for nearly 2 years without full and open competition. In addition, we found that the BOP did not adhere to Federal Acquisition Regulation (FAR) requirements when contracting without full and open competition, such as including adequate documentation to support the Contracting Officer's determination that prices paid for services were fair and reasonable.

### Contract Administration

We found the BOP completed contract modifications when adding services to the contract requirements, but contract administration staff did not include sufficient documentation

in the contract file justifying the modifications.  We also found that the BOP did not always properly delegate contract administration responsibilities to Contracting Officer's Representatives (COR).  In an instance where a COR was delegated at FMC Devens, the COR did not maintain a current COR certification, as required by the FAR.

## Contract Performance

Although the BOP told us that it did not identify any significant problems with UMass's performance related to the timely delivery of inmate healthcare and quality of care, we found that BOP did not have a reliable, consistent process in place to evaluate either the timeliness of inmate healthcare or the quality of that care.  Specifically, we found that for the contracts we audited, facility staff did not complete required tasks to review and evaluate UMass's performance of the contract requirements.  Also, we found that UMass did not provide all required on-site clinics consistently throughout the period of performance of the contracts. In addition, we found that BOP did not have a reliable, consistent process throughout all BOP facilities to monitor and analyze wait times for outside inmate appointments and the causes for cancelled or rescheduled appointments to ensure inmates receive timely healthcare.

## Billing

Our review of the BOP's process related to CMS billings identified several areas where the BOP can and should improve.  Specifically, we found that the BOP did not have a consistent process to review billings for off-site services to ensure they were billed at Medicare rates and in some instances these charges were not verified at all.  Also, we found that the BOP did not always rely on adequate supporting documentation when reviewing billings and that invoices were approved for payment by staff who were not delegated such authority in a COR delegation letter. Additionally, we found that staff, without the proper authority, negotiated pricing not covered by the contract potentially putting the BOP at risk of being subjected to disputes, claims, or overpaying for medical services.  Finally, we found that FCC Butner paid UMass $169,814 in interest during fiscal years 2018 and 2019 because it paid invoices after 30 days, which did not comply with the requirements of the Prompt Payment Act.

# Table of Contents

Introduction .................................................................................................................................1

    Background .............................................................................................................................1

        The Federal Bureau of Prisons..........................................................................................1

        FCC Butner ........................................................................................................................2

        FMC Devens.......................................................................................................................2

        FCI Ray Brook ....................................................................................................................2

        University of Massachusetts Medical School ....................................................................2

        OIG Audit Approach ..........................................................................................................3

Audit Results .............................................................................................................................4

    Comprehensive Medical Services Acquisition Process............................................................4

        Acquisition Process Environment.....................................................................................4

        Request for Contract Action and Supporting Documentation ..........................................5

        Evaluation of Proposals ....................................................................................................6

        Establishing and Managing Milestones Throughout the Acquisition Process ...................7

    Contracting without Full and Open Competition ...................................................................7

        Other than Full and Open Competition Authority and Required Documentation ...................8

        Monitoring of Contracting without Full and Open Competition ....................................9

    Contract Administration .......................................................................................................10

        Contract Modifications....................................................................................................10

        Contracting Officer Representative.................................................................................11

    Contract Performance ..........................................................................................................12

        Inpatient and Outpatient Services...................................................................................12

    Comprehensive Medical Services Costs Billing Process.........................................................15

        Off-site Medical Services Billings ...................................................................................15

        On-site Medical Services Billings ....................................................................................16

        Staff Assigned to Approve Billings ..................................................................................16

        Prompt Payment Act .......................................................................................................17

Conclusion and Recommendations.........................................................................................18

APPENDIX 1:  Objectives, Scope, and Methodology ...............................................................20

    Objectives ...........................................................................................................................20

    Scope and Methodology.......................................................................................................20

Statement on Compliance with Generally Accepted Government Auditing Standards............20

Internal Controls.................................................................................................................20

Compliance with Laws and Regulations ..............................................................................21

Sample-Based Testing..........................................................................................................22

Computer-Processed Data ...................................................................................................22

**APPENDIX 2:  The Federal Bureau of Prisons Response to the Draft Audit Report** .............................23

**APPENDIX 3:  Office of the Inspector General Analysis and Summary of Actions Necessary to Close the Audit Report**...................................................................................................................29

# Introduction

The Department of Justice Office of the Inspector General has completed an audit of three Federal Bureau of Prisons' (BOP) contracts awarded to the University of Massachusetts Medical School (UMass) between 2012 and 2014 to provide comprehensive medical services at the Federal Correctional Complex located in Butner, North Carolina (FCC Butner); Federal Medical Center located in Devens, Massachusetts (FMC Devens); and Federal Correctional Institution located in Ray Brook, New York (FCI Ray Brook).  The contracts were indefinite-delivery/requirements contracts[1], and each had a 1-year base and four 1-year options.  As of March 2020, the comprehensive medical services contracts at all three facilities expired, and each facility used monthly purchase orders to acquire medical care for its inmates.  The estimated total values of the contracts are presented in the following table.

### Table 1

#### Comprehensive Medical Services Contracts with UMass

| BOP Facility | Estimated Value |
| --- | --- |
| FMC Butner | $175,515,071 |
| FMC Devens | 120,742,210 |
| FCI Ray Brook | 8,166,684 |
| Total | $304,423,965 |

Note:  The estimated value at each facility was calculated using the original contract award, any changes made throughout the contract, and amounts from the Justification for Other than Full and Open Competition.

Source:  BOP contract documentation and staff interviews

## Background

### The Federal Bureau of Prisons

The BOP was established in 1930 to provide more progressive and humane care for federal inmates, professionalize the prison service, and ensure consistent and centralized administration.  As of December 2020, the BOP was responsible for the custody and care of 152,184 federal inmates.  The BOP seeks to protect society by confining offenders in the controlled environments of prisons and community-based facilities that are safe, humane, cost-efficient, and appropriately secure.  It also seeks to provide cost-effective health care consistent with community standards by providing essential medical, dental, and mental health services for federal inmates.

When the BOP's internal resources cannot fully meet inmates' health care needs, the BOP awards contracts to supplement its in-house medical services.  Comprehensive medical services (CMS) contracts are intended to

---

[1]  FAR 16.503 states that an indefinite-delivery/requirements contract is one that provides for filling all actual purchase requirements of designated Government activities for supplies or services during a specified contract period with deliveries or performance to be scheduled by placing orders with the contractor.

provide necessary professional and facility services for inmates both as inpatients and outpatients.  The CMS contractors provide these services at local physician's offices, hospitals, and other healthcare facilities, as well as at medical specialty clinics conducted on-site at individual facilities.

The BOP's Field Acquisition Office (FAO) in Grand Prairie, Texas, is responsible for awarding contracts that exceed the Simplified Acquisition Threshold, rather than the individual facility awarding such contracts.[2]  After contract award, facility contracting staff are responsible for contract administration and management functions, while FAO staff provide facilities assistance and guidance.

## FCC Butner

FCC Butner is comprised of five facilities:  a low security facility, two medium-security facilities, a minimum-security satellite prison camp, and a Federal Medical Center (FMC).  Most of the medical services at the complex are provided at the FMC.  The FMC is a full functioning hospital, identified as a Care Level III/IV facility, and provides all specialty areas of medicine, as well as being the primary referral center for all inmates requiring oncology, chemotherapy, or radiation therapy.  As of July 2020, FCC Butner housed 4,203 inmates.

## FMC Devens

FMC Devens is comprised of a federal medical center and an adjacent minimum-security satellite camp, fulfilling the medical and mental health care needs of male inmates.  The FMC, identified as a Care Level IV facility, provides health care to inmates with serious health issues and is the primary center for providing transplant services for inmates.  As of July 2020, FMC Devens housed 919 inmates.

## FCI Ray Brook

FCI Ray Brook is a medium security facility with a detention center and is identified as a Care Level 1 facility with a generally healthy inmate population.  Regardless of this designation, the need for inmate healthcare may arise at any time and in any level of complexity.  As of July 2020, FCI Ray Brook housed 561 inmates.

## University of Massachusetts Medical School

UMass, a public institution and the Commonwealth of Massachusetts' only public medical school, was founded in 1962 to provide affordable medical education for state residents and to increase the number of primary care physicians in underserved areas.  Currently, it is an academic health science center of 6,180 professionals.  UMass offers services and expertise to help federal and state agencies and other health care organizations create and apply needed health care solutions.  This includes offering innovative options for clinical, financial, and policy challenges in developing and administering entire programs serving vulnerable populations.

The UMass Health and Criminal Justice Program provides comprehensive, innovative health care solutions and is responsible for the performance of BOP's comprehensive medical services contracts awarded to UMass.  UMass has been providing comprehensive medical care to BOP since 1999.

---

[2]  As of February 2020, the Simplified Acquisition Threshold is $250,000.  Prior to December 12, 2017, the threshold was $100,000.

## OIG Audit Approach

The objectives of this audit were to assess the BOP's award and administration of the contracts and UMass's compliance with the terms, conditions, laws, and regulations applicable to the contracts in the areas of: (1) contractor performance; (2) billings and payments; and (3) contract management, oversight, and monitoring.

In conducting our audit, we tested compliance with what we consider to be the most important conditions of the contract award.  Unless otherwise stated in our report, the criteria we used to evaluate compliance are contained in the Federal Acquisition Regulation (FAR), and BOP policies and procedures.  We interviewed BOP Central Office and FAO officials.  We also interviewed FCC Butner, FMC Devens, and FCI Ray Brook staff from the Health Services Unit, Business Office, and Contracting who were involved with the UMass contracts. Additionally, we interviewed key personnel at UMass, including executive management and other officials and staff.

We also tested the BOP's procedures for ensuring adequate contract acquisition, administration, and oversight, and reviewed supporting documentation to ensure compliance with contract requirements.  Additionally, we reviewed the BOP's contract files to ensure completeness as required by the FAR.  Lastly, we tested invoices billed to the BOP to ensure accuracy and allowability of costs.

# Audit Results

We found that delays in the CMS acquisition process caused the BOP to acquire medical services for extended periods of time without full and open competition.  We believe these delays can be avoided in the future with improved collaboration, training, and communication, as well as better monitoring of the acquisition process using established milestones.  Additionally, we found that the BOP did not comply with requirements under the FAR related to: (1) adequate documentation in the contract file when executing CMS contract modifications, (2) properly delegating contract administration responsibilities to qualified Contracting Officer's Representatives (COR), and (3) delegated CORs maintaining required certifications.

We also determined that improvements can be made to BOP's management of inpatient and outpatient services.  The improvements relate to ensuring BOP staff that are delegated performance oversight responsibilities complete their required performance reporting tasks and maintain supporting documentation for the contractor's ratings, and ensuring staff are provided guidance and tools for the steps that can be taken when contract requirements are not fulfilled timely.  Further, BOP should implement a reliable, consistent process throughout all BOP facilities to monitor and analyze wait times for outside inmate appointments and the causes for cancelled or rescheduled appointments to ensure inmates receive timely and quality healthcare.

Additionally, we found that the BOP did not ensure that the facilities had a consistent process to review off-site medical services billings for accuracy, that billings for on-site providers had adequate supporting documentation, that appropriate staff approved billings for payment, and that the facilities complied with requirements of the Prompt Payment Act.[3]

## Comprehensive Medical Services Acquisition Process

We found that the BOP has not always been able to complete its acquisition planning and awarding of CMS contracts in a timely manner.  As a result, FCC Butner and FMC Devens acquired medical services for nearly 2 years after existing contracts ended without full and open competition.  We determined the delays in the CMS acquisition process were related to poor communication and collaboration among the individual facilities and the FAO, inefficient preparation and review of documentation included in the Request for Contract Action (RCA), technical evaluations of proposals that were frequently postponed due to a lack of guidance and policies to assist in completing the evaluations, and a lack of preparing acquisition plans including establishing and monitoring milestones for the acquisition.  In addition, we found that a majority of the acquisition process tasks were the responsibility of Health Services staff within the facilities who had other responsibilities that took precedence, and that those priorities resulted in some of the delays in the acquisition process.

### Acquisition Process Environment

CMS contracts are used by the BOP to provide medical services to inmates that cannot be fulfilled within the facility using BOP resources such as access to specialists, transplants, and oncology care.  CMS contracts are awarded for a 5-year period of performance and steps must be taken to have the next contract awarded timely in accordance with BOP policies and the FAR.  The acquisition of medical services at the BOP is a shared responsibility between the FAO and the individual facility where the medical services are necessary.  We found that the facility staff we interviewed for this audit were not always familiar with how to complete required

---

[3] FAR Subpart 32.9

acquisition planning tasks.  While the FAO staff were continuously engaged in the acquisition of medical services for individual facilities throughout the BOP, staff at an individual facility only work on these tasks once every 5 years.  In addition, most of the facility staff that were responsible for these tasks told us they had not received training and did not have written policies and procedures specific to their tasks.

Health Services staff at the facilities responsible for acquisition tasks also told us that completing required documents was difficult due to a lack of understanding in how to prepare the documentation.  Also, other responsibilities within the Health Services Unit, such as providing healthcare to inmates, took precedence over these tasks.  FAO staff told us that they understood facility staff had other priorities; however, there were significant delays, and the FAO staff rarely elevated such issues to senior management.

### Request for Contract Action and Supporting Documentation

The acquisition of CMS begins with the preparation of an RCA that includes documentation required by the BOP, such as an acquisition plan, government estimate for the cost of the services requested, and a description of the necessary services.  While the BOP Acquisition Policy is silent regarding how long completing and approving the RCA should take, it does include a minimum adequate acquisition lead time of 1 year to award a CMS contract from the time an RCA is approved by the FAO.

Although it is the responsibility of a facility's staff to complete an RCA, FAO staff told us that, given the complexity of CMS acquisitions, the FAO typically notifies facilities when an RCA is required approximately 18 months prior to the existing CMS contract ending.  However, we were told by staff at the three facilities that they were not notified by the FAO, and instead they initiated the process on their own 12-18 months prior to ongoing contracts ending.  Given that the BOP estimates the minimum amount of time to award a CMS contract after RCA approval is 1 year, the notification at 18 months would provide 6 months to complete and approve an RCA.  However, we found that the most recent RCAs submitted by FCC Butner and FMC Devens took about 18 months to approve – three times longer than anticipated.

In our review of the RCA process, we found that there was a significant amount of time spent on completing an adequate independent government cost estimate, and we believe this was the cause of significant delay.  Government cost estimates provide the anticipated quantity and related cost of services in an acquisition, and the estimate is prepared by facility staff with first-hand knowledge of a facility's medical needs.  FAO staff told us they provided facility staff general guidance to prepare cost estimates and approved an RCA once it was determined to be adequate.

In our review of the government cost estimates associated with recent CMS acquisitions at FCC Butner and FMC Devens, we found several revisions were made to the estimates, but none of the revisions appeared to be significant.  In some instances, we found that these revisions took several months to be completed and submitted back to the FAO, and these revisions could have been avoided with a discussion between the FAO Contracting Officer and facility staff.  Additionally, we did not identify specific documented reasons for the revisions.  Facility staff told us that there were instances where FAO staff told them revisions were adequate, but then would receive the estimate back months later requiring additional changes.  Additionally, facility staff told us they did not have written policies and procedures specific to preparing cost estimates or training to assist them when completing the cost estimates.

## Evaluation of Proposals

FAO staff use completed RCAs to solicit proposals from prospective vendors through solicitations that include evaluation criteria.  The proposals are to detail how vendors intend to fulfill the requirements established by the BOP in the solicitation.  The submitted proposals are evaluated by both the FAO and facility staff.  FAO staff are responsible for completing an evaluation of price and past performance for each submitted proposal, while the facility staff complete a technical evaluation of each proposal.  FAO works with the facility to convene an evaluation panel consisting of two to three Health Services staff and provides the panel with guidelines for completion of evaluations.

Similar to the completion of RCAs, we found issues with the completion of evaluations for the recent CMS acquisitions at FCC Butner and FMC Devens that contributed to CMS contract award timeliness issues.  We found that the technical evaluation process for the FMC Devens proposals, replacing the contract ending in January 2018, was significantly delayed.  Although the FAO received potential vendors' proposals in May 2019, we found that the proposals were not provided to the technical evaluation panel until October 2019 and the evaluations were not completed and provided to the FAO until March 2020.  We also found no documented communications between FMC Devens staff and the FAO throughout the evaluation process, and no documentation in the file regarding the delays.

For the FCC Butner acquisition, we found that the FAO Comprehensive Medical Service Section Chief and Contracting Officer traveled to the facility to provide in-person guidance for completing the technical evaluations due to the complexity of the requirements.  FCC Butner staff told us that this expedited the process and that, without FAO assistance, staff would not have known what to do and would have been unable to complete the evaluations as quickly.

Staff at both facilities responsible for conducting the technical evaluations told us that the evaluation criteria was generic and vague and did not apply to all the requirements in the solicitation, which made it difficult to evaluate the proposals.  For example, staff at one facility told us that a requirement in the solicitation was to provide on-site clinics, while the evaluation criteria included determining the distance to and from the service provider.  Because the services were to be offered within the facility and were not to include transportation to the provider, the evaluation criteria were not applicable.

In addition, we found that conducting technical evaluations was not routine for facility staff, similar to our finding regarding the completion of RCAs.  According to the facility staff, no training specific to completing technical evaluations had been provided, and there were no written policies and procedures on how to conduct the evaluations.

At the conclusion of our audit, we discussed with BOP officials the training, support, and guidance concerns discussed in the above sections and were told that training was in place for those who complete acquisition tasks, and that FAO was available to provide support to facility staff whenever necessary.  However, we asked but were not provided any additional documentation demonstrating these actions.

Given the challenges facility staff expressed throughout the audit and the timeliness issues related to CMS acquisitions, we believe the BOP should ensure facility staff are aware of resources available to assist in completing acquisition tasks and more thoroughly document its training provided to facility staff responsible for completing acquisition planning tasks.  Additionally, we recommend that BOP should obtain feedback regarding

training currently provided to its facility staff and enhance its training and resources related to preparing adequate RCAs and completing technical evaluations.

### Establishing and Managing Milestones Throughout the Acquisition Process

As discussed, awarding CMS contracts is a multi-step process lasting 18 months or longer and requires collaboration between the FAO and the individual facilities.  The FAR requires agencies to prepare a written acquisition plan that includes milestones necessary to award the contract in a timely manner, as well as the technical, business, management, and other significant considerations of the acquisition.[4]  BOP officials told us that for the CMS acquisitions, milestones were not established or tracked in a written acquisition plan because the contracts are awarded as firm-fixed and do not require a written acquisition plan in accordance with the BOP Acquisition Policy and FAR.  However, the contract documentation we reviewed identified the CMS contracts as indefinite delivery/requirements, which is required by the FAR to have a written acquisition plan.  Regardless, due to the timeliness issues identified previously throughout the acquisition process, we believe the BOP should establish and monitor milestones to ensure CMS contracts are awarded prior to the existing contract ending.

Although the BOP does not require written acquisition plans for CMS acquisitions, BOP maintains contract files with documents and information related to CMS acquisitions in its electronic contract file system.  In our review of these contract files, we found the files included most of the information required in the written acquisition plan except milestones for key events throughout the acquisition process.  We also found that the BOP's electronic system includes a feature to create and monitor milestones, but that this feature was not being utilized.

Because the BOP did not identify and document acquisition milestones, along with planned and actual completion dates – including explanations for significant delays, the contract files were not as useful as they might have been for BOP management to monitor and identify the steps in the process that were prone to delay.  As a result, we recommend the BOP ensure that written acquisition plans, including milestones, are completed for CMS acquisitions and that the established milestones are monitored and any delays, and associated causes and steps taken to address the delays, are documented in the contract file.

## Contracting without Full and Open Competition

We found that delays in the CMS acquisition process resulted in follow-on contracts not being awarded prior to existing CMS contracts ending at both FCC Butner and FMC Devens.  Due to the continuous need to provide medical care for inmates, the BOP bridged these gaps by purchasing medical services using short-term purchase orders.  As shown in Table 2, the BOP purchased medical services through short-term purchase orders at FCC Butner and FMC Devens for approximately $85 million over about 2 years.

---

[4] FAR 7.105

Table 2

Short-Term Contracting for Medical Services

| BOP Facility | Dollar Amount | Number of Monthly Purchase Orders | Number of JOFOCs |
|---|---|---|---|
| FCC Butner | $56,466,946 | 25 | 6 |
| FMC Devens | 28,329,901 | 20 | 4 |
| Total | $84,796,846 | | |

Note:  The dollar amount and number of months were calculated from the end of the 6-month extension exercised after the contracts period of performance ended until March 2020.

Source:  BOP Justification for Other than Full and Open Competition (JOFOC) documents

Although not prohibited, contracting without full and open competition carries risks, such as overpaying for goods and services, and should only be used under certain conditions.  Based on our review, we found the BOP relied on contracting without full and open competition to purchase medical services rather than ensuring follow-on contracts were awarded timely.  As such, to mitigate the associated risks with contracting without full and open competition, the BOP should have a well-designed process including sufficient documentation of the Contracting Officer's determinations and adequate monitoring.

## Other than Full and Open Competition Authority and Required Documentation

To authorize the purchase of medical services without full and open competition, contracting staff at FCC Butner and FMC Devens prepared a written document referred to as a Justification for Other than Full and Open Competition (JOFOC).[5]  The purpose of the JOFOC was to serve as part of the contract file detailing why the required services were obtained without competition as required by the FAR.

We found that the BOP prepared 10 JOFOCs, 6 at FCC Butner and 4 at FMC Devens, to justify the purchase of approximately $85 million in medical services without full and open competition between January 2018 and July 2020.  We reviewed 5 of the 10 JOFOCs to determine whether BOP included sufficient facts and rationale in the justification to justify the use of the authority cited.[6]  We found that the BOP used the authority of 'unusual and compelling urgency' in all the JOFOCs we reviewed.  According to the FAR, this provision should be applied in situations where: (1) an unusual and compelling urgency precludes full and open competition; and (2) delay in award of a contract would result in serious injury, financial or other, to the Government.[7]  Additionally, the FAR notes that agencies cannot use contracting without full and open competition due to a lack of advance planning.[8]

We also found that the contract files did not include sufficient information to justify the use of the selected authority.  Specifically, we focused our review on the BOP's documentation to support the Contracting Officer's

---

[5]  FAR 6.303-1(a)

[6]  FAR 6.303-2

[7]  FAR 6.302-2(b)

[8]  FAR 6.301(c)

determination that the anticipated cost was fair and reasonable.  We found that, for the JOFOCs reviewed, the JOFOCs indicated that the Contracting Officer determined the anticipated costs were fair and reasonable; however, the contract files did not include any supporting documentation or analysis to support that determination.  We found that for some of the JOFOCs reviewed, the anticipated costs were based on the same rates as the expired contracts, while in other JOFOCs reviewed the rates for some services had increased. However, we found that both facilities did not have supporting documentation to justify that the increased rates were fair and reasonable.  In one instance, the FMC Devens Contract Specialist requested assistance on rate determinations from a FAO Contracting Officer and was advised that the increased rates were acceptable; but FAO did not provide supporting documentation for this determination.  Also, we found at FCC Butner that the Contract Specialist negotiated the increased rates with UMass; however, there was no supporting documentation included in the contract file for how the rates were determined to be fair and reasonable.

The FAR also limits the duration of when 'unusual and compelling urgency' can be used.  Specifically, the FAR requires that the period of performance of a contract awarded using this authority: (i) may not exceed the time necessary to meet the unusual and compelling requirements of the work to be performed and for the agency to enter into another contract for the required services using competitive procedures, and (ii) may not exceed 1 year unless the head of the agency determines exceptional circumstances apply.[9]

We reviewed the period of performance for all 10 JOFOCs and found that while each was prepared to cover a period of performance less than 1 year, when added to the previous JOFOC, the period using the authority at each facility exceeded 1 year.  For example, FMC Devens prepared four different JOFOCs, each with a period of performance of 6 months, or a combined total of 2 years as shown previously in Table 2.

In addition to documentation requirements, when agencies contract for services without full and open competition, the agency is required to make the justification publicly available with such disclosure being made within 30 days of the contract award and a posting maintained for a minimum of 30 days.[10]  We found that none of the justifications for FCC Butner and FMC Devens were posted publicly or for the minimum of 30 days. Contracting staff at FMC Devens told us that they were unaware of this requirement.

As a result of the issues we identified with the contract documentation and authority used by the BOP, we recommend the BOP review its use of JOFOCs for CMS acquisitions to ensure compliance with regulations and ensure staff understand the requirements when contracting without full and open competition.

## Monitoring of Contracting without Full and Open Competition

The FAR and BOP Acquisition Policy require that all JOFOCs exceeding the Simplified Acquisition Threshold be approved by the FAO Chief and those that exceed $650,000 receive an additional level of approval from the BOP Procurement Executive and the BOP Assistant Director for Administration Division who serves as the BOP Competition Advocate.[11]  We determined that the BOP adhered to its approval process for the JOFOCs we

---

[9]  FAR 6.302-2(d)

[10]  FAR 6.305

[11]  BOP Acquisition Policy 6.304(c) and FAR 6.304(a)(2)

reviewed.  However, we found that the BOP did not have an adequate process in place to monitor its use of contracting without full and open competition.

BOP's Central Office and FAO officials told us that both offices maintained logs of JOFOCs submitted for approval.  We reviewed both logs from October 2017 through February 2020 and found that the FAO logged 134 CMS JOFOCs including 52 over $650,000, while the Central Office log only included 17 CMS JOFOCs.  The Central Office's Procurement Executive and Competition Advocate told us that they reviewed each JOFOC when it was submitted, but they only receive those over $650,000 and were unaware of the total number of JOFOCs prepared related to CMS acquisitions.  These officials also told us they were unaware how frequently and for how long the facilities were contracting without full and open competition.

We believe that BOP's senior procurement officials lacked sufficient data on the use of contracting without full and open competition related to medical services.  Information providing a more complete picture of this type of contracting would enable senior management to more effectively identify potential underlying problems in the CMS acquisition process and ensure contracting without full and open competition is limited to those circumstances provided by regulation.

As a result of these issues, we recommend the BOP implement a process to properly justify, manage, and monitor all CMS contracting made without full and open competition.

## Contract Administration

We found that the BOP did not adhere to the FAR in several areas related to contract administration of the CMS contracts.  Specifically, we found that the contracting staff at FCC Butner and FMC Devens did not maintain adequate documentation in the contract files when adding services to the requirements through contract modifications.  Additionally, we found that the BOP did not properly delegate contract administration responsibilities to CORs.  Lastly, we found that the delegated COR at FMC Devens did not maintain a current certification because the required training was not completed in accordance with DOJ guidelines.

### Contract Modifications

In large, complex, multi-year contracts such as CMS contracts, it is not uncommon for requirements to change, making it necessary to add or change services that were not anticipated during acquisition planning.  These changes are prepared by the Contracting Officer and called contract modifications.  The FAR requires that the Contracting Officer must include sufficient documentation in the contract file when adding or changing services through a contract modification.  We found 14 of the 27 contract modifications completed for the CMS contracts at both FCC Butner and FMC Devens were made to add services not originally included in the contract requirements.

One important item that is required for Contracting Officers to document in the contract file is how the price was determined to be fair and reasonable when adding services without using competitive procedures.  From our review of the 14 contract modifications that added services, we found that only 2 of the contract modification files included sufficient documentation to support the Contracting Officer's determination that the price for the new services was fair and reasonable.  We found that eight of the contract modification files did not include any documentation to support the Contracting Officer's determination regarding price, and the remaining four included insufficient documentation, in our judgement, to adequately support the Contracting

Officer's determination that the prices were fair and reasonable.  Specifically, we found that these four contract modification files did not include enough information to allow for any meaningful review and scrutiny, such as comparisons to rates for the same specialty in the facility's locality.

We also found that the BOP added positions and services that, according to BOP officials, the BOP does not usually include as part of CMS contract requirements.  In particular, FAO officials told us that the BOP prefers to include only professional medical services as requirements of the CMS contracts, and to award separate contracts for non-professional medical services, such as dental assistants and technicians.  We also found that contract modifications were used to include non-emergent medical transportation services to the CMS contract requirements.  FAO officials told us that Contracting Officers are expected to exercise professional judgment when completing contract actions and that decisions must be sufficiently documented.  FAO officials also told us that, although the preference is to award these services separately, due to the importance of providing timely medical care to inmates, adding these services to the CMS contract would be the best option.

Based on the issues we identified with the documentation provided regarding contract modifications, we recommend the BOP enhance its controls to ensure its contract files comply with regulations for maintaining documentation related to contract modifications.

## Contracting Officer Representative

Contracting Officers are responsible for ensuring performance of all necessary contract actions and contractor compliance with the terms and conditions of a contract.  To assist with the day-to-day administration of a contract, the Contracting Officer has the authority to designate a COR, and is required to provide a written delegation letter to officially designate the COR.  The delegation letter outlines the COR's responsibilities under the contract and the limits of the COR's authority and must be retained in the contract file and updated as necessary.  Additionally, the FAR specifies that a COR shall be qualified by training and experience commensurate with the responsibilities delegated, as well as be certified in accordance with the Office of Management and Budget's guidance.[12]  Due to the complexity of the CMS contracts, the BOP requires the designee to have a FAC-COR Level II certification.[13]

We reviewed the contract files for the three facilities to determine if the BOP properly delegated COR responsibilities and documented the delegation as required.  We found that the BOP did not always properly delegate its COR designations.  Specifically, we found that at FCC Butner, the facility staff member most recently designated as the COR was no longer employed at the BOP and that an updated appointment letter had not been issued by the Contracting Officer.  Instead, another staff member who previously was appointed as the COR was responsible for fulfilling the delegated COR responsibilities.  We found that FCC Butner officials were unaware that the COR delegation letter was not current.  Although the facility staff member acting as the COR had previously been appointed as a COR for the CMS contract, without a current and accurate delegation letter there was the risk that the COR may be unaware of any changes to the contract terms and conditions.

---

[12]  FAR 1.602-2(d)

[13]  The Federal Acquisition Institute and the Office of Federal Procurement Policy have established the FAC-COR certification program, which has three levels of certification that allows for appropriate training and experience to manage various contracts from low-risk simple to high-risk complex.

At FCI Ray Brook, we found that the delegated COR retired in October 2019 and a replacement COR had not been selected because the facility did not have a FAC-COR Level II certified staff member in the Health Services unit.

We also found that the COR at FMC Devens did not maintain the FAC-COR Level II certification after June 2019 because continuous learning requirements were not met by the COR. To maintain a FAC-COR Level II, CORs are required to complete 40 continuous learning points (CLP) hours every 2 years. FAC-COR certification is managed at the federal agency level and, as such, DOJ identifies the training courses that may be taken to satisfy the continuous learning requirement. We found that while the COR at FMC Devens had taken the required hours of training, some of the hours were not eligible to be used for continuous learning purposes according to DOJ's policy. We believe that the risk of poor contract administration increases when delegated staff fail to maintain their certifications.

We recommend that the BOP review and enhance its policies and procedures to ensure that those delegated to administer CMS contracts are appropriately certified, and that appropriate delegations are in place.

## Contract Performance

The CMS contracts we audited required UMass to establish a network of medical specialists to conduct on-site clinics inside facilities and provide inpatient and outpatient services in a community-based setting, such as at local physician's offices, hospitals, and other healthcare facilities. According to the contracts, UMass must conform to community standards in the delivery of healthcare, which includes providing care in a timely manner. [14] During our interviews, BOP officials told us that they did not identify any significant issues related to UMass's performance of contract requirements. However, we found areas where BOP can improve its oversight of contract performance requirements, including monitoring the timeliness and quality of inmate care, ensuring required specialty on-site clinics are provided, and managing and understanding the causes and effects of appointment cancellations on inmate care.

### Inpatient and Outpatient Services

For our audit, we visited FCC Butner, FMC Devens, and FCI Ray Brook and reviewed the contracts awarded to UMass to provide medical services at the facilities. The FMC at FCC Butner and FMC Devens are two of the BOP's six FMCs that are classified as Care Level IV facilities and house inmates with severe health problems and may require daily nursing care. BOP's Care Level IV facilities possess the bureau's most advanced clinical capabilities and resources.

Based on our review of BOP's monitoring records and interviews of BOP's contracting and medical staff, we determined that BOP was generally satisfied with the quality and quantity of services provided under all three contracts. While the healthcare provided to the inmates was continuously monitored throughout their medical evaluations, we found that the BOP did not have a formal process in place to ensure the timeliness of the healthcare inmates received. For the contracts we audited, we found that the BOP did not utilize any mechanisms to consistently review and evaluate UMass's performance of the contract requirements, including the quality and timeliness of healthcare. At the conclusion of our audit, BOP officials told us this is done using

---

[14] Community standard refers to the level and type of care that a reasonably competent and skilled health professional, with a similar background and in the same medical community, would have provided under the circumstances.

reports generated from the BOP's electronic medical records system and completion of the Quality Assurance Surveillance Plan.[15]  However, during our audit, we were not provided evidence that these evaluations were completed for the contracts audited.

We also found that the BOP did not ensure UMass provided all the on-site clinics required by the contracts and it was therefore necessary for BOP to transport inmates outside facilities for treatment, resulting in avoidable security risks and additional expenses.  Further, we found that the BOP faced challenges in transporting inmates to off-site appointments which resulted in a frequent need to reschedule appointments that could delay an inmate's healthcare.  In addition, the BOP did not have systems in place to track and monitor the causes for rescheduling appointments, including whether the reason for a cancellation was a BOP issue or one that was out of its control, such as the physician cancelling the appointment.  BOP also did not have a process in place to monitor how long an inmate waited to receive care after a cancelled appointment.  Because the BOP did not have systems to measure or track any of these issues, we believe it is difficult for the BOP to determine whether inmates are receiving care within the required community standard.

Clinics provided by CMS contractors within BOP facilities are critical for BOP efforts to effectively and efficiently address the health care needs of its inmates.  These clinics also help BOP manage security risks and cancellations by avoiding transporting inmates to community hospitals and doctors' offices.  The CMS contracts we audited identified the clinics UMass was expected to provide according to medical specialty.  For example, at both FCC Butner and FMC Devens, the contracts required UMass to provide clinics for specialties such as cardiology, optometry, vascular surgery, and infectious disease.  The CMS contract at FCC Butner also required UMass to provide after-hour physicians to ensure inmates had around the clock medical care.

From our discussions with BOP and UMass staff and in reviewing documentation, we found that UMass did not always provide all the medical specialty clinics required by the contracts.  Because of this, the BOP was required to transport inmates to off-site facilities for appointments in specialty areas for which there was no on-site clinic.  Also, we found that even though some specialty areas were included in the contracts, BOP did not enforce the contract requirements to provide certain on-site clinics because the demand for the specialty area of care was not sufficient to support the clinic.  BOP did not revise or modify the contract requirements in these situations because of the changing needs of its inmates at the facilities could change in the future.  However, in other circumstances, we found that the BOP identified on-site clinics that were included in the contract requirements, but UMass was unable to provide physicians to conduct the clinics.  For example, at FCC Butner, UMass did not continuously provide a vascular surgery physician for the required on-site clinic.  From September to October 2019, 17 appointments were required to be scheduled off-site for this specialty even though the contract required an on-site clinic for vascular surgery.  When appointments are completed off-site, there is an additional security risk and other appointments cannot be scheduled due to limited BOP resources for off-site appointments.  Additionally, we found that when required on-site clinics were not provided, the BOP did not take any further action to promote contract compliance by ensuring that UMass staff the clinics, except to discuss the status of the vacant clinics at the monthly contractor meetings.

We reviewed the issue of vacant clinics with UMass officials who told us that they are sometimes unable to fill certain clinics because it is difficult to recruit qualified professionals willing to treat inmates inside BOP facilities. UMass officials also told us that the BOP includes in its solicitations for CMS contracts certain clinics that are

---

[15]  The Quality Assurance Surveillance Plan is required by FAR Part 46 and includes rating elements such as quality of goods/services, timeliness of deliveries/performance, business relations, and customer satisfaction.

never requested by the facility throughout the life of the contract.  We reviewed the recent solicitation for a follow-on contract at FCI Ray Brook that required certain clinics even though these clinics had not been provided by UMass in the preceding 5 years covered by the existing contract.  Although this solicitation was beyond the scope of our audit, the BOP stated that it included these on-site clinics in the solicitation in the event that inmate needs change at the facilities.

Due to the variety of inmate medical needs, not all healthcare treatments can be provided within a facility.  The CMS contracts contemplate the need for inmates being seen outside the facility in cases where the level of inmate health care needed exceeds the medical care BOP can provide within the facility, or through available on-site clinics provided by UMass.  In these circumstances, BOP is responsible for transporting these inmates to area hospitals and doctors' offices.  While BOP officials told us they did not have any concerns regarding UMass's scheduling of appointments and the care inmates received outside the facility, they described for us some challenges that can add to the time inmates wait for treatment outside the facility.  These challenges included limits on staff available to escort inmates and the limited number of trips leaving facilities on a single day.  For example, FCC Butner and FMC Devens officials told us that many off-site appointments were rescheduled due to emergency medical trips out of the facility that required around the clock correctional staff coverage and limited how many other trips could be made out of the facility.  UMass and BOP officials also told us that appointments are rescheduled for other unanticipated reasons, such as inmate refusal to attend the appointment, illness of the inmate, or rescheduling required by the medical provider.

UMass officials also told us that there was a significant amount of time spent by its staff cancelling and rescheduling inmate appointments.  During our audit, we found that the BOP does not adequately track cancelled or rescheduled inmate appointments, and we were unable to determine what impact these cancellations and rescheduling had on the delivery of timely medical care to inmates.  Due to the lack of reliable information, we also were unable to verify information provided by UMass regarding the number of cancelled or rescheduled appointments and the reasons why the appointments were cancelled or rescheduled.  The Health Services staff at FCC Butner and FMC Devens told us that they believed most of the cancelled or rescheduled appointments were due to emergency medical trips that took precedence over scheduled, routine appointments, and this resulted in a lack of available BOP correctional officers and vehicles, but we did not identify documentation that supported this explanation.

While we agree the environment for scheduling and transporting inmates for treatment outside the facility is challenging, we found that the BOP does not have a process in place to track cancelled or rescheduled inmate appointments in order to determine wait times, identify causes of cancelling or rescheduling appointments, or demonstrate that UMass was rescheduling inmate appointments in a timely way following a cancellation.

At the conclusion of our audit, we discussed these issues with BOP officials and were told that inmates healthcare is consistently monitored, and the timeliness of outside appointments was determined by the referring physician using community standards.  However, as discussed above, we were unable to determine from BOP records whether delays that resulted when appointments were cancelled and rescheduled impacted the delivery of inmate healthcare.

To improve compliance with contract terms related to inpatient and outpatient services, we recommend that BOP ensure that BOP staff delegated performance surveillance responsibilities complete required performance reporting tasks and maintain supporting documentation for the contractor's ratings.  BOP should also provide

facility staff guidance and tools for the steps that can be taken when contract requirements are not fulfilled in a timely manner.

Additionally, BOP should implement a reliable, consistent process throughout all BOP facilities to monitor and analyze wait times for outside inmate appointments and the causes for cancelled or rescheduled appointments in order to ensure that inmates receive timely medical care.

## Comprehensive Medical Services Costs Billing Process

From our review of the billing process for medical costs at the three facilities, we identified areas for improvement, including ensuring billings for off-site medical services using Medicare rates are adequately reviewed, sufficient documentation is maintained for on-site providers, appropriate delegations for staff who approve billings for payment, and facilities have procedures in place to avoid the payment of interest.

### Off-site Medical Services Billings

Off-site physician services, medical procedures, and hospital services billed by UMass, as well as other CMS contractors, use Medicare-based rate structures that are often complex.[16]  To address the risks associated with the significant amounts billed by contractors for CMS contracts, and the additional complexities created by the use of the rate structures, the BOP contracted with a third-party claims adjudication vendor to ensure the accuracy of claim information, verify that the BOP is not billed for duplicate claims, and verify the local benchmark Medicare rate structures used in the billings.

In 2017, the OIG issued a report that included a recommendation to the BOP to require CMS contractors to submit electronic claims, ensure those claims are properly analyzed and maintained by the BOP's adjudication vendor, and enforce existing contract language that requires the adjudication vendor to perform fraud analytics and report any indicators of fraud to the BOP.  This recommendation was based on the determination that BOP medical care claims were processed primarily through paper based manual methods.  In response to the OIG's recommendation, the BOP awarded a medical claims adjudication services contract, but, as of March 2020, the BOP had not begun using the adjudication vendor because of technology issues within the BOP.

During our audit, we found that the three facilities each processed its off-site medical services claims in a different manner.  We found that FCC Butner utilized the third-party adjudication vendor until August 2019, but since that time its medical service claims were not processed through the adjudication vendor.  In addition, from August 2019 to March 2020, UMass billed over $20 million for medical services provided to FCC Butner that were not reviewed through an adjudication process.  Facility staff told us that the invoices were merely reviewed for mathematical accuracy and to ensure the inmate received the services billed.  Based on the volume of medical services claims, we believe the BOP is at risk of overpaying for medical services incurred by the inmates at FCC Butner due to the adjudication vendor not being appropriately utilized and the complexities to review Medicare rates.

---

[16]  The contracts in our audit utilize Medicare Part A or B Benchmark pricing for the specific locality with a premium applied.

We found the Health Services Unit staff at FMC Devens purchased its own adjudication software that allowed it to adjudicate the UMass invoices for medical services billed using Medicare rates.  The staff told us they preferred to review invoices rather than using the adjudication vendor.

We found that medical services claims at FCI Ray Brook were only reviewed for mathematical accuracy and that the inmate received the services billed, and that no verification of the use of Medicare rates was performed.

As a result of the inconsistent review process of medical services billings, we recommend that the BOP implement specific policies and procedures for reviewing billings submitted using Medicare-based rates, and that the BOP ensure that facilities utilize the third-party adjudicator vendor.

## On-site Medical Services Billings

In a 2007 OIG audit report of the BOP's CMS contract at FCC Butner, the OIG found that FCC Butner did not review, or sign timesheets prepared by on-site providers and did not calculate time spent at the facility by these providers according to the main entrance visitor logs to verify the accuracy of hours billed for on-site providers. The OIG recommended that the BOP implement controls that require on-site providers to record their arrival and departure times within their designated work areas each day, and periodically compare the hours reported in timesheets to the hours recorded on site according to the main entrance logs.

The OIG conducted a follow-up audit in 2013 and reported that in response to the 2007 audit, the BOP implemented a time clock to improve its controls over the review and payment of hours billed for on-site providers.  However, that audit found the time clock records were at times unavailable or unreliable.  In these instances, the BOP relied on the visitor logs, but stated that the providers did not always record both their arrival and departure times.  The OIG recommended that the BOP revise and take additional steps to enforce its policy requiring on-site providers to use the time clock.

During this audit, we reviewed FCC Butner's process to review UMass billings for on-site providers to determine if the BOP strengthened its process to ensure billings were accurate and properly supported.  We reviewed a sample of invoices to determine if the BOP relied on adequate supporting documentation to approve payments to UMass.[17]  Consistent with the results of the prior audits, we found that the records created using the time clock were not always complete or legible, and the corresponding supporting documentation in the visitor logs were also missing or incomplete.

We recommend that the BOP implement Bureau-wide policies and standards for CMS contract billings, to include appropriate supporting documentation, at all facilities.  Also, we recommend that the BOP ensure that FCC Butner enhance its procedures to ensure complete and accurate recording of on-site provider attendance to verify related billings.

## Staff Assigned to Approve Billings

During our review of the invoice approval process at the three facilities, we identified invoices that were approved by individuals that were not delegated this authority in the COR delegation letter.  We found that at

---

[17] The sampled invoices were selected from UMass on-site providers invoices submitted to FCC Butner for services provided between January 2017 and December 2019.

FCC Butner and FMC Devens, Health Services staff approved invoices for payment who were not delegated this authority.  While these individuals were closely involved with the day-to-day operations of the on-site providers, they either did not have a FAC-COR certification or were not certified at the level required by the BOP.  At FCI Ray Brook, after the COR retired in October 2019, we found that the Business Administrator or Clinical Director approved invoices for payment; however, neither were delegated this authority nor had the required FAC-COR certification.

In addition to improper staff approving invoices for payment, we found that other facility staff were negotiating pricing for services not covered by a benchmark Medicare rate.  For example, we found air ambulance transportation costs billed to FMC Devens used a rate other than benchmark Medicare because there was not a rate available for these services.  FMC Devens staff told us they used Medicare Part B for its locality with the contract's premium applied to agree on an acceptable price with UMass.  We were also told that the discussions for the air ambulance pricing were done between Health Services staff and UMass, and the Contracting Officer was not involved.  The FAR states that only Contracting Officers have the authority to make commitments or changes that effect price or other terms and conditions of a contract.[18]  When staff without the proper authority negotiate pricing outside the contract terms and conditions, it puts the BOP at risk of being subjected to disputes, claims, or overpaying for medical services.

As a result of the facilities' lack of adherence to and understanding of contract administration responsibilities related to billings, we recommend that the BOP develop and implement policies and procedures emphasizing responsibilities and authority of staff involved with CMS contracts.

## Prompt Payment Act

FAR Subpart 32.9 requires agencies to establish policies and procedures to ensure compliance with the Prompt Payment Act, which states that the due date for making invoice payments is the later of (1) the 30th day after the designated billing office receives a proper invoice from the contractor; or (2) the 30th day after government acceptance of the services provided.

We requested the amount of interest paid to UMass related to the Prompt Payment Act from FCC Butner and FMC Devens for the contracts we reviewed.  We found that in fiscal years 2018 and 2019, FCC Butner paid UMass $169,814 in interest because FCC Butner took longer than 30 days to pay the related invoices.  Specifically, FCC Butner officials told us that more than 90 percent of the interest paid, $159,148, was related to delays in processing invoices during the federal government shutdown in December 2018 and January 2019.

Although FCC Butner attributed the payment of interest costs to the federal government shutdown, we found that for the same period, FMC Devens paid just $306 in interest to UMass.  FMC Devens officials told us the interest paid was related to payments made after 30 days caused by issues with its accounting system.

We recommend that the BOP develop contingency plans to ensure invoices are paid timely in accordance with the Prompt Payment Act to avoid interest payments during disruptions to normal operations caused by extraordinary circumstances such as a government shutdown.

---

[18]  FAR 1.602-2

# Conclusion and Recommendations

As a result of our audit, we determined that the BOP did not adequately monitor and manage its acquisition of follow-on contracts for comprehensive medical services (CMS).  Consequently, the BOP relied on contracting for medical services without full and open competition rather than ensuring follow-on contracts were awarded timely.  We determined that in order to more effectively manage the potential risks related to contracting without full and open competition, the BOP should focus on improving the efficiency of its process for acquiring CMS.  Additionally, BOP senior executives should closely monitor contracting activities at its facilities for the potential of overusing contracting without full and open competition.

We also identified issues with the BOP's administration and management of the CMS contracts.  Specifically, we found that the BOP did not comply with requirements under the FAR related to: (1) maintaining adequate documentation in the CMS contract files, (2) properly delegating contract administration responsibilities to qualified Contracting Officer's Representatives (COR), (3) ensuring delegated CORs maintained required certifications, and (4) the Prompt Payment Act.  Additionally, the BOP did not have a consistent process in place to ensure billings were adequately supported, reviewed for accuracy, and approved by the appropriate staff.  We believe the BOP should enhance its support and management of its staff to improve its contract administration processes to ensure compliance with regulations and contract terms and conditions.

Finally, BOP officials told us that they did not identify any significant issues related to performance of the contract requirements by UMass.  However, we determined that BOP could improve its oversight of the quality and timeliness of healthcare provided by ensuring staff delegated performance surveillance responsibilities complete required reporting tasks and maintain supporting documentation for the contractor's ratings.  We also determined that BOP should provide staff guidance and tools for the steps that can be taken when contract requirements are not fulfilled in a timely manner.  Further, BOP should implement a reliable process throughout all BOP facilities to monitor and analyze the wait times for outside inmate appointments and the causes for cancelled or rescheduled appointments to ensure inmates receive timely healthcare.

**We recommend that the BOP:**

1. Ensure facility staff are aware of resources available to assist in the acquisition process and more thoroughly document its training provided to facility staff responsible for completing acquisition planning tasks.

2. Obtain feedback regarding training currently provided to its facility staff and enhance its training and resources related to preparing adequate RCAs and completing technical evaluations.

3. Ensure that written acquisition plans, including milestones, are completed for CMS acquisitions and ensure that the established milestones are monitored and any delays, and associated causes and steps taken to address the delays, are documented in the contract file.

4. Review its use of JOFOCs for CMS acquisitions to ensure compliance with regulations and ensure staff understand the requirements when contracting without full and open competition.

5. Implement a process to properly justify, manage, and monitor all CMS contracting made without full and open competition.

6. Enhance its controls to ensure its contract files comply with regulations for maintaining documentation related to contract modifications.

7. Review and enhance its policies and procedures to ensure that those delegated to administer CMS contracts are appropriately certified, and that appropriate delegations are in place.

8. Ensure that BOP staff delegated performance surveillance responsibilities complete required performance reporting tasks and maintain supporting documentation for the contractor's ratings.

9. Provide facility staff guidance and tools for the steps that can be taken when contract requirements are not fulfilled in a timely manner.

10. Implement a reliable, consistent process throughout all BOP facilities to monitor and analyze wait times for outside inmate appointments and the causes for cancelled or rescheduled appointments in order to ensure that inmates receive timely medical care.

11. Implement specific policies and procedures for reviewing billings submitted using Medicare-based rates, and that the BOP ensure that facilities utilize the third-party adjudicator vendor.

12. Implement Bureau-wide policies and standards for CMS contract billings, to include appropriate supporting documentation, at all facilities.

13. Ensure that FCC Butner enhance its procedures to ensure complete and accurate recording of on-site provider attendance to verify related billings.

14. Develop and implement policies and procedures emphasizing responsibilities and authority of staff involved with CMS contracts.

15. Develop contingency plans to ensure invoices are paid timely in accordance with the Prompt Payment Act to avoid interest payments during disruptions to normal operations caused by extraordinary circumstances such as a government shutdown.

# APPENDIX 1:  Objectives, Scope, and Methodology

## Objectives

The objectives of this audit were to assess the BOP's award and administration of the contracts, and UMass' compliance with the terms, conditions, laws, and regulations applicable to the contracts in the areas of: (1) contractor performance; (2) billings and payments; and (3) contract management, oversight, and monitoring.

## Scope and Methodology

The scope of our audit focused on comprehensive medical services provided at FCC Butner, FMC Devens, and FCI Ray Brook by UMass.  In 2012, the BOP awarded Contract Numbers DJBP010600000057 and DJBP010600000061 with a total value of almost $106.5 million to provide comprehensive medical services at FCC Butner.  As of March 2020, FCC Butner's estimated contract value increased to approximately $175.5 million.  In 2013, the BOP awarded Contract Number DJBP020500000016 with a value a little over $85 million to provide comprehensive medical services at FMC Devens and as of July 2020 the estimated value was almost $121 million. In 2014, the BOP awarded Contract Number DJBP021200000035 with a value of almost $8 million to provide comprehensive medical services at FCI Ray Brook and this increased slightly to an estimated value of almost $8.2 million.

To accomplish the audit objectives, we interviewed BOP employees, including senior officials from the BOP's Central Office and the Field Acquisition Office, as well as Contract Specialists at the Field Acquisition Office and staff from the Business Office, Contracting, and Health Services at FCC Butner, FMC Devens, and FCI Ray Brook. We also interviewed UMass senior officials, financial, and program staff with BOP contract responsibilities. Additionally, we reviewed BOP's contract documentation and relevant policies, procedures, and guidance related to contracting and inmate medical care, including the BOP Acquisition Policy.  Further, we conducted fieldwork at the FAO, FCC Butner, FMC Devens, and FCI Ray Brook.

### Statement on Compliance with Generally Accepted Government Auditing Standards

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

### Internal Controls

In this audit, we performed testing of internal controls significant within the context of our audit objectives.  We did not evaluate the internal controls of the BOP and UMass to provide assurance on its internal control structure as a whole.  BOP and UMass management is responsible for the establishment and maintenance of internal controls in accordance with OMB Circular A-123.  Because we do not express an opinion on the BOP's and UMass' internal control structure as a whole, we offer this statement solely for the information and use of the BOP and UMass.[19]

---

[19]  This restriction is not intended to limit the distribution of this report, which is a matter of public record.

In planning and performing our audit, we identified the following internal control components and underlying internal control principles as significant to the audit objectives:

| Internal Control Components & Principles Significant to the Audit Objectives |
| --- |
| **Control Environment Principles** |
| The oversight body and management should demonstrate a commitment to integrity and ethical values. |
| The oversight body should oversee the entity's internal control system. |
| Management should establish an organizational structure, assign responsibility, and delegate authority to achieve the entity's objectives. |
| Management should demonstrate a commitment to recruit, develop, and retain competent individuals. |
| Management should evaluate performance and hold individuals accountable for their internal control responsibilities. |
| **Risk Assessment Principles** |
| Management should identify, analyze, and respond to risks related to achieving the defined objectives. |
| Management should consider the potential for fraud when identifying, analyzing, and responding to risks. |
| **Control Activity Principles** |
| Management should design control activities to achieve objectives and respond to risks. |
| Management should design the entity's information system and related control activities to achieve objectives and respond to risks. |
| Management should implement control activities through policies. |
| **Information & Communication Principles** |
| Management should use quality information to achieve the entity's objectives. |
| **Monitoring Principles** |
| Management should establish and operate monitoring activities to monitor the internal control system and evaluate the results. |

We assessed the design, implementation, and operating effectiveness of these internal controls and identified deficiencies that we believe could affect the BOP's ability to effectively and efficiently operate, to correctly state financial and performance information, and to ensure compliance with laws and regulations.  The internal control deficiencies we found are discussed in the Audit Results section of this report.  However, because our review was limited to aspects of these internal control components and underlying principles, it may not have disclosed all internal control deficiencies that may have existed at the time of this audit.

## Compliance with Laws and Regulations

In this audit we also tested, as appropriate given our audit objectives and scope, selected transactions, records, procedures, and practices, to obtain reasonable assurance that BOP's and UMass' management complied with federal laws and regulations for which non-compliance, in our judgment, could have a material effect on the results of our audit.  Our audit included examining, on a test basis, the BOP's and UMass' compliance with the following laws and regulations that could have a material effect on BOP's or UMass's operations:

- FAR Subpart 1.602 - *Responsibilities*

- FAR Subpart 6.3 – *Other than Full and Open Competition*

- FAR Subpart 7.1 – *Acquisition Plans*

- FAR Subpart 32.9 – *Prompt Payment*

This testing included interviewing BOP and UMass personnel, analyzing contract files and data, and reviewing invoices and supporting documentation.  As noted in the Audit Results section of this report, we found the BOP did not comply with federal regulations related to acquisition and procurement, contract administration, and billings and payments.

## Sample-Based Testing

To accomplish our audit objectives, we performed sample-based testing for invoices and contract documentation.  In this effort, we employed a judgmental sampling design to obtain broad exposure to numerous facets of the areas we reviewed.  This non-statistical sample design did not allow projection of the test results to the universe from which the samples were selected.

## Computer-Processed Data

During our audit, we obtained information from the BOP's Bureau Electronic Medical Records System, CPARs, and UMass' HealthAxis system.  We did not test the reliability of those systems as a whole, therefore any findings identified involving information from those systems were verified with documentation from other sources.

# APPENDIX 2:  The Federal Bureau of Prisons Response to the Draft Audit Report



**U.S. Department of Justice**

**Federal Bureau of Prisons**

_Office of the Director_                    _Washington, D.C. 20534_

January 19, 2022

MEMORANDUM FOR JASON R. MALMSTROM
                ASSISTANT INSPECTOR GENERAL
                AUDIT

FROM:           M.D. Carvajal
                Director

SUBJECT:        Response to the Office of Inspector General's (OIG)
                Draft Report: Audit of the Federal Bureau of
                Prisons' Comprehensive Medical Services Contracts
                Awarded to the University of Massachusetts Medical
                School

The Bureau of Prisons (BOP) appreciates the opportunity to provide
a formal response to the Office of the Inspector General's above
referenced report.  The BOP has completed our review, and offer the
following comments regarding the recommendations.  As a general
comment, the BOP notes that while it concurs with the
recommendations as indicated below, it already has systems and
mechanisms in place to address many of the identified concerns.
These are described in further detail below.

**Recommendation One:**  Ensure facility staff are aware of resources
available to assist in the acquisition process and more thoroughly
documented its training provided to facility staff responsible for
completing acquisition planning tasks.

**BOP's Response:**  The BOP concurs with this recommendation.
Procurement professionals are required to complete acquisition
related training which includes available resources externally and
within the BOP to assist with the acquisition process.  Training is
recorded and included in the procurement staff electronic training
file.  The National Acquisition Branch provides Acquisition
Training for Program Offices.  Additionally, the Health Services
Division hosts biennial leadership training with the procurement

23

training provided by the Field Acquisitions Office (FAO) and the Commercial Law Branch (CLB) within the Office of General Counsel (OGC). All training is documented within the individual staff training records maintained by the Human Resources Management Division (HRMD).

**Recommendation Two:** Obtain feedback regarding training currently provided to its facility staff and enhance its training and resources related to preparing adequate RCAs and completing technical evaluations.

**BOP's Response:** The BOP concurs with this recommendation with regards to institution staff. With the aforementioned training in recommendation one, the Health Services Division obtains training evaluations from each staff member attending leadership training and utilizes this information to enhance future training and resource needs, specifically those involving RCAs and technical evaluations. The BOP plans to continue this evaluation feedback loop process for the purpose of enhancing future training needs within the procurement, RCA, and technical evaluation areas.

**Recommendation Three:** Ensure that written acquisition plans, including milestones, are completed for CMS acquisitions and ensure that the established milestones are monitored and any delays, and associated causes and steps taken to address delays, are documented in the contract file.

**BOP's Response:** The BOP concurs with this recommendation. Acquisition plans/procurement history and milestones documents are included in all Comprehensive Medical Section (CMS) procurement files. Additionally, milestones are captured in Content Manager. All procurement actions are monitored any delays are noted according in the milestones.

**Recommendation Four:** Review its use of JOFOCS for CMS acquisitions to ensure compliance with regulations and ensure staff understand the requirements when contracting without full and open competition.

**BOP's Response:** The BOP concurs with this recommendation. We will review the use of JOFOCS and ensure staff understand compliance with regulations.

**Recommendation Five:** Implement a process to properly justify, manage, and monitor all CMS contracting made without full and open competition.

**BOP's Response:**  The BOP concurs with this recommendation.  In accordance with FAR 13.104, Promoting Competition, procurement staff must promote competition to the maximum.  The BOP will continue to review and monitor CMS contract files to ensure procurement action includes documentation of full and open competition.

**Recommendation Six:**  Enhance its controls to ensure its contract files comply with regulations for maintaining documentation related to contract modifications.

**BOP's Response:**  The BOP concurs with this recommendation. Controls are established by regulation and policy.  All Federal Acquisition Certification in Contracting (FAC-C) Certified/Warranted Contracting staff are required to comply the requirements of the Federal Acquisition Regulation, Justice Acquisition Regulation and the Bureau of Prisons Acquisition Policy, which states Contracting staff shall documents the file related to contract modifications.

**Recommendation Seven:**  Review and enhance its policies and procedures to ensure that those delegated to administer CMS contracts are appropriately certified, and that appropriate delegations are in place.

**BOP's Response:**  The BOP concurs with this recommendation. Policies and procedures exist requiring that all Administrative Contracting Officers (ACO) delegated the authority to administer CMS contracts are properly certified and maintain active FAC-C Certification and BOP Warrants.  Contracting professionals are certified in accordance with the FAC-C standards.  All award notices identify the ACO.

**Recommendation Eight:**  Ensure that BOP staff delegated performance surveillance responsibilities complete required performance reporting tasks and maintain supporting documentation for the contractor's ratings.

**BOP's Response:**  The BOP concurs with this recommendation.  In accordance FAR 42.1502 Policy (Past Performance) and the Contactor Performance Assessment Reporting (CPAR) System, programming staff and procurement staff shall prepare at least annually a past performance evaluation at the time the work under a contract is complete.  The evaluation for contractors remains indefinitely on file in the CPAR automated platform.  Staff designated as contracting officer representatives (CORs) for technical report on contractor's performance work closely with procurement staff to

ensure all reporting is complete and submitted timely through the
CPAR System.

**Recommendation Nine:**  Provide facility staff guidance and tools for
steps that can be taken when contract requirements are not
fulfilled in a timely manner.

**BOP's Response:**  The BOP concurs with this recommendation.
Procurement professionals are required to complete acquisition
related training which includes available resources externally and
within the Agency to assist with the acquisition process.  Training
is recorded and included in the procurement staff electronic
training file.  The National Acquisition Branch provides
Acquisition Training for Program Offices.  Additionally, the Health
Services Division hosts biennial leadership training with the
procurement training provided by the FAO and the CLB within the
Office of General Counsel.  All training is documented within the
individual staff training records maintained by the Human Resources
Management Division.

**Recommendation Ten:**  Implement a reliable, consistent process
throughout all BOP facilities to monitor wait times outside inmate
appointments and the causes for cancelled or rescheduled
appointments in order to ensure that inmates receive timely medical
care.

**BOP's Response:**  The BOP concurs with this recommendation.  The BOP
monitors wait times for outside medical appointments through the
electronic health record (EHR), specifically through the
consultation queue of the EHR.  The consultation queue of the EHR,
identifies that time frame clinically indicated for the
consultation to be scheduled, the actual date the consultation is
scheduled through the comprehensive medical provider, and a
verification of when results are received/recorded from the
completed consultation.  Health Services Administrators review this
consultation queue frequently and specifically during each
utilization review committee (URC).  Identified discrepancies for
canceled or rescheduled appointments are documented within the EHR
with updates to applicable consultations as appropriate.

**Recommendation Eleven:**  Implement specific policies and procedures
for reviewing billing submitted using Medicare-based rates, and
that the BOP ensure that facilities utilize the third-party
adjudication vendor.

**BOP's Response:**  The BOP concurs with this recommendation.  The BOP
has a third-party bill adjudicator platform. All active CMS

contracts will be modified as vendors complete their test trials with the Bill Adjudicator. All new CMS requirements include the Bill Adjudicator language in the solicitation once awarded the execution of bill adjudication is immediately implemented.

**Recommendation Twelve:** Implement Bureau-wide policies and standards for CMS contract billings, to include appropriate supporting documentation, at all facilities.

**BOP's Response:** The BOP concurs with this recommendation. All CMS contracts include FAR 52.212-4(g) which provides a detailed outline of the information required on all invoices. Additionally, the CMS performance work statement *Output #3 "Submit Properly Priced invoices for services rendered"* identifies in detail the information required when submitting invoices/medical claims.

**Recommendation Thirteen:** Ensure that FCC Butner enhance its procedures to ensure complete and accurate recording of on-site provider attendance to verify related billings.

**BOP's Response:** The BOP concurs with this recommendation. Butner will enhance its procedures to ensure complete and accurate recording of on-site provider attendance to verify related billings by re-educating contractor staff regarding the requirement to complete and sign the Contractor/Visitor Log Book at the entrance of each institution when entering and exiting the respective institution. They will also be reminded of the requirement to punch in and out using the time clock at each institution. In the event the time clock is malfunctioning, the contractor will write in his/her time, which will be verified using the sign in/sign out time from the Contractor/Visitor Log Book. When the time cards are copied for billing purposes, staff will ensure the copies are legible and re-copy/adjust the copier settings if necessary.

**Recommendation Fourteen:** Develop and implement policies and procedures emphasizing responsibilities and authority of staff involved with CMS contracts.

**BOP's Response:** The BOP concurs with this recommendation. Procurement staff are aware of the policies, procedures and responsibilities involving CMS contracts. Health Services Administrators work closely with procurement staff and participate in training for CMS specific policies, procedures, and responsibilities.

**Recommendation Fifteen:** Develop contingency plans to ensure invoices are paid timely in accordance with the Prompt Payment Act

to avoid interest payments during disruptions to normal operations caused by extraordinary circumstances such as a government shutdown.

**BOP's Response:**  The BOP does not concur with this recommendation to the extent that it could create a conflict with the Anti-deficiency Act.  All applicable contracts executed by the BOP include FAR Clause 52.232-19 Availability of Funds for Next Fiscal Year, and the Government's obligation for performance of the contract beyond the date is contingent upon the availability of appropriated funds from which payment for contract purposes can be made.  Additionally, the Anti-deficiency Act restricts the Federal Government's ability to obligate funds in advance of an appropriation or beyond appropriation levels.

# APPENDIX 3:  Office of the Inspector General Analysis and Summary of Actions Necessary to Close the Audit Report

The OIG provided a draft of this audit report to the Federal Bureau of Prisons (BOP) and the University of Massachusetts Medical School (UMass) for review and official comment.  The BOP's response is incorporated in Appendix 2 of this final report.  UMass elected not to provide a written response to the draft audit report.  In response to our draft audit report, the BOP concurred with our recommendations and discussed the actions it will implement in response to our findings.  As a result, the status of the audit report is resolved.  The following provides the OIG analysis of the response and summary of actions necessary to close the report.

Recommendations for the BOP:

1. **Ensure facility staff are aware of resources available to assist in the acquisition process and more thoroughly document its training provided to facility staff responsible for completing acquisition planning tasks.**

   Resolved.  The BOP concurred with our recommendation.  The BOP stated in its response that procurement professionals are required to complete acquisition related training which includes available resources externally and within the BOP to assist with the acquisition process, and that training is recorded in the staff's electronic training file maintained by the Human Resources Management Division.  The BOP further stated that its National Acquisition Branch provides acquisition training to its program offices as well as the Field Acquisition Office and the Commercial Law Branch for the Health Services Division.

   This recommendation can be closed when we receive evidence that facility staff responsible for acquisition tasks have received training and are aware of resources available related to the acquisition process.

2. **Obtain feedback regarding training currently provided to its facility staff and enhance its training and resources related to preparing adequate RCAs and completing technical evaluations.**

   Resolved.  The BOP concurred with our recommendation.  The BOP stated in its response that the Health Services Division obtains training evaluations for the training referenced in the above recommendation and utilizes this information to enhance future training and resource needs, specifically those involving RCAs and technical evaluations.  In addition, the BOP stated it will continue the evaluation feedback process to enhance future training needs within procurement, RCA, and technical evaluation areas.

   This recommendation can be closed when we receive evidence that staff feedback was solicited and considered when making enhancements to the training program to address issues identified in our audit related to the acquisition process, RCAs, and technical evaluations.

3. **Ensure that written acquisition plans, including milestones, are completed for CMS acquisitions and ensure that the established milestones are monitored and any delays, and associated causes and steps taken to address delays, are documented in the contract file.**

   Resolved.  The BOP concurred with our recommendation.  The BOP stated in its response that acquisitions plans (procurement history) and milestones documents are included in the procurement files and the milestones are captured in its electronic contract file system.  The BOP further stated that all procurement actions are monitored, and any delays are noted according in the milestones.

   This recommendation can be closed when we receive evidence that written acquisition plans, including milestones, are completed for CMS acquisitions and that sufficient documentation is maintained in the procurement files for any delays.

4. **Review its use of JOFOCs for CMS acquisitions to ensure compliance with regulations and ensure staff understand the requirements when contracting without full and open competition.**

   Resolved.  The BOP concurred with our recommendation.  The BOP stated in its response that it will review the use of JOFOCs and ensure its staff understands regulations associated with contracting without full and open competition.

   This recommendation can be closed when we receive a description of the JOFOC review process and the results of the BOP's review of its use of JOFOCs for CMS acquisitions to ensure compliance with regulations, and that staff understand requirements when contracting without full and open competition.

5. **Implement a process to properly justify, manage, and monitor all CMS contracting made without full and open competition.**

   Resolved.  The BOP concurred with our recommendation.  The BOP stated in its response that it will continue to review and monitor CMS contract files to ensure procurement action includes documentation of full and open competition.

   This recommendation can be closed when we receive evidence that BOP implemented a process to ensure all CMS contracting made without full and open competition is properly justified, managed, and monitored.

6. **Enhance its controls to ensure its contract files comply with regulations for maintaining documentation related to contract modifications.**

   Resolved.  The BOP concurred with our recommendation.  The BOP stated in its response that all warranted contracting staff are required to comply with the requirements of FAR, Justice Acquisition Regulation, and the Bureau of Prisons Acquisition Policy, which states Contracting staff shall document the file related to contract modifications.

This recommendation can be closed when we receive evidence that the BOP enhanced its controls to ensure its contract files comply with regulations for maintaining documentation related to contract modifications.

7. **Review and enhance its policies and procedures to ensure that those delegated to administer CMS contracts are appropriately certified, and that appropriate delegations are in place.**

   Resolved.  The BOP concurred with our recommendation.  The BOP stated in its response that policies and procedures exist requiring that all Administrative Contracting Officers delegated the authority to administer CMS contracts are properly certified and maintain active certifications and warrants.  The BOP further stated that Contracting professionals are certified in accordance with FAC-C standards and that all award notices identify the Administrative Contracting Officer.

   This recommendation can be closed when we receive evidence that the BOP reviewed and enhanced its policies and procedures to ensure staff are properly delegated CMS contract administration responsibilities and staff are appropriately certified.

8. **Ensure that BOP staff delegated performance surveillance responsibilities complete required performance reporting tasks and maintain supporting documentation for the contractor's ratings.**

   Resolved.  The BOP concurred with our recommendation.  The BOP stated in its response that program and procurement staff shall prepare, at least annually, a past performance evaluation at the time work under a contract is complete, and this is to be maintained in the Contractor Performance Assessment Reporting system.  Further, the BOP stated that staff designated as Contracting Officer Representatives work closely with procurement staff to ensure all reporting is complete and submitted timely through the electronic system.

   This recommendation can be closed when we receive evidence that the BOP completed all required performance monitoring and reporting tasks and maintain supporting documentation for the contractor's ratings.

9. **Provide facility staff guidance and tools for steps that can be taken when contract requirements are not fulfilled in a timely manner.**

   Resolved.  The BOP concurred with our recommendation.  The BOP stated in its response that procurement professionals are required to complete acquisition-related training, which includes resources available externally and internally, and the training is recorded in its staff's electronic training record.  The BOP further stated that the Health Services Division hosts biennial leadership training with the procurement training provided by the FAO and the Commercial Law Branch within the Office of General Counsel.

   This recommendation can be closed when we receive evidence that the BOP provided facility staff guidance and tools for steps that can be taken when contract requirements are not fulfilled in a timely manner.

10. **Implement a reliable, consistent process throughout all BOP facilities to monitor wait times outside inmate appointments and the causes for cancelled or rescheduled appointments in order to ensure that inmates receive timely medical care.**

   <u>Resolved.</u>  The BOP concurred with our recommendation.  The BOP stated in its response that it monitors wait times for outside medical appointments through the consultation queue in the electronic health record which identifies the timeframe clinically indicated for the consultation to be scheduled, the actual date consultation is scheduled through the comprehensive medical provider, and a verification of when results are received/recorded from the completed consultation.  The BOP further states that Health Services Administrators review this consultation queue frequently and specifically during each utilization review committee.  The BOP also stated that discrepancies for cancelled or rescheduled appointments are documented within the electronic health record.

   This recommendation can be closed when we receive evidence that the BOP implemented a reliable, consistent process BOP-wide to monitor wait times and the causes for cancelled or rescheduled appointments.

11. **Implement specific policies and procedures for reviewing billing submitted using Medicare-based rates, and that the BOP ensure that facilities utilize the third-party adjudication vendor.**

   <u>Resolved.</u>  The BOP concurred with our recommendation.  The BOP stated in its response that it has a third-party bill adjudicator platform, and that all CMS contracts will be modified as vendors complete testing with the third party.  Further, the BOP stated that all new CMS solicitations include the bill adjudicator language and, once the contract is awarded, the execution of bill adjudication is implemented.

   This recommendation can be closed when we receive evidence that the BOP implemented policies and procedures, BOP-wide, for reviewing billing submitted using Medicare-based rates, and that all facilities are using the third-party bill adjudicator.

12. **Implement Bureau-wide policies and standards for CMS contract billings, to include appropriate supporting documentation, at all facilities.**

   <u>Resolved.</u>  The BOP concurred with our recommendation.  The BOP stated in its response that all CMS contracts include FAR 52.212-4(g), which provides a detailed outline of the information required on all invoices, and the performance work statement identifies, in detail, the information required when submitting invoices/medical clams.

   This recommendation can be closed when we receive evidence that the BOP implemented policies and standards BOP-wide for CMS contract billings to ensure appropriate supporting documentation is received and maintained with the invoices.

13. **Ensure that FCC Butner enhance its procedures to ensure complete and accurate recording of on-site provider attendance to verify related billings.**

   Resolved.  The BOP concurred with our recommendation.  The BOP stated in its response that FCC Butner will enhance its procedures to ensure complete and accurate recording of on-site provider attendance to verify billings and re-educate contractor staff on the requirements to complete the Contractor/Visitor Log at the entrance.  Also, the BOP stated that it will remind contractor staff of the requirement to punch in and out using the timeclock and of procedures if the timeclock is not functioning properly.  Additionally, if the timeclock is malfunctioning, the contractor will write their time on the timecard to be verified to the Contractor/Visitor Log.  Further, the BOP stated that staff will ensure that when timecards are copied for billing purposes that the copies are legible and re-copy if necessary.

   This recommendation can be closed when we receive evidence that the BOP enhanced its procedures to ensure complete and accurate recording of on-site provider attendance at FCC Butner.

14. **Develop and implement policies and procedures emphasizing responsibilities and authority of staff involved with CMS contracts.**

   Resolved.  The BOP concurred with our recommendation.  The BOP stated in its response that procurement staff are aware of policies, procedures, and responsibilities involving CMS contracts and that Health Services staff work closely with procurement staff and participate in CMS specific policies, procedures, and responsibilities.

   This recommendation can be closed when we receive evidence that the BOP developed and implemented policies and procedures emphasizing responsibilities and authority of staff involved with CMS contracts.

15. **Develop contingency plans to ensure invoices are paid timely in accordance with the Prompt Payment Act to avoid interest payments during disruptions to normal operations caused by extraordinary circumstances such as a government shutdown.**

   Resolved.  In its response, the BOP stated it did not concur with our recommendation to the extent that it could create a conflict with the Anti-Deficiency Act.  The OIG agrees that the BOP should not violate the Anti-Deficiency Act, and our recommendation does not suggest that.  We discussed this with BOP officials who stated that the BOP concurs with the recommendation notwithstanding the potential conflict that could be created with the Anti-Deficiency Act.  Specifically, the BOP stated in its response that the Anti-Deficiency Act restricts the BOP's ability to obligate funds in advance of an appropriation.  Outside of this potential conflict, BOP officials stated that they agreed that BOP should pay its invoices and would work to develop contingency plans as outlined in the recommendation.

   This recommendation can be closed when we receive evidence that the BOP developed contingency plans to ensure invoices are paid timely in accordance with the Prompt Payment Act during disruptions to normal operations caused by extraordinary circumstances, and that the BOP provide clarification regarding circumstances when a payment should not occur due to a conflict with the Anti-Deficiency Act.



**Office of the Inspector General**
U.S. Department of Justice

# The Impact of an Aging Inmate Population on the Federal Bureau of Prisons

Revised February 2016

Evaluation and Inspections Division 15-05                    May 2015

# EXECUTIVE SUMMARY

## Introduction

In September 2013, the Federal Bureau of Prisons (BOP) incarcerated 164,566 federal inmates in 119 BOP-managed institutions.[1]  According to BOP data, inmates age 50 and older were the fastest growing segment of its inmate population, increasing 25 percent from 24,857 in fiscal year (FY) 2009 to 30,962 in FY 2013.[2]  By contrast, during the same period, the population of inmates 49 and younger decreased approximately 1 percent, including an even larger decrease of 16 percent in the youngest inmates (age 29 and younger).[3]  Based on BOP cost data, we estimate that the BOP spent approximately $881 million, or 19 percent of its total budget, to incarcerate aging inmates in FY 2013.[4]  The Office of the Inspector General (OIG) conducted this review to assess the aging inmate population's impact on the BOP's inmate management, including costs, health services, staffing, housing, and programming.  We also assessed the recidivism of inmates who were age 50 and older at the time of their release.

## Results in Brief

The OIG found that aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs.  We further found that limited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates.  The physical infrastructure of BOP institutions also limits the availability of appropriate housing for aging inmates.  Further, the BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates.  We also determined that aging inmates engage in fewer misconduct incidents while incarcerated and have a lower rate of re-arrest once released; however, BOP policies limit the number of aging inmates who can be considered for early release and, as a result, few are actually released early.

*Aging inmates are more costly to incarcerate, primarily due to their medical needs.*  We found that the BOP's aging inmate population contributes to increases in incarceration costs.  Aging inmates on average cost 8 percent

---

[1]  For this review, we examined sentenced inmates incarcerated in BOP-managed institutions only.  We excluded approximately 29,000 inmates who are incarcerated in contract institutions, as well as approximately 14,000 pre-trial inmates.

[2]  For the purposes of this review, we define inmates age 50 and older as "aging."  For more information, see page 2.

[3]  The percentage decrease in the youngest inmates (age 29 and younger) was listed incorrectly as 29 percent when this report originally was issued in May 2015.  We discovered the error and have revised the report to correct it.

[4]  For more information, see Appendix 1.

more per inmate to incarcerate than inmates age 49 and younger (younger inmates). In FY 2013, the average aging inmate cost $24,538 to incarcerate, whereas the average younger inmate cost $22,676. We found that this cost differential is driven by increased medical needs, including the cost of medication, for aging inmates. BOP institutions with the highest percentages of aging inmates in their population spent five times more per inmate on medical care ($10,114) than institutions with the lowest percentage of aging inmates ($1,916). BOP institutions with the highest percentages of aging inmates also spent 14 times more per inmate on medication ($684) than institutions with the lowest percentage ($49).

*BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose.* Aging inmates often require assistance with activities of daily living, such as dressing and moving around within the institution. However, institution staff is not responsible for ensuring inmates can accomplish these activities. At many institutions, healthy inmates work as companions to aging inmates; but training and oversight of these inmate companions vary among institutions. We further found that the increasing population of aging inmates has resulted in a need for increased trips outside of institutions to address their medical needs but that institutions lack Correctional Officers to staff these trips and have limited medical staff within institutions. As a result, aging inmates experience delays receiving medical care. For example, using BOP data from one institution, we found that the average wait time for inmates, including aging inmates, to be seen by an outside medical specialist for cardiology, neurosurgery, pulmonology, and urology to be 114 days. In addition, we found that while Social Workers are uniquely qualified to address the release preparation needs of aging inmates, such as aftercare planning and ensuring continuity of medical care, the BOP, which employs over 39,000 people, has only 36 Social Workers nationwide for all of its institutions. Institution staff told us they themselves did not receive enough training to identify the signs of aging.

*The physical infrastructure of BOP institutions cannot adequately house aging inmates.* Aging inmates often require lower bunks or handicapped-accessible cells, but overcrowding throughout the BOP system limits these types of living spaces. Aging inmates with limited mobility also encounter difficulties navigating institutions without elevators and with narrow sidewalks or uneven terrain. The BOP has not conducted a nationwide review of the accessibility of its institutions since 1996.

*The BOP does not provide programming opportunities specifically addressing the needs of aging inmates.* BOP programs, which often focus on education and job skills, do not address the needs of aging inmates, many of whom have already obtained an education or do not plan to seek further employment after release. Though BOP institutions can and do design programs, including release preparation programs, to meet the needs of their

individual populations, even institutions with high percentages of aging inmates rarely have programs specifically for aging inmates.

*Aging inmates commit less misconduct while incarcerated and have a lower rate of re-arrest once released.* Aging inmates, comprising 19 percent of the BOP's inmate population in FY 2013, represented 10 percent of all the inmate misconduct incidents in that year. Also, studies have concluded that post-release arrests decrease as an individual ages, although BOP does not maintain such data. The OIG conducted a sampling of data and found that 15 percent of aging inmates were re-arrested for a new crime within 3 years of release. Based on our analysis, the rate of recidivism of aging inmates is significantly lower than the 41 percent re-arrest rate that the BOP's research has found for all federal inmates. We further found that most of the aging inmates who were re-arrested already had a documented history of recidivism.

*Aging inmates could be viable candidates for early release, resulting in significant cost savings; but BOP policy strictly limits those who can be considered and, as a result, few have been released.* Over a year ago, the Department concluded that aging inmates are generally less of a public safety threat and the BOP announced an expanded compassionate release policy to include them as part of the Attorney General's "Smart on Crime" initiative. However, the Department significantly limited the number of inmates eligible for this expanded release policy by imposing several eligibility requirements, including that inmates be at least age 65, and we found that only two inmates had been released under this new provision. According to institution staff, it is difficult for aging inmates to meet all of the eligibility requirements of the BOP's new provisions. Our analysis shows that if the BOP reexamined these eligibility requirements its compassionate release program could result in significant cost savings for the BOP, as well as assist in managing the inmate population.

## Recommendations

In this report, we make eight recommendations to improve the BOP's management of its aging inmate population. These recommendations include enhancing BOP oversight and training of inmate companions, studying the impact of the aging inmate population on infrastructure, developing programs to address the needs of aging inmates during their incarceration and as they prepare for release, and revising the requirements that limit the availability of compassionate release for these inmates.

# TABLE OF CONTENTS

BACKGROUND ................................................................................................ 1

PURPOSE, SCOPE, AND METHODOLOGY .............................................. 9

RESULTS OF THE REVIEW ......................................................................... 10

Aging inmates are more costly to incarcerate, primarily due to their medical needs................................................................................................... 10

BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose ..................... 16

The physical infrastructure of BOP institutions cannot adequately house aging inmates................................................................................................... 23

The BOP does not provide programming opportunities specifically addressing the needs of aging inmates ............................................................................ 30

Aging inmates commit less misconduct while incarcerated and have a lower rate of re-arrest once released........................................................................... 37

Aging inmates could be viable candidates for early release, resulting in significant cost savings; but new BOP policy strictly limits those who can be considered and as a result, few have been released..................................... 41

CONCLUSION AND RECOMMENDATIONS.......................................... 51

APPENDIX 1:  EXPANDED METHODOLOGY....................................... 55

APPENDIX 2:  THE BOP'S RESPONSE TO THE DRAFT REPORT ........... 60

APPENDIX 3:  OIG ANALYSIS OF THE BOP'S RESPONSE.................... 63

# BACKGROUND

## Introduction

From fiscal year (FY) 2009 to FY 2013, the BOP experienced a shift in the age demographic of its inmate population.  During those 5 years, the number of inmates age 50 and older in BOP-managed institutions was the fastest growing segment of the BOP population, increasing by 25 percent, from 24,857 to 30,962.  During the same period, the population of inmates 49 and younger decreased approximately 1 percent, including an even larger decrease of 16 percent in the youngest inmates age 29 and younger.[5]

The OIG assessed the impact of an aging inmate population on the BOP's inmate management, including costs, health services, staffing, housing, and programming, between FY 2009 and FY 2013.  In this background section, we define the BOP's aging inmate population and discuss the demographics and trends of this population.  In addition, we outline the new compassionate release provisions related to aging inmates.  Finally, we discuss the similar challenges faced by state correctional systems and the different methods they use to address the growing aging inmate population.

### Defining the BOP's Aging Inmate Population

The BOP does not establish a specific age at which an inmate is considered "aging."[6]  For the purposes of this report, we define inmates age 50 and older as aging.[7]  Our definition is based on several factors including studies, state programs and policies, as well as the opinions of BOP officials and institution staff.  In a 2004 report, the BOP's National Institute of Corrections (NIC) defined inmates age 50 and older as aging.[8]  The NIC further reported that seven state correctional agencies considered inmates age 50 and older to be aging.[9]  Several studies, including one published by the *American Journal of Public Health,* state that an inmate's physiological

---

[5]  The percentage decrease in the youngest inmates (age 29 and younger) was listed incorrectly as 29 percent when this report originally was issued in May 2015.  We discovered the error and have revised the report to correct it.

[6]  When we asked BOP staff how they defined aging, their responses ranged from age 40 to age 78.

[7]  Throughout this report, we will use the term "aging inmates" to refer to inmates age 50 and older and the term "younger inmates" to refer to inmates age 49 and younger.

[8]  The NIC is an agency within the BOP.  The NIC provides training, technical assistance, information services, and policy and program development assistance to federal, state, and local correctional agencies.

[9]  The NIC surveyed correctional systems in all 50 states, the District of Columbia, U.S. territories, and Canada and found that seven states (Alaska, Florida, Idaho, New Mexico, North Carolina, Ohio, and West Virginia) and Canada defined inmates as aging at age 50.

age averages 10–15 years older than his or her chronological age due to the combination of stresses associated with incarceration and the conditions that he or she may have been exposed to prior to incarceration.[10]  During our review, BOP officials and staff agreed that the combination of these factors expedites the aging process.  A Clinical Director told us that because most aging inmates have preexisting conditions and are sicker than the general population, they appear to be older than their actual age.

### The BOP's aging inmate population made up 19 percent of the BOP's overall population in FY 2013

Aging inmates made up 16 percent of the BOP's total population in FY 2009 and increased to 19 percent of the BOP's total population in FY 2013.  Table 1 presents the total number of sentenced BOP inmates, the number of younger inmates, and the number of aging inmates from FY 2009 through FY 2013.[11]

**Table 1**

**Total Sentenced Inmate Population by Age**

| Fiscal Year | Sentenced Inmates | Aging Inmates (50 and older) | Younger Inmates (49 and younger) |
|---|---|---|---|
| 2009 | 159,189 | 24,857 | 134,332 |
| 2010 | 159,660 | 26,221 | 133,439 |
| 2011 | 165,797 | 28,239 | 137,558 |
| 2012 | 164,257 | 29,332 | 134,925 |
| 2013 | 164,566 | 30,962 | 133,604 |

Source:  BOP population snapshots.

According to BOP data, not only are the numbers of aging inmates increasing, they are generally increasing at a faster rate in older age groups.  Specifically, the number of inmates age 65 to 69 increased 41 percent; inmates age 70 to 74 increased 51 percent; inmates age 75 to 79 increased 43 percent; and inmates age 80 and over increased 76 percent.  Nevertheless, inmates age 65 and older represented only 14 percent of the aging inmate population in FY 2013, while inmates age 50 to 64 represented 86 percent of the 30,962 aging inmates.  Figure 1 shows the increase in the

---

[10]  B. Williams, et al., "Aging in Correctional Custody:  Setting a Policy Agenda for Older Prisoner Health Care," *American Journal of Public Health* 102, no. 8 (August 2012): 1475–1481, p. 3.

[11]  For this review, we examined sentenced inmates incarcerated in BOP-managed institutions only.  We excluded approximately 29,000 inmates who are incarcerated in contract institutions, as well as approximately 14,000 pre-trial inmates.

number of aging inmates, distributed in 5-year increments, from FY 2009 through FY 2013.

**Figure 1**

**Percent Change in Population of Aging Inmates from FY 2009 to FY 2013**



Source:  BOP population snapshots.

<u>Elimination of parole, use of mandatory minimum sentences, increases in average sentence length over the past 3 decades, and an increase in white collar offenders and sex offenders, among other things, contribute to the aging inmate population</u>

Research indicates that the growth in the aging inmate population can be attributed to sentencing reforms beginning in the late 1980s, including the elimination of federal parole and the introduction of mandatory minimums and determinate sentences.[12]  BOP staff and management officials agreed that these sentencing reforms contributed to longer sentences, leading to an increase in aging inmates.  In addition to the increase in the aging inmate population, there has also been a 9 percent increase in the number of younger inmates who will be age 50 and older when they are ultimately released.[13]  (See Table 2 below.)

---

[12]  Nathan James, "The Federal Prison Population Buildup:  Overview, Policy Changes, Issues, and Options," *Congressional Research Service*, April 15, 2014.

[13]  We based our analysis on each inmate's release date as of the date we received BOP data.  We did not include younger inmates with life sentences, death sentences, or those inmates who did not have release dates.

**Table 2**

**Number of Younger Inmates Who Will Be Age 50 and Older at Release**

| Fiscal Year | Number of Younger Inmates |
|---|---|
| 2009 | 19,385 |
| 2010 | 19,790 |
| 2011 | 20,488 |
| 2012 | 20,761 |
| 2013 | 21,221 |
| Percent Change | 9% |

Source:  BOP population snapshots.

The growth of the aging inmate population can also be attributed to the increase in the number of aging offenders who are first-time white collar or sex offenders.[14]  From FY 2009 to FY 2013, the BOP experienced a 28 percent increase (7,944 to 10,153) in the number of first-time, aging offenders.  Further, the number of aging inmates incarcerated for fraud, bribery, or extortion offenses increased by 43 percent and the number of aging inmates incarcerated for sex offenses increased by 77 percent.  White collar offenders and sex offenders made up approximately 24 percent of the aging inmate population in FY 2013.  Conversely, these offenders made up less than 10 percent of the younger inmate population.

<u>Aging inmates make up a disproportionate share of the inmate population in institutions providing higher levels of medical care</u>

In 2002, the BOP implemented a system that assigned care levels to inmates based on the inmate's medical needs and to institutions based on the resources available to provide care.  Under this system, the BOP assigns each inmate a care level from 1 to 4 based on documented medical history, with Care Level 1 being the healthiest inmates and Care Level 4 being inmates with the most significant medical conditions.  The BOP also assigns each institution a care level from 1 to 4, based on the institution's level of medical staffing and resources.  Inmates are designated to an institution with a corresponding care level.[15]  (See Table 3 below.)

---

[14]  BOP data also indicated that 17,995 of the 30,962 (58 percent) aging inmates in FY 2013 were sentenced at age 50 and older and 7,351 (41 percent) of those sentenced at 50 and older were first-time offenders.

[15]  For more information about the BOP's care level system, see DOJ, OIG, *The Federal Bureau of Prisons' Efforts to Manage Inmate Health Care.*

**Table 3**

**Description of the BOP's Care Levels**

| Care Level | Description |
|---|---|
| 1 | Inmates who are younger than 70, with limited medical needs requiring clinical contact no more than once every 6 months |
| 2 | Inmates who are stable outpatients, with chronic illnesses requiring clinical contact every 3 months |
| 3 | Inmates who are fragile outpatients, with conditions requiring daily to monthly clinical contact |
| 4 | Inmates requiring inpatient care:  Care Level 4 institutions are BOP medical centers. |

Source:  U.S. Department of Justice (DOJ), OIG, *The Federal Bureau of Prisons' Efforts to Manage Inmate Health Care,* Audit Report 08-08 (February 2008).

According to BOP data, in FY 2013 aging inmates made up a disproportionate share of the inmates housed in Care Level 3 and 4 institutions.  Specifically, aging inmates made up 21 percent of the population of Care Level 3 institutions and 33 percent of the population of Care Level 4 institutions, compared to only 19 percent of the overall inmate population.[16]  Figure 2 illustrates the proportion of aging inmates assigned to each care level.

**Figure 2**

**Percentage of Aging Inmates Assigned to Each Care Level, FY 2013**



Source:  BOP population snapshots.

---

[16] Care Level 4 institutions also house cadre inmates who have work assignments and are primarily made up of healthier, non–Care Level 4 inmates.

*BOP Program Statement 5050.49 (Compassionate Release)*

The increase of the aging inmate population adversely affects crowding levels, particularly in minimum security, low security, and medical institutions.  At the end of FY 2013, the BOP as a whole was 34 percent over capacity, with minimum security institutions at 19 percent over capacity, low security institutions at 32 percent over capacity, and medical centers at 16 percent over capacity.[17]  According to BOP data, aging inmates made up 26 percent of the population of minimum-security institutions, 23 percent of the population of low-security institutions, and 33 percent of the population of medical centers.

In the *Sentencing Reform Act of 1984,* Congress authorized the BOP Director to request that a federal judge reduce an inmate's sentence based on "extraordinary and compelling" circumstances.  Under the statute, the request can be based on either medical or nonmedical conditions that could not reasonably have been foreseen by the judge at the time of sentencing.  The BOP has issued regulations and a Program Statement entitled "Compassionate Release" to implement this authority.  In April 2013, the OIG released a report that found significant problems with the management of the BOP's compassionate release program and that an effectively managed program would help the BOP better manage its inmate population and result in cost savings.  We also found, in considering the impact of the compassionate release program on public safety, a recidivism rate of 3.5 percent for inmates released through the program.  By comparison, the general recidivism rate for federal inmates has been estimated as high as 41 percent.

In August 2013, following the release of our review, the BOP implemented new provisions to its Compassionate Release Program Statement making inmates at least age 65 eligible for consideration for both medical and nonmedical reasons.[18]  One provision applies to inmates sentenced for an offense that occurred on or after November 1, 1987, who are age 70 years or older at the time of consideration for release and who have served 30 years or more of their sentence of imprisonment.  A second provision applies to inmates:

---

[17]  Over-capacity level is based on our analysis of the BOP's FY 2013 population snapshot, combined with information about each institution's security level as reported on the BOP's website.  Our analysis excluded detention centers and contract institutions.  The BOP's Long Range Capacity Plan, which includes all institutions, reports that at the end of FY 2013 the BOP as a whole was 36 percent overcrowded.  At the end of FY 2014, the BOP reported that its inmate population had dropped slightly from the year before.  However, for this report we examined population data only through FY 2013.

[18]  See BOP, *Compassionate Release/Reduction in Sentence:  Procedures for Implementation of 18 U.S.C. § 3582(c)(1)(A) and 4205(g),* Program Statement 5050.49 (August 12, 2013).

1. age 65 and older,

2. suffering from chronic or serious medical conditions related to the aging process,

3. experiencing deteriorating mental or physical health that substantially diminishes their ability to function in a correctional facility,

4. for whom conventional treatment promises no substantial improvement to their mental or physical condition, and

5. who have served at least 50 percent of their sentence.

A third provision applies to inmates who are age 65 and older and have served the greater of 10 years or 75 percent of their sentence. An inmate's medical condition is not evaluated under the first or third provisions. To determine whether inmates applying under any of the three provisions are suitable for compassionate release, the BOP further evaluates each inmate in light of several factors, including but not limited to the nature and circumstance of the inmate's offense, criminal history, input from victims, age at the time of offense and sentencing, release plans, and whether release would minimize the severity of the offense.

*States have begun addressing the challenges the of the aging inmate population*

State correctional systems are also facing an increase in aging inmate populations. Specifically, according to a 2014 report, the number of inmates age 55 and older in state and federal institutions increased 204 percent between 1999 and 2012.[19] State correctional systems have also experienced a substantial increase in healthcare costs. According to the report, correctional healthcare spending rose in 41 states by a median of 13 percent during the 5-year period from FY 2007 to FY 2011. The report indicates that states generally incurred higher inmate healthcare spending where aging inmates represented a larger proportion of the inmate population. For example, the median healthcare spending per inmate in the 10 states with the highest percentage of inmates age 55 and older averaged $7,142, while the 10 states with the lowest percentage of these inmates averaged $5,196 per inmate. Later in this report, we provide a similar analysis based on BOP institutions with the highest and lowest percentage of aging inmates.

To address the growth of aging inmate populations, at least 15 states have provisions that would allow for the consideration of early release for

---

[19] Pew Charitable Trusts and the John D. and Catherine T. MacArthur Foundation, "State Prison Health Care Spending," July 8, 2014, http://www.pewtrusts.org/en/research-and-analysis/reports/2014/07/08/state-prison-health-care-spending (accessed April 9, 2015). The report did not break out the increase between state and federal institutions.

aging inmates, but with varying eligibility requirements.[20]  Some states restrict eligibility to aging inmates with physically or mentally debilitating conditions, while other states open eligibility to all aging inmates who meet age and time served requirements.  Outside of early release considerations, several states have developed separate housing units or institutions for aging inmates, including housing units dedicated to older inmates with chronic health problems.  For example, the Florida Department of Corrections has several institutions with units designed specifically for aging inmates, including one dedicated for inmates age 50 and older.  States have also recognized the need for different programming for aging inmates, including one program in Nevada designed for inmates age 55 and older to enhance their overall health through daily activities.

---

[20]  Tina Chiu, "It's About Time:  Aging Prisoners, Increasing Costs, and Geriatric Release," *VERA Institute of Justice*, April 2010.

## PURPOSE, SCOPE, AND METHODOLOGY

**Purpose**

Our review examined the BOP's aging inmate population by assessing the population's impact on incarceration costs, health services, staffing, housing, and programming.  We also determined the recidivism rate of aging inmates released from BOP custody.

**Scope and Methodology**

Our review analyzed BOP inmate population and cost data, as well as BOP policies and programs from FY 2009 through FY 2013.  Our review focused on federal offenders incarcerated in the 119 institutions operated by the BOP during our scope years.  We excluded inmates housed in private correctional institutions, contract community corrections centers, and contract state and local institutions from our analysis.  We also excluded inmates who were in pre-trial detention.

Our fieldwork, conducted from February 2014 through September 2014, included interviews, data collection and analyses, and document reviews.  We interviewed BOP officials, including the Assistant Directors responsible for eight Central Office divisions.[21]  We conducted 13 site visits to BOP institutions, including 5 institutions through video teleconferences and 8 institutions in person.  For each site visit, we interviewed institution officials and staff.  For those institutions that we visited in person, we also interviewed inmates, toured housing units, and observed the physical landscapes.  Our site visits encompassed BOP institutions representing all security levels, including minimum-, low-, medium-, and high-security institutions, as well as administrative security institutions such as federal medical centers and detention centers.  A detailed description of the methodology of our review is in Appendix 1.

---

[21]  The BOP's Central Office is located in Washington, D.C.  We interviewed the Assistant Directors of the Administration; Human Resource Management; Health Services; Information, Policy, and Public Affairs; Reentry Services; Correctional Programs; and Industries, Education and Vocational Training Divisions.  We also interviewed the General Counsel.

## RESULTS OF THE REVIEW

### Aging inmates are more costly to incarcerate, primarily due to their medical needs

According to BOP officials and staff, an aging inmate population's most significant impact is on medical costs. From fiscal year (FY) 2009 to FY 2013, the BOP's spending on inmate healthcare increased by 29 percent, according to BOP data. In FY 2009, the BOP spent $854 million of its $5.5 billion budget (16 percent) to provide medical care for its inmate population. By FY 2013, medical costs increased to $1.1 billion, representing 17 percent of the BOP's $6.5 billion budget that year. While the BOP states that it cannot determine the specific medical costs associated with individual inmates, we found that aging inmates, as a group, are more expensive to incarcerate than younger inmates, primarily due to their medical needs. We also found that medical costs are increasing at a rate higher than the BOP's total budget, especially at institutions housing more aging inmates, and are driven by medications and medical trips outside of institutions. Finally, we found aging inmates are receiving more medical services, both within BOP institutions and from outside healthcare providers.

Using BOP inmate population and cost data, we estimated costs per inmate based on security level and the number of days incarcerated within a fiscal year.[22] We found that an aging inmate, on average, costs 8 percent more to incarcerate than a younger inmate. For example, in FY 2013, the average aging inmate cost $24,538 to incarcerate, whereas the average younger inmate cost $22,676. We also found that average cost per inmate rises with age, with the 8,831 inmates age 18 to 24 costing an average of $18,505 each and the 157 inmates age 80 and older costing an average of $30,609 each. While the aging inmate population represents only 19 percent of the BOP's total population, the costs to incarcerate them are increasing at a faster rate than for younger inmates. For example, the cost of incarcerating aging inmates grew 23 percent, from $715 million in FY 2010 to $881 million in FY 2013, while the cost of incarcerating younger inmates grew 3 percent, from $3.5 billion to $3.6 billion over the same period. (See Figure 3 below for the average annual cost per inmate in FY 2013.)

---

[22] The BOP determines the average cost to incarcerate inmates by the type of institution where an inmate is housed, such as a low-security institution or a federal medical center, not by the specific cost to incarcerate each inmate. Therefore, we calculated the number of days served by each inmate in each fiscal year and applied the cost of the type of institution where that inmate was housed. See Appendix 1 for more details on our analysis.

**Figure 3**

**Average Annual Cost per Inmate by Age, FY 2013**

Source:   BOP population and daily cost data.

According to the BOP's Assistant Director for Health Services and Medical Director, inmates in their fifties and sixties place the greatest burden on the BOP because their numbers are increasing and many of them have significant health problems stemming from years of substance abuse. Similarly, BOP officials and staff at each institution we visited said the most significant impact of aging inmates on the BOP is the cost associated with addressing their increased medical needs.  For example, a Health Services Administrator of an institution where aging inmates were 27 percent of the population told us that her institution's medical budget increased from $3 million to $9 million in FY 2012 alone due to the aging inmate population. Aging inmates we interviewed also acknowledged their impact on the BOP's medical costs.  One aging inmate told us that he has had two heart attacks, two strokes, open-heart surgery, cancer, and has diabetes.  He told us that it must cost the BOP "a fortune" to keep him incarcerated.  We discuss the impact aging inmates have on BOP institutions' medical costs, as well as factors that drive increased medical costs for aging inmates, below.

*Healthcare spending per inmate is greater at institutions with the highest percentage of aging inmates*

Using BOP population and medical cost data, we calculated medical spending per inmate within each institution and found that the BOP's healthcare spending coincides with the percentage of aging inmates at an institution.[23]  Specifically, we found that the five institutions with the highest percentage of aging inmates spend significantly more per inmate on medical costs than the five institutions with the lowest percentage of aging inmates (see Table 4).[24]

**Table 4**

**Medical Spending per Inmate at Institutions with the Five Highest and Lowest Percentages of Aging Inmates**

| FY 2009 | Percentage of Aging Inmates | Cost Per Inmate | FY 2013 | Percentage of Aging Inmates | Cost Per Inmate |
|---------|------------------------------|-----------------|---------|------------------------------|-----------------|
| Highest | 27% | $6,528 | Highest | 31% | $10,114 |
| Lowest | 5% | $2,110 | Lowest | 7% | $1,916 |

Source:  BOP medical spending data.

As Table 4 shows, in FY 2009, institutions with the highest percentage of aging inmates spent on average $6,528 per inmate on medical costs while institutions with the lowest percentage of aging inmates averaged $2,110 per inmate.  The same pattern of spending emerged in FY 2013, when institutions with the highest percentage of aging inmates spent on average $10,114 per inmate while institutions with the lowest percentage of aging inmates spent $1,916 per inmate.

---

[23]  According to the BOP, there is no direct way to associate medical care provided with the costs incurred for each inmate because its electronic medical records system and financial management system are not connected.  The BOP's Assistant Director for Administration told us that the BOP does not track costs by inmate because its accounting system tracks spending by program area only.

[24]  We excluded BOP medical centers, detention centers, and correctional complexes from this analysis.  We excluded correctional complexes because spending data is reported in the aggregate instead of separately for each institution within the complex.  For example, one correctional complex spent $99 million on medical care in FY 2013 but we could not determine how much was specifically spent by a medical center and each of three other institutions within the complex.  Because we excluded these institution types, our cost estimates of spending per inmate are lower.  See Appendix 1 for additional details.

*Institutions with the highest percentage of aging inmates spend more per inmate on medical care provided both inside and outside BOP institutions*

All BOP institutions operate ambulatory clinics that incur medical expenses for inmate care provided inside the institution.  If an inmate has a medical condition that becomes emergent, escalates, or requires further examination or diagnosis from a specialist, the inmate may be transported outside the institution for services.  We found that medical costs incurred for care provided both inside and outside institutions account for 86 percent of the BOP's medical costs each year.[25]  According to the BOP, costs for medical services provided inside all BOP institutions increased 19 percent, from $413 million in FY 2009 to $493 million in FY 2013.  Costs for medical services provided outside BOP institutions (often in private or public hospitals) increased even more sharply, rising 31 percent, from $320 million in FY 2009 to $420 million in FY 2013.

We also found that costs for medical services provided both inside and outside institutions increased at a higher rate at institutions with the highest percentage of aging inmates when compared to institutions with the lowest percentage of aging inmates.  For example, in FY 2009, institutions with the highest percentage of aging inmates spent about four times as much on medical care provided outside of institutions than those with the lowest percentage of aging inmates.  By FY 2013, the gap widened even more significantly, with institutions with the highest percentage of aging inmates spending on average over 10 times more on outside medical care than institutions with the lowest percentage of aging inmates.  (See Table 5 below.)

**Table 5**

**Average Cost Per Inmate for Medical Services Provided Inside and Outside Institutions with the Highest and Lowest Percentages of Aging Inmates**

| FY 2009 | Percentage of Aging Inmates | Inside Services | Outside Services | FY 2013 | Percentage of Aging Inmates | Inside Services | Outside Services |
|---|---|---|---|---|---|---|---|
| Highest | 27% | $2,551 | $2,826 | Highest | 31% | $3,436 | $5,751 |
| Lowest | 5% | $1,244 | $658 | Lowest | 7% | $1,224 | $563 |

Source:  BOP medical spending data.

---

[25]  Medical costs also include salaries for U.S. Public Health Service employees, who staff many institution medical clinics; medical transport costs; and costs of handling unforeseen medical events at institutions.  These costs, when combined with inside and outside medical services, total the BOP's medical budget.  See Appendix 1 for additional details.

Institution staff also told us that aging inmates incur more medical costs due to increased visits to medical clinics inside the institution and medical trips outside the institution.  For example, a Warden told us that aging inmates are more likely to be chronic care patients seen more frequently by healthcare services.[26]  Aging inmates also told us they are receiving more medical services.  For example, a different aging inmate from the one referenced above told us he gets two shots per day, requires dialysis,

> **Budgetary Impact of Hepatitis C Treatment**
>
> According to the BOP, as medication costs continue to increase, they will place even greater pressure on the BOP's budget in the future.  For example, institution staff told us about treatments recently approved by the Food and Drug Administration (FDA) regarding Hepatitis C, a condition that is particularly prevalent among aging inmates.  Approximately 12,000 inmates have Hepatitis C, and 47 percent of those are aging inmates.  Medical staff at a BOP medical center told us that while they did not yet know the cost of the new Hepatitis C medication at the time of our interview, they anticipated costs to be "astronomical" because Hepatitis C is one of the most common infectious diseases in the inmate population.  The BOP reports that former treatments cost $6,600 per patient, while the treatment recently approved by the FDA will cost an additional $20,000 to $40,000 per patient.
>
> Source:  BOP FY 2015 congressional budget justification.

and has a number of ailments including congestive heart failure, diabetes, sleep apnea, cataracts, and Hepatitis C.  In addition to medical care provided inside the institution to treat his medical conditions, every 6 months he receives outside medical care for his heart.  Below, we discuss two specific factors that we found drive increased medical costs associated with an aging inmate population:  medication costs and staff overtime to meet inmate medical needs.

*Medications and staff overtime to meet inmate medical needs are significant drivers of increasing medical costs*

Due to their medical needs and chronic health problems, aging inmates require more medications and are substantially driving up the BOP's medical costs.  We found that the BOP's spending on medications increased 32 percent, from $62 million in FY 2009 to $82 million in FY 2013.  We also found that the BOP's spending on medications was higher, and increased faster, at institutions with the highest percentage of aging inmates.  The BOP's Assistant Director for Health Services and Medical Director told us that medication for inmates requiring chronic care is one of the BOP's major healthcare cost drivers.  A Warden also said that a high percentage of aging inmates are being treated for chronic medical conditions and that medications drive the costs to care for these inmates.  By contrast, medication costs were lower and increased more slowly at institutions with

---

[26]  The BOP schedules inmates with ongoing medical problems for frequent appointments with BOP medical staff to reassess their status and renew their prescriptions.

the lowest percentage of aging inmates.  For example, in FY 2013 institutions with the highest percentage of aging inmates spent an average of $684 per inmate on medications, or about 14 times more than those with the lowest percentage of aging inmates, which spent an average of $49 per inmate on medications in FY 2013.

Institution staff also told us that aging inmates with chronic conditions require treatment from specialists outside the institution and that overtime paid to Correctional Officers who escort inmates to such appointments is a significant budget item.  According to BOP data, in FY 2013, in addition to paying for outside medical care, the BOP spent $53 million in overtime to transport inmates to outside medical care, a 17 percent increase from the $46 million spent in FY 2009.  As one example, an Associate Warden said overtime costs associated with transporting aging inmates to outside medical appointments and hospitalizations were "phenomenal" and that his institution was over its allotted overtime budget less than half way through the fiscal year for this reason.

*Aging inmates disproportionately require catastrophic medical care*

In May 2012, the BOP Assistant Director for Health Services and Medical Director issued to all institutions a memorandum on "Catastrophic Case Management"; it defined catastrophic medical cases as those where the estimated or actual cost of outside medical care for an inmate housed in a nonmedical BOP institution exceeds $35,000 for a single medical event and provided guidance on how to track and monitor these cases.[27]  We analyzed catastrophic care data from one BOP region between FY 2009 and FY 2013 and found that while only 18 percent of the inmates in this region were aging inmates during this period, 59 percent of the catastrophic medical cases involved aging inmates (see Table 6).  Moreover, because the aging inmate population in this region was about four times smaller than the younger inmate population, the probability of an aging inmate having a catastrophic medical issue was about eight times higher than for a younger inmate.

---

[27]  As of FY 2012, all BOP regions adopted a catastrophic case management system designed to track and monitor cases and to measure the fiscal and clinical outcomes of care. While beyond the scope of this review, we learned that the BOP's six regions do not consistently track catastrophic medical cases and that the BOP's Central Office does not process or analyze that data to better understand the impact of catastrophic healthcare events on budget and decision-making.  Due to the inconsistency of regional tracking, we were able to analyze catastrophic case spending in only one region.  See Appendix 1 for details.

**Table 6**

**Catastrophic Cases in One BOP Region, FY 2009 to FY 2013**

| Age | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | Total |
|---|---|---|---|---|---|---|
| Cases Involving Younger Inmates | 53 | 58 | 70 | 60 | 79 | **320** |
| Cases Involving Aging Inmates | 58 | 76 | 104 | 104 | 126 | **468** |
| **Total** | **111** | **134** | **174** | **164** | **205** | **788** |
| Percent of Aging Inmates in this Region | 16% | 17% | 18% | 18% | 19% | **18%** |
| Percent of Catastrophic Cases Involving Aging Inmates | 51% | 57% | 60% | 63% | 61% | **59%** |

Source:  BOP catastrophic case data.

We also found that during this time, this region spent $71 million on catastrophic medical care, 60 percent ($45 million) of which was spent on aging inmates.  Based on our review of available data, we found that aging inmates received catastrophic medical services for a variety of medical conditions, particularly heart and lung conditions.  Services from this region included treatment of clogged arteries, heart failure, cardiovascular issues, respiratory failure, lung disease, and cellulitis.  Finally, while the costs associated with catastrophic care cases must all exceed at least $35,000, we found cases with significantly more costs.  For example, the most expensive case from this region involved over $850,000 spent for an aging inmate who was treated for complicated coronary artery disease.

In addition, we found that the increase in catastrophic medical cases in this region was not limited to Care Level 3 institutions, which, as described above, are specifically intended to care for outpatient inmates with medical conditions that require daily to monthly outpatient clinical contact.  For example, a Care Level 2 institution, which incarcerates inmates who are stable outpatients and typically require clinical contact only every 3 months, accounted for 30 percent of the region's catastrophic medical cases in FY 2013.  Aging inmates comprised 62 percent of this institution's catastrophic medical cases, even though they represented only 27 percent of its population.

**BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose**

As described above, the increasing aging inmate population has resulted in an increase in trips outside of institutions to address their medical needs.  We found that institutions lack Correctional Officers to staff these trips and have limited medical staff within institutions to address aging

inmates' medical needs. As a result, aging inmates experience delays in receiving medical care. In addition, the needs of aging inmates differ from their younger counterparts, including the need for increased assistance with activities of daily living. According to BOP staff, however, staff is not responsible for ensuring inmates can accomplish these activities. We found that, instead, institutions rely on local inmate companion programs in which healthy inmates provide assistance for aging or disabled inmates. Further, aging inmates, specifically those with unique medical needs, also require advanced release preparation. We found that Social Workers are uniquely qualified and trained to address these needs, yet few institutions have them. Finally, we found that institution staff has limited training to identify signs of aging in inmate conduct, which can be mistakenly viewed as reflecting disciplinary issues rather than signs that the inmate needs medical or mental health care.

*Understaffed health services units limit access to medical care and contribute to delays for aging inmates*

Aging inmates have an increased need for health services; but, according to BOP officials, staff, and inmates, institutions lack adequate health services staff to address these needs.[28]  For example, the Clinical Director of a medical center told us that only 80 percent of that institution's health services positions are staffed and that the vacancies limit the number of inmates, including aging inmates, the institution can treat.[29]  A Case Manager at a nonmedical institution told us that the institution was "over a thousand inmates behind" in servicing those enrolled in chronic care clinics. An aging inmate told us that the health services staff at his institution is "inundated" with requests for care and that, while they work hard, they can only do so much. Aging inmates at numerous institutions also told us that limited health services staff sometimes resulted in long waiting periods for care.[30]  For example, an aging inmate told us that he requested dentures in

---

[28]  BOP officials told us that hiring health service staff is difficult. According to the Assistant Director for Human Resources, it is difficult to hire medical staff in urban areas because the BOP cannot offer doctors and nurses salaries and benefits that are comparable to those offered by private employers. Although the salaries and benefits are more competitive in rural areas, the BOP is challenged with finding medical staff willing to live in remote areas. The BOP uses some incentives such as periodically increasing employee pay, paying relocation expenses, and offering to a pay a portion of student loans. Nevertheless, as of August 2014, only 84 percent of the BOP's medical doctor positions were filled, which is below the BOP's goal of 90 percent.

[29]  This medical center had two physician vacancies, two mid-level practitioner vacancies, and several nurse vacancies open at the time of our fieldwork.

[30]  The BOP's Assistant Director for Health Services and Medical Director told us that in November 2014 the BOP launched a survey of inmates in all BOP institutions to assess inmates' access to healthcare. He told us that once the survey is complete, the Health Services Division will analyze the results by institution. For institutions where inmates report delays in receiving care, the BOP will try to determine the underlying causes of delay at each institution in order to develop potential responses.

2010 and had yet to receive them.[31]  He said this makes it extremely hard to eat because he cannot chew food.

Additionally, the lack of an adequate number of health services staff increases the need for outside care.  A Case Manager told us that the lack of health services staff at his institution has led to more emergency trips to hospitals outside the institution because the institution does not have a Physician Assistant to address medical needs.  We also found that trips to outside medical providers are often limited by the availability of Correctional Officers to escort inmates.  According to BOP policy, correctional staff is required to escort inmates to outside medical appointments.[32]  The limited availability of Correctional Officers restricts aging inmates' access to medical care outside the institutions, and institution staff told us that, as a result, there are waitlists to send inmates to outside medical specialists.

Using BOP data from one institution, we found that the average wait time for inmates, including aging inmates, to be seen by an outside medical specialist for cardiology, neurosurgery, pulmonology, and urology to be 114 days.  The wait time at this institution increased to 256 days for those inmates waiting to see outside specialists for additional or routine appointments.[33]  The Assistant Health Services Administrator at this institution told us that there was no doctor at the institution and, while staff used to be able to send inmates on 10 medical trips per day, the institution now has the staff to provide only 6 planned trips and 2 emergency trips per day.  We found similar difficulties staffing outside medical trips at other institutions.  The Associate Warden at one institution told us his staff can accommodate 6 trips to outside medical specialists per day, even though the inmate population requires 8 to 10 trips per day.  We also noted that outside medical trips depend on appointment availability and that, while an institution may be able to provide the necessary number of medical trips per week, specialists in the community must also be available and willing to see an inmate.

We additionally found that the management of outside medical care waitlists affects the medical care provided to aging inmates.  Specifically, we were provided examples of inmate appointments not being rescheduled when canceled, being rescheduled when the appointment had already taken place,

---

[31]  Inmates with dental problems, such as abscesses, that could cause harm if left untreated, receive priority for dental appointments.  The BOP's Assistant Director for Health Services and Medical Director told us that the BOP has also initiated a National Dental Waiting List so that inmates awaiting dental care do not fall back to the end of the list if they are transferred to a different institution.

[32]  BOP, *Escorted Trips,* Program Statement 5538.06 (August 29, 2014).

[33]  Only one institution tracked waitlist times, and we requested this data from the BOP.  Based on the data available to us, we could not determine how much of the delay in receiving outside medical care is due to limited staffing and how much is due to limited availability of appointments with specialists.

or not being scheduled at all.  A Health Services Administrator told us that inmates who are on waitlists for outside medical care can "fall through the cracks" if their appointments are canceled and not rescheduled.  An aging inmate told us that he was sent outside the institution for a medical appointment and 2 months later was rescheduled for the same medical need. When he brought the issue to the Clinical Director, he was told that it was just an appointment reminder.  However, the inmate told us that he believes staff did not realize he had already been seen.  Another aging inmate told us that at the time of our interview he had been waiting 2 years to be taken outside his institution for an examination to receive eyeglasses and had resorted to using a magnifying glass in the meantime.

*The availability and purpose of inmate companion programs used to help aging inmates accomplish their activities of daily living vary by institution*

All inmates are expected to perform activities of daily living, including dressing, cleaning their cells, and moving around within the institution. However, staff told us that aging inmates often cannot perform these activities on their own because of their medical conditions and staff is not responsible for ensuring inmates can accomplish these activities.  Some institutions we visited have established local inmate companion programs to address the increasing number of aging inmates who need assistance with these activities.  These programs utilize healthier inmates to provide support to inmates, including aging inmates, who experience difficulty functioning in a correctional environment.

Institution staff we interviewed found their local inmate companion programs beneficial to both aging inmates and staff.  For example, a Health Services Administrator described to us an aging inmate with dementia and Alzheimer's disease who needed increased resources and attention.  In this case, an inmate companion served as staff's "eyes and ears," alerting them to changes in the inmate's behavior.  A Counselor told us he does not know how he would manage the unit without the assistance of inmate companions. However, not all institutions have inmate companion programs.  At one institution without an inmate companion program, an Assistant Health Services Administrator told us that aging inmates typically pair with a friend or cellmate for assistance.  A Health Services Administrator at another institution said that inmates who cannot perform their activities of daily living and require daily or weekly assistance beyond what the inmate companions there are trained to provide are referred for transfer to an institution that can meet their needs.[34]

---

[34] Inmates needing a medical transfer had been waiting for an average of 1–2 months in October 2014.  We further discuss issues regarding transfers for medical reasons below.

Also, the implementation of inmate companion programs varies by institution, particularly between nonmedical institutions and medical centers. For example, medical centers had local policies and position descriptions establishing expectations for inmate companions.  Inmate companions at one medical center are expected to work in contact with bodily fluids and to help care for inmates suffering from chronic and acute diseases.  They also provide assistance with moving inmates within an institution, feeding, answering patient call lights, and changing diapers.  However, at nonmedical institutions, including those with high percentages of aging inmates, inmate companion programs have no policies or job descriptions.  Instead, inmate companions are often referred to as "wheelchair pushers" because their primary responsibility is to help inmates confined to a wheelchair travel within an institution.  Staff at two institutions we visited said they use inmate companions only as part of their institution's suicide prevention programs. An Associate Warden told us that each of the eight institutions where he has worked implemented its local inmate companion program differently.  We found other differences between how institutions implement inmate companion programs, including:

- *Training:*  At some institutions we visited, inmate companions are provided training on medical safety standards, confidentiality, listening skills, and job expectations.  However, training at other institutions is less extensive.  For example, at one institution where inmate companions are utilized as wheelchair pushers, inmate companions complete 1 day of training on wheelchair ergonomics and safety precautions.  At another institution, there is no formal training for wheelchair pushers.

- *Selection:*  Each institution we visited that had an inmate companion program selected inmates who were considered responsible and had few misconduct incidents.  Institutions with more robust programs also require inmate companions to meet specific selection criteria, such as having passed a General Education Development (GED) test.

- *Compensation:*  At institutions we visited, inmate companion pay varied based on companions' levels of responsibility.  For example, a Counselor at an institution where inmate companions have more responsibility told us that most companions are paid $40 a month.  A Case Manager at an institution where inmates have less responsibility told us that companions are paid $5 to $7 a month.

- *Oversight:*  One institution with a local inmate companion policy developed a committee of nursing staff and selected inmate companion representatives to oversee the program.  The committee reviews inmate companion assignments, develops plans of care, and identifies training needs.  At another institution, where the program

does not operate out of the health services or nursing departments, unit teams informally manage the inmate companions.[35]

According to institution staff and inmates, despite the benefits of and need for inmate companion programs, aging inmates face risks when these programs are inconsistently implemented.  An aging inmate told us that most inmate companions really try to help, but sometimes companions take advantage of aging inmates.  For example, a Supervisor of Education told us about an inmate who had an inmate companion who was threatening the inmate's wife and forcing her to send money in return for the inmate's protection.  The inmate told the Supervisor that it had been going on for a long time but that he had been unable to tell institution staff because the companion accompanied him everywhere, including to personal meetings with staff.  Institution officials and staff said that the inmate companion program should be a standardized national program, with a program statement establishing policies that hold inmate companions accountable for their responsibilities.  At one institution with program guidelines, inmate companions are expected to sign the guidelines, acknowledging they will abide by program rules.  If a companion violates any of the guidelines, the inmate companion committee conducts a misconduct review.  Without the protections or oversight of national guidelines, however, each institution can run the program inconsistently.

*Social Workers are uniquely qualified and trained to address the needs of aging inmates, particularly with release planning, but few institutions have Social Workers*

We found that Social Workers are a great benefit for aging inmates.  While Case Managers, Counselors, Social Workers, and other institution staff work in concert to prepare inmates for release, only Social Workers have extensive training in addressing the unique needs of aging inmates.  Licensed Social Workers can proficiently help with aftercare planning, resource brokering, and medical continuity of care during reentry.  A Social Worker told us that they help aging inmates with accessing medical services and equipment in the community upon release.

However, relatively few institutions have Social Workers.  Specifically, as of November 2014, there were only 36 Social Workers throughout all of the BOP's institutions.  A Social Worker told us that at her institution there are approximately 1,000 inmates for every Social Worker.  Another Social Worker told us that because there are so few Social Workers, he has to prioritize the inmates he helps based on their more difficult problems and

---

[35]  The unit teams consist of a Unit Manager, Case Managers, Correctional Counselors, Unit Secretaries, Correctional Officers, an Education Advisor, and a Psychologist who work with all inmates assigned to live in a particular housing unit.  The unit team directly observes an inmate's behavior and can make recommendations in programming areas.

greater reentry needs, limiting his ability to assist all inmates, including aging inmates.[36]  Although the BOP employs six Regional Social Workers to assist institutions that do not have a Social Worker, they are limited in availability because each of them is responsible for between 15 and 17 institutions.  We reviewed the BOP's Community Release Planning Guidelines for Social Work and found that it did not define any duties for regional Social Workers that were distinct from the duties for institution Social Workers.  BOP institution staff told us that regional Social Workers provide resources so that institution staff can work with individual inmates.

We also found that the lack of availability of Social Workers within BOP institutions hinders the BOP's ability to effectively prepare aging inmates to reenter society because other BOP staff do not have the training unique to Social Workers.  A Case Manager at an institution with Social Workers told us that she relies on Social Workers because they know things she does not, such as the "ins and outs" of applying for Social Security benefits.  A Case Management Coordinator at an institution without Social Workers said that he has to try to find resources on the internet to assist aging inmates in applying for Social Security.  Staff at institutions without a Social Worker also told us about the benefits a Social Worker would bring to their institution, including addressing issues related to halfway house placement, explaining eligibility for benefits to many uninformed or confused aging inmates before they are released, and removing some of the burdens placed on Case Managers.

Recognizing the benefit that Social Workers play in helping inmates prepare for release, the BOP recently approved and budgeted for the hiring of seven additional Social Workers to be assigned to 5 correctional complexes, 1 medical center, and 1 female institution.

*Institution staff is not adequately trained to identify the signs of aging, which mistakenly can be viewed as reflecting disciplinary issues rather than a need for medical or mental healthcare*

The BOP provides brief, limited training for institution staff on recognizing the signs of aging in its Annual Refresher Training, which states that the significant increase in aging inmates requires staff to contend with increased mobility issues, terminal illness, and cognitive impairments.  The training includes ways staff can be aware of changes in aging inmates and provide increased monitoring to help with inmates' cognitive and physical deterioration.  The training further elaborates on aging inmates'

---

[36]  In October 2014, the BOP released Community Release Planning Guidelines for Social Work (Guidelines) to assist inmates in identifying necessary community resources for release planning.  While these Guidelines identify Social Workers as a resource for inmate release planning, Social Workers are currently available only at Care level 3 and 4 institutions, making their availability to Care level 1 and 2 inmates limited.

vulnerabilities, such as being forgetful, losing track of time, taking longer to complete tasks, not being able to follow directives, and having increased physical stress.  The training also informs participants that aging inmates will require time and understanding to acclimate to an institutional environment.  However, the Annual Refresher Training Instructor Guide states that training on signs of aging as well as medical emergencies can be completed in 30 minutes.

The Assistant Director for Human Resources told us that the BOP currently trains all staff to meet the local needs of its population and that, as a result, staff at Care Level 3 and 4 institutions should be able to recognize mobility issues and make necessary accommodations.  However, we found that inmates in Care Level 2 institutions also have mobility issues that would require staff to recognize and accommodate those and other health issues in aging inmates.  For example, an anemic, wheelchair-bound aging inmate at a Care Level 2 institution told us that he was disciplined several times for pushing himself inside a building to wait for his medication rather than waiting outside, including in cold weather, to receive it.

In March 2010, the BOP's National Institute of Corrections (NIC) released a training video on aging inmates, aimed at officials running state and local institutions, which said that the most critical step institutions could take to address an aging inmate population is staff training.  According to the video, training is important to help staff understand that aging inmates may have a medical reason that explains behavior that would otherwise be subject to discipline, such as an aging inmate who is in the wrong place because he has dementia.  Institution staff with whom we spoke agreed that this type of training at the BOP would be helpful and provided us examples.  A Case Manager described to us how she once asked an inmate several questions and received strange responses.  She said she thought the inmate was trying to "fool her," but she later learned that the inmate had medical conditions that prevented him from responding.  She said training on how to recognize behaviors resulting from dementia or other debilitating conditions would be helpful.  A Social Worker also said staff should be trained to understand the behaviors associated with dementia.  The Assistant Director for the Health Services Division and Medical Director said that the BOP has started to put more into annual training regarding officer sensitivity but that the BOP should permanently incorporate training specifically for the care of aging inmates across the institutions.

**The physical infrastructure of BOP institutions cannot adequately house aging inmates**

The BOP's mission includes confining federal offenders in controlled environments that are safe, humane, cost-efficient, and appropriately secure.  However, the BOP's ability to confine its aging inmate population is insufficient due to overcrowding in its institutions, as well as problems with

their internal and external infrastructures.  Lower bunks, essential for accommodating aging inmates with mobility limitations or medical conditions, is limited by the overcrowding of BOP institutions.  As a result, institutions do not always have enough lower bunks as well as handicapped-accessible cells and bathrooms, and others cannot accommodate the number of inmates with mobility devices that require elevators.  Further, aging inmates cannot consistently navigate the narrow sidewalks and uneven terrain at some institutions.  Staff and inmates told us that separate housing units, or entire institutions, would be more appropriate to house aging inmates.

*Lower bunks are limited due to the overcrowding of BOP institutions*

According to BOP staff and officials, aging inmates generally require lower bunks because of their physical limitations and risk of falling.  However, BOP institutions are consistently overcrowded, limiting the number of available lower bunks.[37]  Several officials and staff told us that their institution has run out of lower bunks for aging inmates.  We found that the lack of sufficient lower bunks affects aging inmates in several ways.

First, the lack of lower bunks may prevent or delay aging inmates from receiving lower bunks.  Consequently, aging inmates may be housed in upper bunks until a lower bunk becomes available.  For example, a Warden told us that aging inmates are sometimes assigned to an upper bunk out of necessity, which could be a problem for aging inmates because climbing into an upper bunk is not always easy.  During our visits to BOP institutions, we observed upper bunks that did not have ladders or steps, which required inmates to climb on desks, chairs, or makeshift pedestals to access the upper bunks.

Second, the lack of lower bunks has forced institutions to retrofit other space to create additional lower bunks.  A Supervisor of Education told us that her institution was unable to accommodate all of the inmates who needed lower bunks.  As a result, the institution had to add beds to a room not originally intended for housing.  We also found that institutions modified or added lower bunks within existing housing cells to accommodate aging inmates and inmates with mobility limitations, including retrofitting two-man cells or "cubes" to hold three inmates.  A Case Manager told us that while many three-man cells are composed of one double bunk and one single bunk, her institution created some triple-level bunk beds in which both the middle and bottom bunks are considered "lower bunks."  She also told us she observed inmates with histories of seizures and high blood pressure receiving middle bunks, which she said could create a liability for the BOP if the inmates were to fall.

---

[37]  In FY 2013, the BOP as a whole operated at 36 percent over capacity and aging inmates represented the fastest growing segment of the BOP's population.

Finally, the lack of lower bunks requires staff to regularly reassign lower bunks by prioritizing and reorganizing bed assignments, which sometimes creates tension among the inmates being moved.  Specifically, institution staff told us that managing lower bunks can be a very difficult, time-consuming endeavor and that it often takes a collaborative effort between inmates and staff from other units to accommodate aging inmates.  A Counselor told us that trying to find a lower bunk is comparable to "finding a needle in a haystack."  Moreover, accommodating aging inmates with lower bunks has repercussions.  Staff from institutions across all security levels described to us situations in which moving a younger inmate to an upper bunk to accommodate an aging inmate created tension or animosity within the housing unit.  In one case, a Counselor told us that the tension from assigning a younger inmate from a lower to an upper bunk led to an assault.

To help manage lower bunks, institution medical staff issues lower bunk passes to those inmates who meet criteria in a memorandum issued in June 2012 by the Assistant Director of the BOP's Health Services Division.  The memorandum, entitled "Lower Bunk Criteria," standardizes the assignment of lower bunks across the BOP by providing specific medical criteria for institution medical staff to consider before assigning a lower bunk.[38]  However, several nonmedical institution staff told us that lower bunk passes are given to inmates who do not need them.  One Counselor said that there is a disconnect between medical and nonmedical staff concerning inmates' needs for lower bunk passes.  We found that other institutions faced similar circumstances and issued lower-bunk passes exceeding the availability of lower bunks.  A Health Services Administrator told us that his institution was operating at maximum lower-bunk capacity at all times and provided us with a document that showed 452 inmates had lower bunk passes at that time while the institution had only 444 lower bunks.

*Overcrowding also limits the BOP's ability to move aging inmates to the institutions that best address their medical needs*

The BOP primarily utilizes its Care Level 3 and 4 institutions to house inmates with the most significant medical issues.  The BOP's Care Level 3 institutions treat inmates with medical conditions that require daily to monthly outpatient clinical contact.  These inmates may also require assistance in some activities of daily living.  But, we found that inmates needing a transfer to a Care Level 3 institution may be temporarily housed in

---

[38]  The memorandum identifies a range of specific medical conditions for which a lower bunk pass is recommended, including but not limited to orthopedic conditions, neurological conditions, blood-clotting problems, balance problems, pregnancy, and obesity.  The memorandum does not specify at what age an inmate should receive a lower bunk.  However, staff told us they attempt to assign lower bunks to inmates by age, which varied by institution. At one institution, the Health Services Administrator stated that he always places inmates over the age of 70 on lower bunks.  A Counselor at a different institution said that the majority of inmates over the age of 55 are in lower bunks.

the receiving institution's Special Housing Unit while waiting for an available bed.[39]  A Medical Designator in the BOP's Office of Medical Designations and Transportation told us that when an inmate is being transferred due to medical needs, the BOP may decide to transfer the inmate as quickly as possible, even if that means the inmate has to be assigned to the Special Housing Unit until a bunk in the general population becomes available.  An Assistant Health Services Administrator and a Case Manager at a Care Level 3 institution confirmed that their institution has sometimes placed aging inmates in their institution's Special Housing Unit until a bunk became available elsewhere in the institution.

Access to the BOP's Care Level 4 institutions, which comprise the BOP's six medical centers, is determined, in part, by the availability of bed space, and we found that transfers to these institutions are often difficult to complete in light of overcrowding.  Inmates waiting for transfer to a BOP medical center must remain in their institution's general population until a bed becomes available or their condition worsens.  A Health Services Administrator told us that inmates waiting for transfer place a huge strain on staff because his institution does not have an infirmary.  A Case Manager told us that space is at a premium at the medical centers and if an inmate's condition is not an emergency most inmates will wait 2–3 months for a transfer.  We asked the BOP for all data on pending medical transfers and found that in October 2014 two inmates awaiting an emergency transfer had been waiting on average 11 days, inmates awaiting a routine urgent transfer had been waiting an average of 31 days, and inmates awaiting a routine transfer had been waiting an average of 57 days.[40]  If an inmate's condition worsens, he is sent to a local hospital at government expense until the BOP's Office of Medical Designations and Transportation can approve his transfer to a medical center.

A Medical Designator in the Office of Medical Designations and Transportation said that institution staff is always inquiring about the wait period for transfer, often requesting that inmates be transferred sooner.  However, because transfers depend on the availability of bed space, inmates are placed in a queue and have to wait for a bed to become available in a BOP medical center.  A Health Services Administrator at a medical center told us that one of her biggest concerns is delaying care for inmates who need to

---

[39]  A Special Housing Unit is a separate unit used to segregate inmates in administrative detention status or disciplinary segregation status from the rest of the inmate population.  Inmates can be in administrative detention status for a variety of reasons, including a pending transfer to another institution or a need for protection from the general population.  Inmates in disciplinary segregation status are being punished for violating institution rules.  *See* 28 C.F.R. §§ 541.20–541.24.

[40]  Routine urgent transfers occur for medical conditions such as operative wound care and dialysis.  Routine transfers occur for medical concerns such as poor medication compliance or for further evaluation pending surgery approval.

transfer to her institution but cannot do so because there are no available beds.

*Institutions have difficulty accommodating inmates requiring handicapped-accessible facilities*

All BOP institutions are required to comply with the *Architectural Barriers Act of 1968,* which requires that public buildings and infrastructure be accessible to individuals with disabilities, including handicapped-accessible hallways, doors, and cells.[41]  The specific guideline addressing institutions and cells states that "accessible cells or rooms should be dispersed among different levels of security, housing categories, and holding classifications to facilitate access."  Officials from the BOP's Administrative Division said each institution is built to meet all accessibility standards that were in place at the time of its construction, with newer institutions being more accessible than older institutions.  However, the Deputy Chief from the BOP's Design and Construction Branch told us that some BOP institutions were built over a century ago and many continue to have accessibility difficulties even after retrofitting and renovation.  A Case Manager at a medical center told us that the institution is old and that many of the units cannot house wheelchair inmates because they do not have wide enough doors.  Also, BOP officials and staff told us that the infrastructure of more recently built institutions was not designed to handle the number of aging and handicapped inmates who are housed in these institutions.

The BOP's care level system has led to higher concentrations of aging inmates in institutions with higher care levels and more inmates needing handicapped-accessible infrastructure than the institutions were designed to handle.  During our visits to BOP institutions, we found a number of infrastructure difficulties that limit the BOP's ability to provide appropriate accommodations to house aging inmates, particularly those with physical disabilities.  Institution staff expressed similar concerns regarding the accessibility of housing units.  Due to housing limitations, inmates using wheelchairs and walkers are often housed together, creating cells with very limited space.  In one case, a Social Worker observed a cell that housed two wheelchair inmates together where the wheelchairs had to be placed outside the room because the cell could not accommodate both wheelchairs.  We were also told that when multiple inmates with physical disabilities are housed in the same unit their wait time for the limited number of accessible showers and bathrooms increases.  An aging inmate told us that his unit houses approximately 160 inmates, with only one handicapped-accessible toilet.  A second inmate in the same unit confirmed that, as a result, he often sees wheelchair-bound inmates waiting in line for that toilet because the rest of the toilet stalls are too narrow to accommodate wheelchairs.

---

[41]  42 U.S.C. §§ 4151–4157.

We found that institutions also have difficulty accommodating the growing number of aging inmates who need elevators.  A Case Manager told us that many units could not house aging inmates with mobility issues, particularly those who require a wheelchair, because the units lack elevators.  In these cases, inmates with mobility issues are housed in the same unit, increasing the use of elevators to that unit.  Staff at several institutions said that as a result, a common problem is frequent elevator outages, which may take days to be repaired.  A Social Worker told us that she observed inmates walking down stairs with walkers because elevators were broken.  We found that some institutions had handicapped-accessible cells and lower bunks that could be accessed only by stairs, and therefore aging inmates who may need the additional space provided in handicapped cells have to climb stairs to reach the larger cells or be placed in a regular-size cell within the general housing unit.  At one institution we visited, staff and inmates told us that aging inmates with mobility issues sometimes have to walk up stairs to the second floor to access their lower bunk.  One inmate told us that sometimes inmates with walkers remain assigned to an upstairs housing unit for weeks until space becomes available on the bottom floor.  Staff from another institution told us that their institution was not handicapped accessible because inmates have to navigate steps in order to reach their cells.  Inmates who cannot climb stairs cannot be housed at the institution and must be transferred to a nearby BOP institution.

Institutions have the authority to pay for their own maintenance and small renovation projects.  We found that one institution had to retrofit education space to create a wheelchair repair shop due to the number of wheelchair-bound inmates.  However, an institution cannot spend more than $10,000 of its own funding on renovations and larger projects have to be coordinated with their regional office or the BOP's Central Office.  The Chief of the BOP's Facilities Programs told us that institutions rarely submit proposals to the BOP's Central Office for major renovations to make housing units more accessible.

We also found that from 1994 to 1996 the BOP inspected all institutions to evaluate their accessibility for inmates with mobility impairments and funded recommended renovations based on those inspections.  For example, an inspection in one institution found that the medical and dental areas were accessible only by stairs.  As a result, the institution had an elevator installed in that area to make it accessible for inmates with mobility issues.  The Chief of the BOP's Facilities Program stated that all high-priority and some of the medium-priority renovations were completed but that renovations funded by the Central Office stopped prior to addressing the lowest priorities.  We were also told that the BOP has not conducted another BOP-wide review of the accessibility of all institutions since 1996.

*External infrastructure, including narrow sidewalks and uneven terrain, present difficult and sometimes unsafe conditions for aging inmates to navigate*

We found that the conditions of the external infrastructure of some institutions, such as uneven terrain or narrow sidewalks, makes it difficult and sometimes unsafe for aging inmates, particularly those with mobility issues, to move within the premises.  A Clinical Director said some housing units are far from the cafeteria, on uneven terrain, and become dangerous in snow or inclement weather.  In addition, a Counselor told us that the visiting room at his institution is at the top of a hill and wheelchair-bound inmates have to use a service road to access the visiting room, rather than the stairs the other inmates can use.  Further, many of the handicapped inmates at this institution are located at the bottom of a hill because that is where the only handicapped-accessible units are located.  An inmate at this institution also told us that the sidewalks are narrow and do not allow enough space to accommodate inmates in a wheelchair.[42]  Additionally, a Warden at another institution told us that the housing units at his institution are on a hill, which makes it harder for aging inmates in wheelchairs and walkers to move about.  He said that while the institution was built less than 20 years ago, it was not built to accommodate the number of aging inmates in wheelchairs and walkers currently housed there.  To address challenges associated with an institution's external infrastructure, we found that in some cases institution staff would move aging inmates to housing units that are closer to common areas to shorten walking distances.  However, as described above, bed space and accessible areas are often limited and not all aging inmates can be placed in accessible areas.

*According to BOP staff and officials, separate units, or entire institutions, would be more appropriate to house aging inmates*

The BOP does not provide specialized housing units based on age.  Some staff told us that the current system of having housing units contain a mix of ages enables aging inmates to mentor younger inmates and that the presence of aging inmates in general improves the behavior of the entire inmate population.  The BOP operates a number of segregated or specialized housing units, including units for inmates under administrative detention or disciplinary segregation and units to provide programming and treatment for sex offenders, drug offenders, and inmates diagnosed with mental health conditions.  The BOP's Assistant Director for Health Services and Medical Director told us that BOP officials have discussed the possibility of similarly housing aging inmates together.  However, he said that doing so would

---

[42]  During our visit to this institution, staff showed us how wheelchairs take up nearly the entire width of sidewalk and explained that not only was this unsafe for inmates in wheelchairs, it was also problematic for other inmates since they are not permitted to walk on the grass.

require "a real trade-off" because it would require the BOP to house many aging inmates farther away from their families.[43]

However, other staff and inmates provided several reasons why separate units, or entire institutions, would be more appropriate to accommodate the increasing population of aging inmates.  For example, and as described above, the internal and external infrastructures of institutions often limits the BOP's ability to safely confine its aging inmate population.  A Unit Manager suggested that given the number of aging inmates at his institution, the BOP should retrofit an entire building dedicated to accommodating aging inmates who need lower bunks that are strategically located in areas easily accessible to certain institution services, such as healthcare.  A Clinical Director told us that the BOP should create a separate institution for aging inmates with an "aging-friendly infrastructure" in a location that has flat terrain.  Additionally, a Counselor told us that having aging-inmate units with dedicated, round-the-clock nursing support could cut down on medical costs because a nurse could consistently help with their chronic health issues.  The Assistant Director for the Administration Division said that requests for geriatric units and institutions have been made before, and that he would "love" to have these units if it did not require costly construction.

In addition, BOP officials and staff told us that separate housing units or institutions would provide safer housing for aging inmates who may be more susceptible to being victimized by younger inmates.  While we were told that younger inmates often respect aging inmates, we were also told that younger inmates sometimes victimize aging inmates.[44]  For example, a Unit Manager in a Care Level 3 institution told us that his institution receives aging inmates directly from a BOP medical center and houses them in the general population.  He said this is an unsafe practice because they are vulnerable to being victimized when surrounded by younger inmates.

**The BOP does not provide programming opportunities specifically addressing the needs of aging inmates**

All BOP institutions offer programs and activities for inmates to further their education, obtain vocational and occupational training, practice their religion, enhance interpersonal and life skills, and participate in recreation

---

[43]  The BOP considers incarceration close to family members an important aspect of an inmate's rehabilitation and therefore attempts to place inmates in institutions that are within 500 miles of the release area, especially when an inmate is within 36 months of release.

[44]  We requested data from the BOP on incidents where aging inmates were victimized by younger inmates, but we were informed that the BOP does not keep statistics in this manner.

and leisure activities.[45]  However, there are no programs, and limited activities, that specifically address the needs of aging inmates, many of whom have already obtained an education or do not plan to seek further employment once released.  Aging inmates who want to participate in programs face obstacles, including having already completed all the programs available at an institution.  Institution officials and staff told us that the lack of programming and activities specifically designed for aging inmates makes them more likely to be idle and not participate in any activities or programs at all.  Finally, general release preparation programs do not address the unique release programming needs of aging inmates.

*There are no programs, and limited activities, specifically designed or appropriate for aging inmates*

All BOP institutions are required to provide GED classes, as well as English as a Second Language, Adult Continuing Education, and parenting classes, and to have a library.[46]  The BOP also offers programs with standardized curricula in multiple institutions for residential and nonresidential drug treatment, psychological treatment, occupational education classes that teach trade skills, and work through Federal Prison Industries, or UNICOR.[47]  In addition, institutions have the flexibility to develop local programs.

At the outset of our review, the BOP told us that there are no programs specifically designed for the needs of aging inmates but that aging inmates participate in standardized programs and local programs.  The Assistant Director of Correctional Programs said there are no programs set aside for inmates of a particular age and that everything is based on inmate need rather than age.  A Supervisor of Education also told us there are no age-specific programs but there are activities such as music appreciation and

---

[45]  Programs are formal educational opportunities, with start and end dates, required attendance, a curriculum, and measurable achievement standards.  Activities are less formal events, including one-time events and sports or game tournaments, in which inmates can participate for recreation.

[46]  Detention centers, metropolitan correctional centers, and the Oklahoma City Federal Transfer Center are exempted from providing programs beyond these minimal requirements.  Additionally, satellite camps (minimum-security camps next to a larger, higher-security institution) are exempt but more programs are available at the higher-security institutions to which the camps are attached.

[47]  Federal Prison Industries, commonly referred to by its trade name UNICOR, is a wholly owned government corporation whose mission is to employ and provide job skills training to the greatest practicable number of BOP inmates and produce market-priced quality goods and services for sale to the federal government with minimal impact on private business and labor.  *See* http://www.bop.gov/inmates/custody_and_care/unicor.jsp.  *See also* DOJ, OIG, *Audit of the Management of Federal Prison Industries and Efforts To Create Work Opportunities for Federal Inmates,* Audit Report 13-35 (September 2013), http://www.justice.gov/oig/reports/2013/a1335.pdf (accessed April 9, 2015).

exercise courses that aging inmates gravitate toward.  We reviewed the BOP's Directory of National Programs and found that the BOP has 18 standardized programs but none specifically addressing the needs of aging inmates.  Finally, when we asked BOP officials and staff whether aging inmates had different needs than younger inmates, they cited different physical needs but did not cite different programming needs related to age.

Institution staff told us that they frequently recommend the BOP's standard parenting class to aging inmates because many of them have adult children and grandchildren.  However, we found that this program had one of the lowest rates of aging inmate participation.  According to BOP data, only 11 percent of inmates who participated in the parenting program in FY 2013 were aging inmates.  Overall, we found that aging inmates participated in only two of the BOP's eight largest standardized programs at rates equal to or higher than their percentage of the overall BOP population.  (See Figure 4 below.)

**Figure 4**

**Aging Inmate Participation in the BOP's Largest Programs, FY 2013**



Note:  The figure includes only those programs that had more than 10,000 inmate participants in FY 2013.  Adult Continuing Education was the largest program, with 71,235 participants, including 13,693 aging inmates.

Source:  BOP program participation data.

BOP officials and institution staff also suggested local health and wellness programs for their aging inmates because aging inmates often have health concerns.  We were unable to evaluate aging inmate participation in these programs because inmate participation in local programs is tracked only at the local level and we were told that the programs offered vary by institution.

Although BOP officials and staff told us that programs do not focus on inmate age, we found one that the BOP created exclusively for younger inmates.  The Bureau Rehabilitation and Values Enhancement (BRAVE) program is designed for medium-security male inmates who are 32 or younger, have a sentence of at least 60 months, and are beginning their first federal sentence.  The BOP describes the program as helping inmates adjust to incarceration and reducing their incidents of misconduct.  In FY 2013, not more than 2,580 inmates met the criteria for the BRAVE program.[48] Meanwhile, in FY 2013, there were 30,962 aging inmates for whom no specific programs existed.

*While institutions have the flexibility to create programs that could address aging inmates' needs, few have such programs*

According to the BOP, each institution can assess where its inmates' interests lie and offer programs and activities that appeal to the interests and needs of its population.  However, despite having the flexibility to develop and offer local institution programs, we found that even institutions with a high percentage of aging inmates did little to identify the unique programming needs of aging inmates who already have an education or job skills and to provide programs to address their unique needs.  A Supervisor of Education said that age has a big impact on the types of programs inmates participate in because aging inmates are less likely to participate in physically demanding activities.  Staff at the institutions we visited told us that their institutions could do more for the aging inmates and that if programs for aging inmates were offered, those inmates would be more interested in participating.  For example, a Reentry Coordinator told us his institution held a health fair for inmates of all ages and found it was popular with aging inmates because it gave them the opportunity to learn about age-related diseases.  A Case Manager suggested to us that the BOP should survey its aging inmates to determine what additional programming they would like to see.  Other staff said the BOP should implement programs similar to those offered at nursing homes or community senior centers, such as disease awareness and therapy.  Aging inmates described to us a number of additional programs that would meet their needs, including a wider variety of

---

[48]  We could not determine from BOP data how many inmates were serving their first federal sentence, but we could determine that there were 2,580 medium-security male inmates age 32 or younger who began serving sentences of 60 months or more during FY 2013.  BRAVE is offered at two institutions.

computer classes, wellness classes on prolonging physical and mental health, foreign languages, college preparation or similar academic courses to keep their minds sharp, singing, and quilting.

*Aging inmates who want to participate in programs face obstacles*

We found that even when aging inmates are interested in participating in programs, their ability to participate can be hindered by a lack of programs that are new to them.  Aging inmates at institutions we visited told us that the number of programs available was limited and rarely changed.  Inmates at different institutions said that they participated in more programs at the beginning of their incarceration but had completed everything of interest to them after a few years, or that their institutions never offered programs that interested them.

We also found that aging inmates might not participate in programs to avoid revealing their vulnerabilities or limitations to younger inmates.  One Warden told us that some aging inmates ask to be exempt from GED classes because they do not want other inmates to discover they cannot read.  An aging inmate at a different institution agreed, saying that she had seen inmates become discouraged and embarrassed in the GED classes because they were so far behind academically.

Further, the Assistant Director for the Industries, Education and Vocational Training Division told us that the BOP has the responsibility to accommodate aging inmates' physical needs so that their participation in programs is not limited.  Some aging inmates have physical limitations that make program participation more difficult, and so some institutions have devised alternatives to facilitate program participation.  For example, an Assistant Supervisor of Education told us that her institution had begun providing books from a local library as a substitute to attending classes for aging inmates who cannot physically leave their units.

*Activities designed specifically for aging inmates are limited*

BOP institutions are required to provide recreational activities for inmates to pursue in their free time.  Institution staff told us they often recommended art, music, and hobby classes for aging inmates.  Some of the aging inmates we spoke with participated in these and other low-impact activities such as reading in the library, playing cards or other games, and exercise such as walking on the track.  However, in other cases, aging inmates who may want to participate in more physical activities cannot keep up with younger inmates.  Overall, we found that a few of the institutions we visited considered age when designing activities, mainly by creating athletic leagues with varying age cutoffs to increase opportunities for aging inmates to participate.  One institution we visited established a basketball league for inmates age 35 and older, while a second institution has a league for inmates

age 40 and older, and a third institution has a league for inmates age 50 and older.  However, not all institutions offered age-specific athletic leagues.  Beyond athletic leagues, only 1 of 13 institutions we visited offered an activity designed specifically for aging inmates:  an aerobics and nutrition class for inmates age 65 and older, which was held at a BOP institution with one of the highest percentages of aging inmates.

Due in part to the lack of programming and activities designed specifically for aging inmates, idling is a common sight in BOP institutions, according to institution officials and staff.  However, one inmate told us that aging inmates do not idle by choice, but rather because there is nothing for them to do.  Another inmate said that the aging inmates who idle seem to deteriorate mentally and become depressed.

*The BOP does not address the specific release needs of aging inmates*

Aging inmates often have different release needs than do younger inmates.  We found that the BOP's release preparation program focuses on workforce reentry and does not address the unique circumstances, such as finding new healthcare providers or collecting Social Security benefits, which apply to aging inmates.  We also found that aging inmates' increased healthcare needs can make transitioning into home confinement difficult.[49]

<u>Pre-release programs do not address the unique needs of aging inmates</u>

The BOP implements a release preparation program in all institutions to prepare inmates to reenter the community and the workforce in particular.[50]  Each institution designates a staff member to determine the release needs of the institution's population and coordinate a release preparation program.  The program consists of six core topics:  health and nutrition, employment, personal finance, community resources, release procedures, and personal development, with each institution developing its own program to address each core topic.

We found that institutions we visited provide release preparation information to every inmate on the same six core topics rather than tailoring the information to individual inmates or categories of inmates.  For example, one of the six core topics in the release preparation program focuses on employment.  However, release preparation programs do not consistently

---

[49]  The BOP's Home Confinement Program allows federal inmates to live at home and work at gainful employment while remaining in official detention status.  To participate, inmates must be within the last 6 months or 10 percent of their sentence.

[50]  BOP, *Release Preparation Program,* Program Statement 5325.07 (December 31, 2007).  The OIG is currently reviewing the BOP's implementation of this program.  *See* http://www.justice.gov/oig/ongoing/bop.htm (accessed April 9, 2015).

include assistance for those aging inmates who will not be employed after release.  We found that programs that did include assistance for those aging inmates briefly discussed accessing Social Security or Veterans benefits, but did not include community reintegration.  A Supervisor of Education told us that institutions have the responsibility to prepare inmates to rejoin their communities; but if an inmate's role in that community will be as a retired person, his or her needs will greatly differ from someone reentering the workforce.

Aging inmates told us that the information provided in release preparation programs was not helpful for them and that topics that would be helpful for their release were not discussed.  For example, one inmate told us, "You have what they call core programs, such as learning to save money, learning to buy a house, and learning to bring up a family.  I'm 67 and I have two houses.  And I still have to [take these] programs? . . . [Aging inmates] don't need to take that.  We've already accomplished that."  Another inmate said that he worries about being released after retirement age and would like to have programs that prepare him for that future.  "What's going to happen when I step out at 70?  Because if I live to be 70, I'm going to reenter society when I'm past the working age.  So how will I survive? . . . What do I do with my medical issues?  How am I going to provide for myself if there's no family support?"

Institution staff described to us several ways in which they believed BOP release preparation programs could be adapted to address aging inmates' needs.  For example, a Social Worker suggested that the BOP tailor life skills programs for different age cohorts so that younger inmates could learn how to search for jobs and live independently while aging inmates could learn how to apply for Social Security benefits and find assisted living communities.  Institution staff also suggested that aging inmates be provided with updated information on life skills, such as online banking, and on health situations that people encounter as they age, such as managing blood pressure.

<u>Insufficient support and access to medical care may limit the placement of aging inmates on home confinement</u>

The BOP has the authority to assign inmates to home confinement for up to the final 6 months of their sentences.[51]  Although the population of aging inmates placed on home confinement is relatively small, aging inmates placed on home confinement increased 258 percent, from 161 to 577 inmates, from FY 2009 through FY 2013.[52]  Institution staff told us that

---

[51]  BOP, *Home Confinement,* Program Statement 7320.01 (September 6, 1995).

[52]  During this time, the total number of inmates placed on home confinement increased 323 percent, from 382 inmates in FY 2009 to 1,616 inmates in FY 2013.

home confinement is a good option for many aging inmates. Specifically, institution staff said that as long as an inmate has the resources to pay for medical care, home confinement offers more flexibility in addressing his or her medical needs.[53]

However, we were told that there are a number of obstacles, particularly concerning access to medical care, that limit the BOP's ability to place aging inmates on home confinement. A Social Worker told us of an aging inmate with dementia who was released from a medical center into home confinement. The inmate returned just days later because he did not have sufficient support to live in his home. Subsequently, the inmate had to serve the remainder of his sentence in the medical center's inpatient unit because his dementia could not be managed in the general population. Institution staff also expressed liability concerns because the BOP remains ultimately responsible for an inmate's medical care while the inmate is on home confinement. The Assistant Director for Health Services and Medical Director said that the BOP has an obligation to link inmates being released to home confinement with healthcare providers in their communities but after that connection is made it is ultimately up to the inmate to visit the provider for care. He further said that inmates on home confinement are eligible to enroll in Medicaid, Medicare, or private insurance and that BOP Social Workers can help facilitate this enrollment.[54]

### Aging inmates commit less misconduct while incarcerated and have a lower rate of re-arrest once released

Based on BOP data and feedback from officials and staff, we determined that aging inmates engage in fewer disciplinary problems during their incarceration. For example, aging inmates have been sanctioned for disproportionately fewer misconduct incidents compared to younger inmates during their incarceration. Also, in considering the impact that releasing aging inmates has on public safety, aging inmates have a lower rate of re-arrest in comparison to younger inmates and the rate of re-arrest decreases with age. Those aging inmates who are re-arrested often have a

---

[53] Unlike inmates in institutions, inmates on home confinement do not have to wait for an institution to schedule a trip for an outside medical appointment. Additionally, inmates on home confinement do not have to adhere to halfway house rules on employment and check-in hours, making their schedules more flexible for arranging medical appointments. Finally, home confinement may be more appropriate than halfway houses for aging inmates who will be retired since the primary purpose of halfway houses is to support inmates seeking employment.

[54] The Assistant Director of the Reentry Division said that institution staff focuses on enrollment in benefits programs, in lieu of employment skills, for aging inmates who may not be seeking employment. She further said that Medicaid enrollment is particularly challenging because, although no one can receive Medicaid benefits while in an institution, the rules vary from state to state regarding eligibility for benefits and whether inmates can submit their Medicaid applications while they are still in an institution or only after release.

history of criminal behavior and are most commonly arrested for drug offenses.

*Aging inmates engage in fewer misconduct incidents while incarcerated compared to younger inmates*

According to BOP data, 53,885 inmates engaged in misconduct incidents consisting of violations of institution rules at least once during FY 2013.  We found that aging inmates represented about 10 percent (5,621) of these misconduct incidents, while accounting for 19 percent of the BOP's total population during that period.  Further, the misconduct of aging inmates was typically of lower severity.  According to BOP data, 67 percent of aging inmates' misconduct was of moderate or low severity compared to 60 percent of younger inmates' misconduct.[55]

This data is consistent with what we were told by BOP officials and institution staff.  In general, they said that aging inmates are less likely than younger inmates to violate institution rules.  The Director of the BOP's Office of Research and Evaluation stated that age is one of the biggest predictors of misconduct, and that inmates tend to "age out" of misconduct as they get older.  Further, if aging inmates engaged in misconduct incidents, it was usually for less serious infractions that did not demonstrate violent or aggressive behavior.  For example, a Social Worker told us that an aging inmate with dementia engaged in a misconduct incident by not standing up during the daily inmate count.  Another Case Manager said that if aging inmates engage in misconduct incidents it is more likely to be for refusing to participate in programs, often because they are not motivated.  As discussed below, we found similar trends in our analysis of aging inmates who were re-arrested after release from BOP custody.

*Aging inmates have a lower rate of recidivism compared to younger inmates*

At the outset of this review, the BOP told us they were unaware of any entity with comprehensive data on recidivism, including data on the recidivism of inmates age 50 and older.  BOP research from over 20 years ago found that aging inmates have a lower rate of re-arrest than younger inmates do.  Specifically, a 1994 BOP study of inmates released in 1987 found that 15 percent of inmates age 55 and older released from its custody were re-arrested for either a new crime or a probation violation within 3 years of release, as compared to 57 percent of inmates age 25 and younger who were re-arrested.  This study also found that 41 percent of federal inmates of all ages were re-arrested for either a new crime or a

---

[55]  Moderate-severity misconduct incidents, which include incidents of refusing to obey an order, refusing to work, or refusing to accept a program assignment, were the most common level of violation for inmates of all ages.

probation violation within 3 years.[56]  The Department's Bureau of Justice Statistics (BJS) released a study in 2014 about recidivism rates for state inmates which also showed that recidivism rates were lower for older inmates than for younger inmates; but the study did not specifically break out recidivism rates for inmates over age 50.  The BJS studied inmates released from 30 state correctional systems in 2005 and reported that 60 percent of inmates age 40 and older were re-arrested for a new crime or probation violation within 3 years, while inmates under age 30 had recidivism rates exceeding 70 percent within 3 years (with 76 percent of released inmates age 24 or younger re-arrested within 3 years).  The BJS includes both re-arrests for new crimes and re-arrests for probation violations, and we could not separate the two categories.[57]

In light of this absence of data on recidivism rates for aging inmates, the OIG undertook its own analysis.  The Federal Bureau of Investigation's (FBI) Criminal Justice Information Services Division provided us with criminal history records of all 37,271 aging inmates who were released from BOP custody between FY 2006 and FY 2010.[58]  We based our analysis on a randomly selected sample of 381 inmates released during this period.

We reviewed the criminal history of these 381 aging inmates and found that 58 (15 percent) were re-arrested for new crimes within 3 years of their release.  We also found that the re-arrest of aging inmates within our sample generally declined with age.  For example, 34 of 181 released inmates (19 percent) age 50 to 54 were re-arrested for a new crime compared to no re-arrests for released inmates age 70 and older.  See Table 7.

**Table 7**

**Re-Arrest Rate of Aging Inmates Released Between FY 2006 and FY 2010**

| Age Cohort | Total | Re-Arrested for New Crime | Percentage |
|---|---|---|---|
| 50–54 | 181 | 34 | 19% |
| 55–59 | 99 | 16 | 16% |

---

[56]  BOP, *Recidivism Among Federal Prisoners Released in 1987* (August 4, 1994), p. 3, http://www.bop.gov/resources/ research_projects/published_reports/recidivism/ oreprrecid87.pdf (accessed April 9, 2015).

[57]  *See* BJS, *Recidivism of Prisoners Released in 30 States in 2005:  Patterns from 2005 to 2010* (April 2014), http://www.bjs.gov/index.cfm?ty=pbdetail&iid=4987 (accessed April 9, 2015).  In its report, BJS cautions against making direct comparisons between recidivism statistics published at different times for a number of reasons, including that criminal record histories have become more comprehensive and reliable in recent years.

[58]  We analyzed aging inmates released between FY 2006 and FY 2010 to ensure that every inmate in our sample had been released for at least 3 years.  See Appendix 1 for more details.

| Age Cohort | Total | Re-Arrested for New Crime | Percentage |
|---|---|---|---|
| 60–64 | 64 | 5 | 8% |
| 65–69 | 27 | 3 | 11% |
| 70–74 | 9 | 0 | 0% |
| 75+ | 1 | 0 | 0% |
| Total | 381 | 58 | 15% |

Source:  FBI data.

In addition to those who were re-arrested for new crimes, we found that 28 of 381 aging inmates (7 percent) in our sample were re-arrested for probation violations.  In total, 23 percent of inmates age 50 and older were re-arrested within 3 years of their release from BOP custody for either new crimes or probation violations.

*Aging inmates were most frequently re-arrested for drug offenses and for offenses similar to those that resulted in their prior incarceration*

Aging inmates who were re-arrested were most commonly charged with drug offenses (41 percent), followed by violent offenses (17 percent) and immigration offenses (16 percent).[59]  See Table 8.

### Table 8

### Re-Arrest Offense of Aging Inmates

| Type of Offense | Number Re-Arrested | Percentage |
|---|---|---|
| Drugs | 24 | 41% |
| Violent Offense | 10 | 17% |
| Immigration | 9 | 16% |
| Burglary/Larceny | 5 | 9% |
| Miscellaneous | 4 | 7% |
| Court | 3 | 5% |
| Counterfeiting/Embezzlement | 2 | 3% |
| Sex Offenses | 1 | 2% |

Note:  Miscellaneous offenses are those that do not fit into any of the other categories and include driving under the influence and driving with a suspended license.

Source:  FBI data.

---

[59]  Violent offenses include offenses defined in BOP, *Categorization of Offenses,* Program Statement 5162.05 (March 16, 2009).  Violent offenses also include simple assault, battery, corporal injury, and robbery that are not included in Program Statement 5162.05. See the Appendix for more details about how we categorized offenses.

We also found similarities between aging inmates' criminal history and the offenses for which they were re-arrested. On average, 45 percent of aging inmates were re-arrested for crimes similar to those that led to their previous incarceration. For example, 58 percent of aging inmates who were re-arrested for drug offenses and 78 percent who were re-arrested for immigration violations were previously incarcerated for similar crimes.

Finally, we found that only 8 of the 58 (14 percent) aging inmates in our sample who were re-arrested had been first-time offenders at the time they were released from the BOP. The remaining 50 aging inmates in our sample who were re-arrested were already recidivists at the time they were released from the BOP. Therefore, 86 percent of aging inmates in our sample who recidivated were already known recidivists.

**Aging inmates could be viable candidates for early release, resulting in significant cost savings; but new BOP policy strictly limits those who can be considered and as a result, few have been released**

In April 2013, the OIG released a report that found significant problems with the management of the BOP's compassionate release program, and that an effectively managed program would help the BOP better manage its inmate population and result in cost savings. Among other issues, the OIG found that the policy was being applied only to inmates with terminal medical illnesses who had less than 12 months to live. On August 12, 2013, the Attorney General announced expanded provisions for inmates age 65 and older to seek compassionate release as part of the Department's "Smart on Crime" initiative, which was implemented to, among other things, address concerns about unfair sentencing disparities, and reduce overcrowded institutions.[60] That same day, the BOP revised its compassionate release policy to expand the eligibility provisions for elderly inmates for medical and nonmedical reasons.[61] In announcing the revised policy, the Department said that the BOP would generally consider for compassionate release inmates age 65 and older who had not committed violent crimes and had served significant portions of their sentences.

---

[60] In the *Sentencing Reform Act of 1984,* Congress authorized the BOP Director to request that a federal judge reduce an inmate's sentence for "extraordinary and compelling" circumstances. The statute permits requests based on either medical or nonmedical reasons that could not reasonably have been foreseen by the judge at the time of sentencing. The BOP issued regulations and a Program Statement entitled *Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. § 3582(c)(1)(A) and 4205(g),* Program Statement 5050.49 (August 12, 2013), to implement this authority.

[61] The program statement establishes eligibility provisions for "elderly" inmates. For the purposes of our review, we refer to inmates who requested compassionate release under these provisions as "aging inmates" because each provision falls within our definition of an aging inmate.

*Few aging inmates are eligible for early release consideration under the new BOP policy*

Following the release of our compassionate release report in 2013, Department and BOP officials formed a working group to expand the use of compassionate release by identifying inmates who do not present a threat to the community and who present a minimal risk of recidivism.[62]  The working group determined that inmates age 65 and older could be appropriate candidates for compassionate release, and the BOP revised its program statement to include three new provisions under which these inmates could request compassionate release.  The BOP based its revisions to the compassionate release program on provisions that had already been established by the *Violent Crime Control and Law Enforcement Act of 1994,* the United States Sentencing Guidelines, and the *Second Chance Act of 2007.*  These provisions, however, already existed at the time of the BOP's earlier compassionate release policy, and none had resulted in the release of many BOP inmates.

The first new eligibility provision applies to inmates who are age 70 and older and have served 30 years or more of their sentence for an offense that was committed on or after November 1, 1987 (referred to as "new law" elderly inmates).[63]  Therefore, no inmate will be eligible for compassionate release consideration under these provisions until at least November 1, 2017.[64]  As a result, no inmate has yet to be released under this provision.  Moreover, we determined that just 18 inmates would likely be eligible for consideration under this provision in the first year after November 1, 2017.

The second new eligibility provision applies to inmates:

---

[62]  DOJ, OIG, *The Federal Bureau of Prisons' Compassionate Release Program,* Evaluation and Investigations Division Report I-2013-006 (April 2013).  The working group consisted of representatives from the Office of the Attorney General, the Office of the Deputy Attorney General, the Executive Office for United States Attorneys, the Office of Legal Policy, three U.S. Attorneys' Offices, and the BOP.

[63]  18 U.S.C. 3582(c)(1)(A)(ii) states that upon motion of the BOP Director, a federal judge may reduce an inmate's sentence if the inmate is age 70 or older; has served at least 30 years in prison, pursuant to a sentence imposed under 18 U.S.C. § 3559(c), for the offense or offenses for which the defendant is currently imprisoned; and the BOP Director has determined that the defendant is not a danger to the safety of any other person or the community, as provided under 18 U.S.C. § 3142(g).  The BOP's provisions do not require inmates to be serving a sentence imposed under 18 U.S.C. § 3559(c), which mandates a life sentence for a defendant convicted of a third serious violent felony or a second serious violent felony plus a serious drug felony.  Because 18 U.S.C. § 3559(c) was passed in 1994, inmates would not have served the minimum 30 years until 2024.

[64]  The BOP General Counsel said that, even though the provision would not be effective for several years, the BOP included it when revising the program statement in 2013 so that it would not need to resubmit the program statement to the union for negotiation shortly after it had been revised.

1. age 65 and older,

2. suffering from chronic or serious medical conditions related to the aging process,

3. experiencing deteriorating mental or physical health that substantially diminishes their ability to function in a correctional facility,

4. for whom conventional treatment promises no substantial improvement to their mental or physical condition, and

5. who have served at least 50 percent of their sentence.

Officials with the BOP's Office of General Counsel told us that the Department's working group chose 65 as the eligibility age after considering several factors, such as when inmates become eligible for federal benefits and how their health compares to aging individuals who are not in prison. The working group also decided that inmates should serve a minimum of 50 percent of the sentence to justify the resources that the Department spent to prosecute the inmate. The BOP's General Counsel said that the medical provisions were based on the United States Sentencing Guidelines (USSG) definition of the term "extraordinary and compelling reasons."[65] However, we note that, unlike the new BOP policy, the USSG policy statement applies to inmates of all ages, not just those age 65 and older, and it does not require inmates to have served a minimum percentage of their sentence. According to BOP data, as of September 2013, there were 2,204 inmates age 65 and older who had served at least 50 percent of their sentence.

Finally, the third new eligibility provision applies to inmates without medical conditions who are age 65 and older and who have served the greater of 10 years or 75 percent of their sentences. The BOP's General Counsel told us that the provisions were based on the Elderly and Family Reunification for Certain Non-Violent Offenders Pilot Program (pilot program) created as part of the *Second Chance Act of 2007*.[66] In a report to Congress

---

[65] The USSG defines "extraordinary and compelling reasons" to include: (1) a terminal illness; (2) a permanent physical or medical condition, or deteriorating physical or mental health because of the aging process, that substantially diminishes the inmate's ability to provide self-care and for which conventional treatment promises no substantial improvement; (3) the death or incapacitation of the only relative capable of caring for the inmate's minor child; and (4) any other circumstance that the BOP Director finds to be extraordinary and compelling. USSG § 1B1.13 (Policy Statement), Application Notes, Note 1.

[66] The *Second Chance Act* directed the BOP to conduct the pilot program during FYs 2009 and 2010 to determine the effectiveness of placing eligible elderly inmates on home detention until the end of their sentences. The Act excluded inmates with a life sentence; a history of violence, espionage, sex offenses, or acts in connection with terrorism; or a history of escape or attempted escape. The statute also required the BOP to determine that eligible inmates were not at substantial risk of recidivating or endangering the public.

after the conclusion of the pilot program in September 2010, the BOP recommended that the pilot program not be made permanent for a number of reasons, including that few inmates were eligible under the provisions.[67] Specifically, the BOP reported that there were relatively few inmates over the age of 65 in its population (approximately 4,000 at that time) and that many were already at an advanced age when they committed the crime for which they were incarcerated. As a result, the eligibility provisions precluded consideration of the vast majority of these inmates. The BOP reported that 71 of 855 inmates (8 percent) who requested to participate in the pilot program were ultimately placed on home detention, while 750 inmates of the 855 inmates (88 percent) were ineligible because they did not meet the provisions.[68] The BOP's Central Office did not approve the transfer of the remaining 32 inmates to home detention because the BOP determined the inmates were a risk for recidivism or endangering the public. According to BOP data, as of September 2013, there were 529 inmates age 65 and older who had served the greater of 10 years or 75 percent of their sentence.

*Few inmates age 65 and older were released under the new compassionate release policy*

In our 2013 review of the BOP's compassionate release program, we found that from 2006 through 2011, 24 inmates on average were released from BOP custody each year.[69] Since the BOP expanded the compassionate release program in August 2013 to include inmates age 65 and older as part of the Department's Smart on Crime initiative, only two inmates were released under the new age 65 and older eligibility provisions (see Table 9). By contrast, 83 inmates were released under the provisions in the new policy not tied to age.

---

[67] The report to Congress also concluded that the pilot program did not result in any cost savings. However, the Government Accountability Office questioned the BOP's cost estimates, concluding that the BOP could not determine the actual cost of monitoring inmates who were on home detention. *See* U.S. Government Accountability Office, *Federal Bureau of Prisons: Methods for Estimating Incarceration and Community Corrections Costs and Results of the Elderly Offender Pilot*, GAO-12-807R (July 27, 2012), pp. 2, 15–16. The BOP told us that as of February 2013 it requires all entities bidding on contracts for halfway houses and home detention to separate the costs of those two services.

[68] Seventy-three inmates were deemed eligible for the pilot program, but two were not placed on home detention. One inmate died before he could be placed on home detention. The second inmate's placement was denied because staff from community corrections and U.S. Probation and Pre-trial Services were unable to perform the necessary home visits and therefore unable to provide adequate supervision.

[69] DOJ, OIG, *The Federal Bureau of Prisons' Compassionate Release Program.*

**Table 9**

**Compassionate Release Requests,
August 12, 2013, through September 12, 2014**

|  | Requests by Inmates | Requests Approved by Institutions | Requests Approved by the BOP Director | Released |
|---|---|---|---|---|
| All Provisions | **2,621** | **320** | **111** | **85** |
| "New Law" Elderly Inmates | 52 | 12 | 0 | 0 |
| Elderly Inmates with Medical Conditions | 203 | 33 | 0 | 0 |
| Elderly Inmates without Medical Conditions | 93 | 19 | 3 | 2 |

Notes:  Included in the "All Provisions" row are requests for compassionate release made under the three provisions available to inmates age 65 and older, as well as the provisions available to inmates of all ages such as the provision for inmates with a terminal or debilitating medical condition.

Some requests by inmates were still pending a decision by institutions as of September 12, 2014.  Additionally, some requests approved by institutions were still pending a decision by the BOP's Central Office as of September 12, 2014.  Finally, although the BOP Director can approve the requests, the sentencing court makes the ultimate decision as to whether an inmate is released.

Source:  BOP.

As shown in Table 9, since the new provisions went into effect, inmates made 2,621 requests for compassionate release, but only 348 requests (13 percent) were made under the new eligibility provisions for inmates age 65 and older.  The remaining 2,273 requests (87 percent) were made under eligibility provisions available to inmates of all ages, including those with a terminal illness.

*The new eligibility provisions for inmates age 65 and older are unclear*

In our 2013 review of the BOP's compassionate release program, we found that the BOP failed to provide institution staff with adequate guidance regarding appropriate requests for compassionate release.  As part of this review, BOP officials and staff told us that the eligibility provisions for inmates age 65 and older are unclear.  For example, the BOP's revised program statement includes eligibility for an inmate age 65 and older under the medical or nonmedical provisions.  However, institution staff said that determining whether an inmate age 65 and older qualifies under the medical or nonmedical provisions is difficult.  The BOP's Assistant Director for Health Services and Medical Director, who told us he was not consulted on the development of the provisions, including the medical provisions, described

the provisions as "vague." The BOP's General Counsel told us that the BOP is aware of the need to include more clarification regarding the different medical provisions. The BOP held in-person training for all institution-level compassionate release coordinators in December 2014 to answer the coordinators' questions and better ensure consistent implementation of the program statement across institutions. The BOP also issued an Operations Memorandum in March 2015 that provided more-specific examples of medical conditions and problems with activities of daily living that make an aging inmate eligible for compassionate release under the medical provisions.

Institution staff also found the nonmedical eligibility provision confusing. The program statement says that inmates age 65 and older without medical conditions must serve the greater of 10 years or 75 percent of their sentence to be eligible to apply for compassionate release. A Case Manager told us that when he contacted the BOP's Office of General Counsel to clarify the provision, he was told that the Office of General Counsel interprets the provision to mean an inmate must serve *both* a minimum of 10 years *and* 75 percent of the sentence. As a result, only elderly inmates who receive sentences in excess of 10 years are eligible to seek early release under this provision. The BOP's General Counsel confirmed that this is the BOP's interpretation of the provision and told us that while the BOP received a lot of questions regarding this provision when the program statement was first released and that it does need to be clarified, the BOP has not discussed making any changes to the program statement itself.

In general, BOP officials and staff we interviewed did not believe that the existing aging inmate provisions would significantly reduce the size of the BOP's aging inmate population. For example, a Warden told us that laws and policies are sometimes written with good intentions; but if policymakers do not do the homework in advance, the result will be a policy that sounds good but does not accomplish much. He added, "I think that's what this [the aging inmate provisions] is going to pan out to be too. There is always a thin line between being compassionate to the elderly and protecting society. When you have that thin line, you normally write in provisions that start excluding a lot of people from consideration."

*The BOP's compassionate release program could be more effective in assisting the BOP in managing its aging inmates, which would result in significant cost savings*

In announcing the Smart on Crime initiative, the Attorney General stated that revisions to the BOP's compassionate release policy would help the Department use its limited resources to incarcerate those who pose the greatest threat. As we outlined previously, aging inmates commit fewer and less-severe misconduct incidents while incarcerated than do younger inmates and have a lower rate of re-arrest once released. The BOP General Counsel told us that the Department's working group to expand the use of

compassionate release concluded that aging inmates do not pose a significant public safety threat.

We found that the BOP's compassionate release program could have a greater impact on overcrowding and incarceration costs if the BOP revised the inmate age provisions to align with the NIC's recommended definition of an "aging" inmate as age 50 or above.  We found that the BOP does not define the term "aging" or "elderly" inmate.[70]  Rather, as stated above, the BOP requires inmates to be at least 65 years old to request compassionate release under the new provisions.  However, the NIC, a Department agency within the BOP, has recommended since 1992 that correctional agencies nationwide define aging inmates as starting at age 50.[71]  The NIC based its recommendation on aging inmates' pre-incarceration lifestyles and limited pre-incarceration access to medical care, two factors BOP institution staff commonly cited to us when they described their own views of aging inmates.  The NIC continued to recommend that correctional agencies define aging inmates starting at age 50 in a 2010 online training seminar concerning the management of aging inmates.[72]

Our analysis of BOP data shows that if the BOP revised the age provisions in its compassionate release policy from age 65 and older to age 50 and older, consistent with the NIC's recommendation, the potential pool of candidates for compassionate release would increase more than sevenfold, from 4,384 inmates age 65 and older to 30,962 inmates age 50 and older, based on FY 2013 population data.  Our analysis also shows that the current age provision of 65 and older will not enable the BOP to effectively address its overcrowding issues in BOP institutions because that age group, while growing, constitutes only 3 percent of the BOP's total inmate population.

We found that lowering the eligibility provision to age 50 and older could assist the BOP in addressing its overcrowding issues, particularly in its minimum- and low-security institutions where more aging inmates are incarcerated.  For example, at the end of FY 2013, BOP minimum- and low-security institutions had a population of 71,679 inmates and were operating at 27 percent over capacity.  In order to eliminate over-capacity in these

---

[70]  When we asked BOP staff how they defined these terms, their responses ranged from age 40 to age 78.

[71]  DOJ, NIC, *An Administrative Overview of the Older Inmate* (1992).  The NIC provides training, technical assistance, information services, and policy and program development assistance to federal, state, and local correctional agencies.  The NIC also provides leadership to influence correctional policies, practices, and operations nationwide in areas of emerging interest and concern to correctional executives and practitioners as well as public policymakers.

[72]  *See* DOJ, NIC, *Effectively Managing Aging and Geriatric Offenders*, Satellite/Internet Broadcast, March 11, 2010, http://nicic.gov/library/024363 (accessed April 9, 2015).  However, we note that, while the NIC is part of the BOP, no BOP employees participated in the broadcast.

institutions, the BOP would have to reduce its minimum- and low-security population by about 15,000 inmates. We found that inmates age 65 and older represented only 4 percent (2,755 inmates) of the BOP's minimum- and low-security inmate population, whereas inmates age 50 and older represent 24 percent (17,482 inmates) of the BOP's total minimum- and low-security inmate population. If a modest 5 percent (874 of 17,482 inmates) of this larger group of aging inmates was determined to be appropriate for compassionate release and were released from BOP custody, the BOP could reduce overcrowding in its minimum- and low-security institutions by 2 percent.[73] In comparison, the BOP would have to release 32 percent of minimum- and low-security inmates age 65 and older (874 of 2,755) to reduce overcrowding in its minimum- and low-security institutions by the same amount.

Based on BOP cost data, we estimate that the BOP spent approximately $881 million, or 19 percent of its total budget, to incarcerate aging inmates in FY 2013.[74] We found that lowering the threshold age from age 65 to age 50 in the revised compassionate release program, coupled with a modest 5 percent release rate for only those aging inmates in minimum- or low-security institutions or medical centers, could reduce incarceration costs by approximately $28 million per year. Specifically, we estimate that it cost the BOP approximately $438 million to incarcerate inmates age 50 and older in minimum- and low-security institutions in FY 2013. The early release of 5 percent (874) of these inmates could save the BOP over $21 million in incarceration costs per year. Also, as previously noted, aging inmates represent one-third of the population at the BOP's six medical centers, which, at $59,000 per inmate per year, are the BOP's highest-cost institutions. If 5 percent of aging inmates housed in the BOP's medical centers (112 of 2,246 inmates) were released, the BOP could potentially save an additional $7 million in 1 year.[75]

Finally, we found that revising the time-served provision in the new compassionate release program statement for inmates age 65 and older without medical conditions would also increase the potential pool of candidates for compassionate release. The BOP's eligibility provisions for these inmates require them to serve the greater of 10 years or 75 percent of their sentence. As noted above, the BOP's Office of General Counsel

---

[73] For this analysis, we considered only the age of the inmates, not the percentage of sentence served.

[74] Using BOP population snapshots and per capita costs, we calculated the costs of BOP's aging inmates based on the number of days served within a fiscal year and designated institution security level. For more information, see Appendix 1.

[75] We did not consider the cost impact of compassionate release for aging inmates at medium- and high-security institutions because aging inmates represent a smaller portion of the population at those security levels and their potential release would have less of an impact on overcrowding.

interprets these provisions to mean that an inmate must have served *both* 10 years *and* at least 75 percent of his or her sentence. We found this provision excludes almost half of the BOP's aging inmate population because many sentences are too short for the inmate to be eligible for compassionate release. In FY 2013, this policy excluded from consideration 45 percent of the 4,384 BOP inmates who were age 65 and older because they were serving sentences of 10 years or less.[76] We have concerns because Department leadership says the compassionate release policy is designed to address prison overcrowding by providing for early release of aging inmates who did not commit violent crimes and who pose no threat to public safety. Yet this policy as written prohibits early release consideration for nearly half of the BOP's aging inmate population who are likely to be the best candidates for early release. These ineligible inmates who received a shorter sentence are more likely to have committed a less serious offense, and present less danger to the public, than those inmates who are eligible because they received sentences of imprisonment in excess of 10 years.

We believe the BOP should consider whether to revise this provision to eliminate the 10-year minimum time served requirement so that all of the BOP's aging inmates could be eligible for compassionate release consideration once they had served 75 percent of their sentences, including those aging inmates who committed less serious crimes and received shorter sentences and therefore may be most worthy of early release consideration. The BOP's General Counsel told us that these provisions might be "really limiting" and that it may be better if inmates just met one of the time served requirements.[77]

We note that not all aging inmates age 50 and older will be appropriate for compassionate release. For each compassionate release request, the BOP evaluates many other factors, including the nature and circumstances of the inmate's offense, criminal history, the inmate's release plans, and whether release would minimize the severity of the punishment. Nonetheless, the BOP has already determined that aging inmates are a low public safety risk. We believe that reevaluating the compassionate release eligibility provisions for aging inmates could substantially increase the pool of eligible inmates. Within that larger pool of eligible aging inmates, we believe the BOP could further identify more aging inmates whose offenses, criminal histories, and release plans also make them suitable candidates for

---

[76] Moreover, because inmates are eligible to earn good conduct time credit under 18 U.S.C. § 3624(b), which equates to about 87 percent of their sentences under BOP policy, elderly inmates who earned all of their good conduct time credit (and therefore would likely be the best candidates for early release) would need to be serving a sentence in excess of 11 years in order to actually serve at least 10 years in prison. Due to good time credit, we found that 48 percent of BOP inmates age 65 and older were likely to be released before they had served 10 years in prison.

[77] The BOP's General Counsel also said that any changes to the eligibility criteria would require coordination with the Department and then negotiations with the BOP's union.

compassionate release, resulting in reduced overcrowding and additional cost savings to the BOP.

## CONCLUSION AND RECOMMENDATIONS

We concluded that a growing aging inmate population has an adverse impact on the BOP's ability to provide a safe, humane, cost-efficient, and appropriately secure environment for aging inmates and to assist aging inmates reentering the community. Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it. Several aspects of the BOP's inmate management, including costs, housing, and programming, are affected by an aging inmate population that is growing more quickly than the rest of the BOP's inmate population.

First, aging inmates are more costly to incarcerate than their younger counterparts. According to our analysis of BOP data, an aging inmate costs 8 percent more to incarcerate than a younger inmate due in large part to increased medical needs. Further, aging inmates represent one-third of the population at the BOP's six medical centers, which at $59,000 per inmate per year are the BOP's highest-cost institutions. In FY 2013, the BOP spent $1.1 billion of its $6.5 billion budget (17 percent) on health services. In that same year, institutions with the highest percentage of aging inmates spent an average of $10,114 per inmate on medical costs, while institutions with the lowest percentage of aging inmates spent an average of $1,916 per inmate. The continuing increase in the aging inmate population will drive even greater increases in medical spending, especially at institutions with the highest percentages of aging inmates.

Second, BOP institutions lack appropriate staffing levels and offer limited training to address the needs of an aging inmate population. Some institutions have established local inmate companion programs to assist aging inmates with the activities of daily living. However, we found that these programs lack consistent oversight and that implementation varies by institution. We believe the BOP should develop a standardized program to ensure consistency in the implementation of the companion program, as well as set clear program expectations for companions in order to reduce the risk of victimization of aging inmates. We also believe the BOP should implement more training to help staff recognize and respond to the signs of aging. If institution staff is appropriately trained, the inmates' underlying medical needs could be met with care instead of disciplinary action.

Third, the BOP cannot sufficiently house aging inmates at all institutions because of limitations in physical infrastructure. Specifically, overcrowding of BOP institutions results in an inadequate number of lower bunks needed to accommodate aging inmates with limited mobility. Overcrowding also restricts the BOP's ability to move aging inmates to institutions, including its medical centers, that can best address aging inmates' medical needs. Institutions, including those with higher care levels or a high percentage of aging inmates, lack sufficient handicapped-accessible

cells and bathrooms and have difficulty accommodating the number of inmates who need elevators.  As a result, aging inmates may be placed in compromising and sometimes unsafe situations due to limitations in institutions' physical infrastructure.  The BOP has not evaluated all institutions' accessibility for inmates with mobility impairments since 1996.  We believe that, due to the growing aging inmate population, the BOP should reexamine the accessibility of all of its institutions to accommodate the large number of aging inmates with mobility needs.  BOP staff and officials told us that separate units, or entire institutions, might be more appropriate to house aging inmates.  Units designated specifically for aging inmates, supplemented with medical staff, could help the BOP provide aging inmates more efficient medical care, as well as identify unique programming needs.

Fourth, the programming opportunities to help aging inmates reenter the community are inadequate.  There are no standardized programs specifically designed for aging inmates.  While institutions have the flexibility to create local programs or activities to address the needs of their population, few have such programs or activities for aging inmates, including those institutions with high percentages of such inmates.  As a result, aging inmates either participate in programs that may not meet their needs or are left idle, not participating in any activities.  The BOP's release preparation program does not address the unique release needs of aging inmates, including those aging inmates who do not plan to seek employment after release or require assistance with continuity of medical care.  The BOP should consider developing programs specifically tailored for aging inmates and enhance its release preparation program to address the unique needs commonly associated with the release of aging inmates.

Fifth, many aging inmates could be viable candidates for early release.  We found that aging inmates have fewer misconduct incidents while incarcerated and a lower rate of re-arrest after release.  Our analysis concluded that aging inmates comprised 10 percent of all BOP misconduct incidents in FY 2013, while accounting for 19 percent of the entire population.  Based on our research and discussions with BOP officials and staff, we consider the rate of misconduct by aging inmates during incarceration to be relatively low compared to younger inmates.  In addition, we found that only 15 percent of a sample of aging inmates released from BOP custody was re-arrested for a new crime within 3 years.  Based on studies by the BOP and the BJS, we also consider the rate of re-arrest for aging inmates to be relatively low compared to the re-arrest rates of younger inmates.  Therefore, while individual cases will vary, aging inmates are generally less of a threat during incarceration and less likely to be a threat to society once released.

Finally, we found that the BOP's revised eligibility provisions for inmates age 65 and older to request compassionate release have not been effective in achieving the Department's goals.  In August 2013, the Attorney General announced expanded provisions for inmates age 65 and older to

seek compassionate release as part of the Department's Smart on Crime initiative.  While a Department working group determined that inmates age 65 and older could be appropriate candidates for compassionate release, and the BOP revised its program statement to include three new provisions under which these inmates could apply, these provisions are based on existing statutes, which previously resulted in few inmates released from BOP custody.  Because of the limitations in the revised provisions, we found that only two aging inmates have been released since the BOP revised the compassionate release policy.  While we found that the BOP's eligibility provisions for aging inmates to request compassionate release are currently ineffective, our analysis shows that the BOP could more fully achieve the outcomes the Department seeks by using its existing authority to further revise its eligibility provisions.  Expanding the eligibility provisions, such as lowering the age requirement to age 50 and revising the time served provisions for those aging inmates without a medical condition, would increase the pool of potential candidates for compassionate release and further assist the BOP in reducing overcrowding and could save the Department millions of dollars.

**Recommendations**

To ensure the BOP continues to provide safe, humane, and cost-efficient care within its institutions and to further assist the BOP in managing its aging inmate population, reducing overcrowding, and reducing incarceration costs, we recommend that the BOP:

1.   Develop national guidelines for the availability and purpose of inmate companion programs.

2.   Consider the feasibility of placing additional Social Workers in more institutions, particularly those with larger populations of aging inmates.

3.   Provide all staff training to identify signs of aging and assist in communicating with aging inmates.

4.   Reexamine the accessibility and the physical infrastructure of all of its institutions to accommodate the large number of aging inmates with mobility needs.

5.   Study the feasibility of creating units, institutions, or other structures specifically for aging inmates in those institutions with high concentrations of aging inmates.

6.   Systematically identify programming needs of aging inmates and develop programs and activities to meet those needs.

7.    Develop sections in release preparation courses that address the post-incarceration medical care and retirement needs of aging inmates.

8.    Consider revising its compassionate release policy to facilitate the release of appropriate aging inmates, including by lowering the age requirement and eliminating the minimum 10 years served requirement.

## APPENDIX 1:  EXPANDED METHODOLOGY

**Data Analysis**

*Medical Spending by Institution*

The BOP provided total medical obligations for all BOP-operated institutions from fiscal year (FY) 2009 to 2013.  To calculate each institution's medical rate per inmate, we used the population data obtained from the BOP's SENTRY case management system.[78]  We then divided the medical obligations by the total population at each institution to determine the average annual medical rate per inmate.

We compared the medical rates per inmate of institutions with the highest and lowest percentage of aging inmates.  Medical centers were excluded from our analysis because their populations tend to have higher medical rates for inmates of all ages.  Detention centers were excluded because the population data sets do not include pre-trial inmates.  Last, we also excluded correctional complexes because medical spending was only reported for the complex as a whole, not for each institution within it.  Therefore, we could not determine which institution within a complex was influencing overall medical costs.

*Medical Spending Inside and Outside the Institution*

The BOP provided data on medical obligations inside and outside the institutions, including medical airlifts, public health service obligations, and unforeseen medical services that, when combined, totaled the BOP's entire medical obligations.  The OIG analyzed only medical obligations for expenses incurred inside and outside the institutions.  We sorted the sub-object codes based on expenses inside or outside the institution to determine which codes had the highest rates of spending.  We excluded sub-object codes such as administrative pay, Federal Health Benefits, and Retirement, and analyzed codes such as contract services, pharmaceuticals, medical hospital services, overtime, and night differential.[79]  We analyzed the sub-object codes with high rates of spending at the institutions with the highest and lowest

---

[78]  SENTRY is the BOP's primary mission support database.  The system collects, maintains, and tracks critical inmate information, including inmate location, medical history, behavior history, and release data.  Inmate deaths are also entered into SENTRY, but there is no code to determine whether deceased inmates were awaiting compassionate release consideration.

[79]  A night differential is compensated payment above the basic rate for regularly scheduled night work as a non-wage employee.  These costs were incurred outside the institution for matters such as escorting inmates to medical appointments and guarding inmates at local hospitals.

percentage of aging inmates.  When comparing institutions based on its percentage of aging inmates, as explained above, we excluded detention centers, medical centers, and all federal correctional complexes.

*The BOP's Catastrophic Cases*

The BOP provided national data on catastrophic care costs incurred by each of the six regions from FY 2009 to 2013.  We received data for all six regions, however data from five of the regions was too inconsistent to analyze.  Three regions did not consistently provide the BOP register number of inmates who received care from FY 2009 to FY 2013.  Without a register number, inmate age could not be determined.  One region did not consistently report data from medical centers, and the other region did not report data until FY 2012, with the most consistent data in FY 2013.  The data we received was also incomplete until FY 2012 and could not be analyzed for trends.  Therefore, we isolated one region to determine the impact of catastrophic cases on the BOP's medical obligations and there was no margin for comparison.

Using the BOP register number provided in each inmate's catastrophic case and the population snapshots provided by the BOP, we determined each inmate's age.  If age was not available in the snapshot, we used the register number to search for the inmate in the BOP's inmate locator and calculated age depending on the fiscal year during which the inmate received care.[80] Once inmates were categorized by age, we grouped the data in 5-year age increments (under 24, 25–29, . . . 80+), and then into the two broader categories "under 50" and "50 and above."  Using these categories, we calculated the costs of catastrophic cases for each fiscal year.

*Total Costs and Average Cost by Age Cohort*

The BOP provided snapshots of its populations near the end of each fiscal year from 2009 to 2013:  FY 2009 – September 28, 2009; FY 2010 – September 25, 2010; FY 2011 – September 23, 2011; FY 2012 – September 28, 2012; and FY 2013 – September 28, 2013.  The population for each fiscal year represents the number of inmates incarcerated at the time of the snapshot dates.  The snapshots included an inmate's register number, name, age, sex, date of birth, citizenship, nature of offense, criminal history points, sentence start date, sentence length, pre-release date, security level, institution location, institution start date, public safety variables, and management variables.[81]  The BOP also provided daily and annual costs for each security classification for each fiscal year.  The

---

[80]  The BOP's Inmate Locator can be found here:  http://www.bop.gov/inmateloc/.

[81]  When we discuss inmates with no criminal history in the Background section of this report, we are referring to inmates who have zero criminal history points.

documents provided the average cost of an inmate at each security classification, which we used to calculate our cost estimates.

Since the snapshots represented the population only as of that date, it did not include inmates who were either released prior to or incarcerated after the snapshot date. For example, the FY 2010 snapshot would not have included an inmate who was released prior to September 25, 2010, or an inmate who had entered the BOP after September 25, 2010. To improve our estimates by including those who had served before and after the snapshot dates, we combined inmates from the snapshots of other fiscal years into the snapshot we were analyzing. For example, for FY 2010, we used the prior fiscal year snapshot (FY 2009) to add all inmates released prior to September 25, 2010, into our FY 2010 estimates. Also, we used the preceding fiscal year snapshot (FY 2011) to include inmates with a sentence start date after September 25, 2010, but before October 1, 2010, for our FY 2010 estimates. We included both of these additions to include all inmates who served at least portion of their sentence in FY 2010 but were not included in the original FY 2010 snapshot. All duplicates in a snapshot were deleted. However, since we did not request snapshots from FY 2008 and FY 2014, we could not include inmates who may have been incarcerated prior to or after the snapshots for FY 2009 and FY 2013.

To determine the total cost and average cost based on age and institution security classification, we used the eight per capita cost categories reported by the BOP each year: high, medium, low, minimum, administrative, complex, detention center, and medical center. Each inmate was assigned the cost category for the institution where he or she was incarcerated at the time of the snapshot. Further, we designated minimum-security inmates incarcerated in the minimum security camps attached to standalone institutions (not part of a complex) as minimum security. We then calculated the number of days served for each inmate within each fiscal year using the institution start date and the last day of the fiscal year. If an inmate is projected to be released prior to the end of the fiscal year, we used the projected release date instead. Because a small percentage (less than 2 percent) did not include an institution start date but were designated to an institution, we used the sentence start date as a substitute. We multiplied the number of days served for each inmate by the average daily cost based on security classifications provided by the BOP to find the cost of each inmate.

To calculate average cost by age, we grouped inmates based on age cohorts: under 24, 25–29, 30–34 . . . 75–79, and 80 and older. We then added the cost for each inmate within each age cohort to find the total cost. We divided the total cost in each age cohort by the total number of inmates in each age cohort to find the average cost. We followed similar procedures to find total and average cost at each security classification.

*Recidivism of Aging Inmates*

We received data from the FBI of all 36,682 federal inmates age 50 and older released from BOP institutions from FY 2006 through FY 2010.  The data included any reported arrest from any jurisdiction until the end of FY 2013.  From the 36,682 inmates in the data set, we chose a random sample of 381 inmates.  The sample size was selected by using a confidence level of 95 percent and a margin of error of 5 percent.  For each inmate in our sample, we reviewed the criminal history and considered a recidivist any inmate who was re-arrested for a new crime within 3 years after release.  We separately counted the number of these inmates who were re-arrested for a probation or parole violation.

For inmates re-arrested for a new crime, we categorized their re-arrest offense based on the description provided in the criminal history.  With the exception of the violent offense category, we used the offense categories in SENTRY.  Our violent offense category includes offenses that fit under the BOP's homicide/aggravated assault category, as well as offenses like simple assault, battery, robbery, and corporal injury due to the use of force on a victim.

## Interviews

We conducted 169 interviews during this review.  We interviewed Central Office officials, including the Assistant Directors responsible for eight Central Office Divisions; the Director of the Office of Research and Evaluation; a Senior Counsel in the Office of General Counsel; five staff responsible for overseeing construction and maintenance of BOP institutions; seven staff responsible for the BOP budget; the Chief of the Designation and Sentence Computation Center; a Medical Designator in the Office of Medical Designations and Transportation; and a Deputy Chief in the Industries, Education, and Vocational Training Division.[82]

We visited eight institutions in person, and another five via video teleconference, for a total of 13 institutions.  During those visits, we interviewed 10 Wardens, 5 Associate Wardens, 7 Health Services Administrators, 4 Assistant Health Services Administrators, 4 Clinical Directors, 1 Director of Nursing, 1 Chief of Psychology, 1 Chief Social Worker, 6 Social Workers, 7 Supervisors of Education, 2 Assistant Supervisors of Education, 1 Reentry Affairs Coordinator, 4 Case Management Coordinators, 1 Deputy Case Management Coordinator, 5 Unit Managers, 23 Case

---

[82]  We interviewed the Assistant Directors of the Administration; Human Resource Management; Health Services; Information, Policy, and Public Affairs; Reentry Services; Correctional Programs; and Industries, Education and Vocational Training Divisions, as well as the General Counsel.  We did not interview the Assistant Director of the Program Review Division or the Acting Assistant Director of the National Institute of Corrections.

Managers, and 23 Counselors.  We also interviewed 6 inmates per institution at the 8 institutions we visited in person, totaling 48 inmates.

**Site Visits**

The team conducted site visits to eight institutions:  Federal Correctional Institution (FCI) Butner Low, FCI Butner Medium I and Camp, Federal Medical Center (FMC) Butner, United States Penitentiary (USP) Hazelton, FCI Morgantown, FCI Cumberland, Federal Detention Center (FDC) Philadelphia, and Metropolitan Correctional Center (MCC) New York.  We selected the Butner institutions because they had the highest percentage of aging inmates in the BOP.  We selected USP Hazelton, FCI Morgantown, and FCI Cumberland because the institutions follow the same growing aging inmate trend and to interview officials, staff, and inmates at every security level.  Last, the team visited two detention centers, FDC Philadelphia and MCC New York, to assess the effects the aging inmate trend has on the BOP's detention centers.

*Inmate Interview Selection*

During our site visits, the team interviewed inmates who were randomly selected based only on our definition of aging inmates as age 50 and older.  The BOP provided a snapshot of all inmates age 50 and older at the end of FY 2013, which the team used to randomly select inmates.  If an inmate was not available at the time of the interview, the team substituted a different inmate from a backup list that was also randomly selected.

*Video Teleconferences*

The team conducted video teleconferencing with five institutions: FCI Fort Worth, FMC Lexington, FMC Carswell, Federal Correctional Complex Forrest City, and FCI Seagoville.  We selected these five institutions because they had a combination of a high number and a high percentage of aging inmates in their populations, excluding FCI Butner Low and FMC Butner, in FY 2013.

## APPENDIX 2:  THE BOP'S RESPONSE TO THE DRAFT REPORT



**U.S. Department of Justice**

Federal Bureau of Prisons

_____

*Office of the Director*                           *Washington, DC 20534*

April 27, 2015

MEMORANDUM FOR NINA S. PELLETIER
                ASSISTANT INSPECTOR GENERAL
                EVALUATION AND INSPECTION

FROM:        Charles E. Samuels, Jr.
             Director
             Federal Bureau of Prisons

SUBJECT:     Response to the Office of Inspector General's (OIG)
             Draft Audit Report:  Review of the Impact of an Aging
             Inmate Population on the Federal Bureau of Prisons,
             Assignment Number A-2013-008

The Bureau of Prisons (Bureau) appreciates the opportunity to respond
to the open recommendations from the draft report entitled, Review
of the Impact of an Aging Inmate Population on the Federal Bureau
of Prisons.

Please find the Bureau's response to the recommendations below:

**Recommendation #1:**  Develop national guidelines for the
availability and purpose of inmate companion programs.

**Initial Response:**  The Bureau agrees with the recommendation and
will establish national inmate companion guidelines.

**Recommendation #2:**  Consider the feasibility of placing additional
Social Workers in more institutions, particularly those with larger
populations of aging inmates.

**Initial Response:**  The Bureau agrees with the recommendation and has requested funding and will initiate the action once funding is received.  We request this recommendation be closed.

**Recommendation #3:**  Provide all staff training to identify signs of aging and assist in communicating with aging inmates.

**Initial Response:**  The Bureau agrees with the recommendation.  The Bureau's Learning and Career Development Branch will work with the Health Services Division to develop curriculum to teach employees to identify signs of aging and assist in communicating with aging inmates.

**Recommendation #4:**  Reexamine the accessibility and the physical infrastructure of all of its institutions to accommodate the large number of aging inmates with mobility needs.

**Initial Response:**  The Bureau agrees with the recommendation to examine the accessibility and physical infrastructure of its institutions to gather baseline information to help inform the goals of the multi division task force as discussed below in the Bureau's response to recommendation #5.  The Bureau will survey all institutions to gather information on current accessibility such as: the numbers of handicap accessible cells, showers, toilets, and other infrastructure issues affecting inmates with mobility needs.

**Recommendation #5:**  Study the feasibility of creating units, institutions, or other structures specifically for aging inmates in those institutions with high concentrations of aging inmates.

**Initial Response:**  The Bureau agrees with the recommendation.  The Bureau will create a multi-division task force to study the feasibility of creating units specifically for aging inmates in those institutions with high concentrations of aging inmates.

**Recommendation #6:**  Systematically identify programming needs of aging inmates and develop programs and activities to meet those needs.

**Initial Response:**  The Bureau agrees with the recommendation and will identify programming needs of aging inmates and develop programs and activities to meet those needs.  As program needs are identified and new programs developed, these programs will be incorporated into the Bureau's Inmate Model Programs Catalog or national policy.

2

**Recommendation #7:**  Develop sections in release preparation courses that address the post-incarceration medical care and retirement needs of aging inmates.

**Initial Response:**  The Bureau agrees with the recommendation.  The Bureau will identify and develop programs which will assist aging inmates as they transition back to the community.

**Recommendation #8:**  Consider revising its compassionate release policy to facilitate the release of appropriate aging inmates, including by lowering the age requirement and eliminating the minimum 10 years served requirement.

**Initial Response:**  The Bureau agrees that the criteria concerning elderly offenders should be further considered and evaluated before any final determinations are made.  The Bureau intends to raise the issue with relevant stakeholders for further discussion, and in relation to any future updates made to the relevant policy statement.  As the recommendation only calls for the consideration of new criteria (rather than the adoption of new standards), we request this recommendation be closed.

If you have any questions regarding this response, please contact Sara M. Revell, Assistant Director, Program Review Division, at (202) 353-2302.

3

## APPENDIX 3:  OIG ANALYSIS OF THE BOP'S RESPONSE

The Office of the Inspector General (OIG) provided a draft of this report to the Federal Bureau of Prisons (BOP) for comment.  The BOP's response is included in Appendix 2.  The OIG analysis of the BOP's response and actions necessary to close the recommendations are discussed below.

**Recommendation 1:**  Develop national guidelines for the availability and purpose of inmate companion programs.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with the recommendation, stating that it will develop national inmate companion guidelines.

**OIG Analysis:**  The BOP's actions are responsive to the recommendation.  Please provide a copy of the national inmate companion guidelines, including guidance describing how inmate companions will be selected, trained, paid, and overseen by institution staff, by July 31, 2015.

**Recommendation 2:**  Consider the feasibility of placing additional Social Workers in more institutions, particularly those with larger populations of aging inmates.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with the recommendation, stating that it had requested additional funding and would initiate further action upon receipt of that funding.

**OIG Analysis:**  The BOP's actions are responsive to the recommendation.  Please provide information about the number of Social Workers to be hired, their institution placement, and information about how the BOP factored the aging inmate population into its decisions about which institutions should receive additional Social Workers, by July 31, 2015.

**Recommendation 3:**  Provide all staff training to identify signs of aging and assist in communicating with aging inmates.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with the recommendation, stating that the Health Services Division and the Learning and Career Development Branch would jointly develop a training curriculum to teach employees to identify signs of aging and assist in communicating with aging inmates.

**OIG Analysis:**  The BOP's actions are responsive to the recommendation.  Please provide a copy of the training materials provided to BOP staff and a description of how training was implemented by July 31, 2015.

**Recommendation 4:**  Reexamine the accessibility and the physical infrastructure of all of its institutions to accommodate the large number of aging inmates with mobility needs.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with the recommendation, stating that it would survey all institutions to gather information on current accessibility, such as the number of handicapped-accessible cells, showers, toilets, and other infrastructure issues affecting inmates with mobility needs. The BOP further stated that it will use the baseline information gathered in the survey to inform the goals of a multi-division task force that will study the feasibility of creating units for aging inmates (see the BOP's response to Recommendation 5).

**OIG Analysis:**  The BOP's actions are responsive to the recommendation.  Please provide the results of the BOP's study, to include its assessment of the accessibility of lower bunks, external infrastructure, and handicapped-accessible cells, showers, and toilets, by July 31, 2015.

**Recommendation 5:**  Study the feasibility of creating units, institutions, or other structures specifically for aging inmates in those institutions with high concentrations of aging inmates.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with the recommendation, stating that it would create a multi-division task force to study the feasibility of creating units specifically for aging inmates in those institutions with high concentrations of aging inmates.

**OIG Analysis:**  The BOP's actions are responsive to the recommendation.  Please provide meeting minutes and the results of the task force's deliberation, including the institutions that the task force studied, by July 31, 2015.

**Recommendation 6:**  Systematically identify programming needs of aging inmates and develop programs and activities to meet those needs.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with the recommendation, stating that it would identify programming needs of aging inmates, develop

programs and activities to meet those needs, and incorporate those programs into the BOP's Inmate Model Programs Catalog or national policy.

**OIG Analysis:** The BOP's actions are responsive to the recommendation. Please describe the programming needs identified and provide copies of program curricula and activities developed in response to those needs, as well as copies of any national policies updated as a result, by July 31, 2015.

**Recommendation 7:** Develop sections in release preparation courses that address the post-incarceration medical care and retirement needs of aging inmates.

**Status:** Resolved.

**BOP Response:** The BOP concurred with the recommendation, stating that it would identify and develop programs to assist aging inmates in transitioning back into the community.

**OIG Analysis:** The BOP's actions are responsive to the recommendation. As noted in the report, the BOP's current release preparation does not address the needs of aging inmates who are retired or not seeking employment upon release. Further, aging inmates' increased medical needs makes continuity of medical care upon release a pressing concern. Please provide copies of program curricula developed to address aging inmates' release needs, specifically including programs for inmates not reentering the workforce and addressing continuity of medical care, by July 31, 2015.

**Recommendation 8:** Consider revising its compassionate release policy to facilitate the release of appropriate aging inmates, including by lowering the age requirement and eliminating the minimum 10 years served requirement.

**Status:** Resolved.

**BOP Response:** The BOP concurred with the recommendation, stating that the criteria concerning aging inmates should be further evaluated. The BOP stated that it plans to raise the issue with relevant stakeholders for further discussion and in relation to future policy updates.

**OIG Analysis:** The BOP's actions are partially responsive to the recommendation. As noted in the report, the existing provisions for aging inmates are ineffective in part because the minimum age provision restricts eligibility to only a small portion of the aging inmate population and the minimum time served provisions restrict eligibility even further. Please provide minutes of meetings between the BOP and other relevant stakeholders to discuss this topic, copies of BOP data or other BOP

information reviewed by the BOP and the other stakeholders in the course of their deliberations, and the results of the deliberations, by July 31, 2015.

*The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations.  Information may be reported to the DOJ OIG's hotline at www.justice.gov/oig/hotline or (800) 869-4499.*



Office of the Inspector General
U.S. Department of Justice
www.justice.gov/oig